LAW OFFICES OF

# DRATEL & MYSLIWIEC, P.C.

A PROFESSIONAL CORPORATION

2 WALL STREET
3rd Floor
NEW YORK, NEW YORK 10005
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
www.dratelmys.com

JOSHUA L. DRATEL                                    STEVEN WRIGHT
AARON MYSLIWIEC                                     *Office Manager*
—                                                   RYAN DUFFEY
ALICE L. FONTIER                                    *Paralegal*
LINDSAY A. LEWIS

January 26, 2012

**BY ECF**

The Honorable John Gleeson
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States v. Kaziu*,
         09 Cr. 660 (JG)

Dear Judge Gleeson:

This letter is submitted on behalf of Betim Kaziu, defendant in the above-entitled action, in connection with his sentencing, which is scheduled for Wednesday, February 1, 2012, at 2 p.m.  For all the reasons set forth below, it is respectfully submitted that Mr. Kaziu should be sentenced to a term of imprisonment significantly below the Sentencing Guidelines range calculated by the Pre-Sentence Report (hereinafter "PSR").[1]

Those reasons include:

(a)     the nature of the sentencing Guidelines for terrorism offenses, which Guidelines automatically apply Draconian enhancements – particularly §3A1.4, with respect to both the offense level and Criminal History Category – that significantly increase the Guidelines range in *every* terrorism-related case, and grossly overstates Mr. Kaziu's criminal record in this case (which is otherwise non-

---

[1]  While this afternoon the Court ordered disclosure of the PSR's recommendation, it has not yet been received.  Because of the length of this submission and the impending sentencing date, this letter is submitted now.  If the recommendation changes anything in this letter in material fashion, counsel will provide a brief supplemental letter in advance of sentencing.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 2 of 42

existent).  Indeed, a life sentence here, or anything in that range, would negate any distinction between Mr. Kaziu's conduct and the most serious terrorism offenses and offenders;

(b)     Mr. Kaziu's offense conduct did not result in any injury or harm to any person or property;

(c)     the four offenses are all inchoate, and represent simply different – but primarily interrelated – statutory means of charging the same course of conduct, and serve to amplify the possible sentence in a manner both disproportionate and unnecessary;

(d)     Mr. Kaziu's age and lack of sophistication substantially reduced his chance of completing the charged offenses, all of which are either conspiracies or attempts;

(e)     the sentences imposed on defendants convicted of either similar or far more serious terrorism-related offenses compel a sentence for Mr. Kaziu significantly below the Guidelines range;

(f)     Mr. Kaziu has endured extended pretrial confinement – 29 months – at the Metropolitan Correctional Center (hereinafter "MCC"), which has been recognized as constituting harsh conditions;  and

(g)     the most recent U.S. Sentencing Commission statistics reveal that the wide majority of sentences in the Eastern District of New York (hereinafter "EDNY") – 68.9% – are *below* the applicable sentencing Guidelines range.

In addition, Mr. Kaziu respectfully requests that the Court recommend he be designated to a facility as close as possible to his family in Brooklyn.

**I.     *The PSR, the Sentencing Guidelines, and the Principles Governing Federal Sentencing Since* United States v. Booker, *543 U.S. 220 (2005)***

The PSR calculates a total offense level of 45 and places Mr. Kaziu in Criminal History Category VI, resulting in a recommended Guidelines range of *life imprisonment*.  PSR at ¶¶ 76 & 79.  However, as detailed below, both the offense level and Criminal History Category – both comprised principally of the 12-point terrorism enhancement pursuant to §3A1.4, which also places a defendant in Criminal History Category VI regardless of his criminal record – prescribe a sentence well in excess of that "sufficient but not greater than necessary" to achieve the

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 3 of 42

purposes of sentencing enumerated in 18 U.S.C. §3553(a)(2).

The PSR also unfortunately provides little if any guidance in navigating and evaluating the relevant considerations under §3553(a), and arriving at a sentence "sufficient but not greater than necessary" to achieve the goals listed in §3553(a)(2). Indeed, last year, in *Pepper v. United States*, ___ U.S. ___, 131 S. Ct. 1229 (2011), the Court *twice* emphasized that a sentencing judge assumes "an overarching duty overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Id.*, at 1242, 1243. *See also United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010) ("[u]nder §3553(a)'s 'parsimony clause,' it is the sentencing court's duty to 'impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth' at 18 U.S.C. § 3553(a)(2)"), *quoting United States v. Samas,* 561 F.3d 108, 110 (2d Cir. 2009).

As the Second Circuit explained in *Dorvee*,

> [e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the §3553(a) sentencing factors. *See* [*United States v.*] *Cavera,* 550 F.3d [180,]189 [(2d Cir. 2008) (*en banc*)].

604 F.3d at 93. *See also Pepper*, ___ U.S. at ___, 131 S. Ct. at 1244-45 (statute – 18 U.S.C. §3742(g)(2) – precluding consideration, at re-sentencing, of post-sentence rehabilitation was invalid because it had the effect of making the Guidelines mandatory in "an entire set of cases").

In that context, the PSR fails in any meaningful manner to account for *United States v. Booker*, 543 U.S. 220 (2005), its progeny, or the sentencing factors identified in §3553(a). Indeed, any mention of §3553(a) in the PSR constitutes merely lip service, and not the qualitative, individualized analysis that post-*Booker* sentencing demands.

Thus, for all practical purposes, the PSR (and its recommendation, to the extent it recommends a Guidelines sentence), remains premised upon analysis of the Guidelines exclusively, and an implicit but unmistakable presumption that the Guidelines, and *only* the Guidelines, prescribe a reasonable sentence. Yet, as the Supreme Court declared in *Nelson v. United States*, 550 U.S. 350 (2009), "[t]he Guidelines are not only *not mandatory* on sentencing

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 4 of 42

courts; they are also not to be *presumed* reasonable." *Id*., at 351 (emphasis in original).[2] *See also Dorvee*, 604 F.3d at 93 ("[i]n conducting this review [of the §3553(a) sentencing factors], a district court needs to be mindful of the fact that it is 'emphatically clear' that the 'Guidelines are guidelines – that is, they are truly advisory'"), *quoting United States v. Cavera,* 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*).

Indeed, in *Pepper*, Justice Sotomayor again hearkened back to *Koon v. United States*, 518 U.S. 81 (1996) – as Justice Stevens had in *Rita v. United States*, 551 U.S. 338, 364 (2007) (Stevens, J., *concurring*) – repeating that

> "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

___ U.S. at ___, 131 S. Ct. at 1239-40, *quoting Koon*, 518 U.S. at 113.

Thus, while sentencing judges must still consider the Guidelines, *see* 18 U.S.C. §3553(a)(4), nothing in the statute provides any reason to treat that calculation as more controlling of the final sentencing decision than any of the other factors a court *must* consider under §3553(a) as a whole. *See United States v. Menyweather*, 431 F.3d 692, 701 (9th Cir. 2005); *United States v. Lake*, 419 F.3d 111, 114 (2d Cir. 2005), *explaining United States v. Crosby*, 397 F.3d 103, 111-13 (2d Cir. 2005).[3]

Moreover, the Supreme Court has been vigilant in ensuring that the Guidelines are genuinely advisory, and not merely a default sentence ratified by appellate courts by rote. For example, in *Nelson*, 550 U.S. at 350, the Court *twice* remanded the Fourth Circuit's decision(s) that affirmed a sentence even though the District Court had stated that while the Guidelines were

---

[2] While the Supreme Court's ruling in *Rita v. United States*, 551 U.S. 338 (2007), established that a within-Guidelines sentence can be presumptively reasonable, *id.* at 347, that presumption is restricted to appellate review and "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Id.* at 351 (*citing United States v. Booker*, 543 U.S. 220, 259-60 (2005)). *See also Nelson*, 550 U.S. at 351.

[3] The Court's experience in sentencing, demonstrated by its scholarly contributions, *see, e.g.*, **post**, at 40-41, render unnecessary and superfluous an extended discussion of the principles that govern federal sentencing post-*Booker*.

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 5 of 42

not mandatory, they enjoyed a presumption of "reasonableness."[4]  *See also Pepper*, ___ U.S. at ___, 131 S. Ct. at 1236-40.

Thus, in *Nelson*, the Court reiterated that "district judges, in considering how the various statutory sentencing factors apply to an individual defendant 'may not presume that the Guidelines range is reasonable.'"  550 U.S. at 351, *quoting Gall*, 552 U.S. at 50; *see also id*. ("[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable").[5]

The broad discretion afforded district courts to determine a sentence also conforms with 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  *See also United States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir. 1990);  *Jones*, 531 F.3d at 172, n. 6.

In fact, in *Pepper*, the Court cited §3661 as an important means of achieving just sentences:  "[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'"  ___ U.S. at ___, 131 S. Ct. at 1240, *quoting Wasman v. United States,* 468 U.S. 559, 564 (1984).[6]

---

[4]  *See* 237 Fed.Appx. 819 (4th Cir. 2007) and 276 Fed.Appx. 331 (4th Cir. 2008).

[5]  Conversely, the Supreme Court has also been active in protecting the district courts' discretion at sentencing, and insulating them from undue interference by appellate courts.  For instance, in *United States v. Thurston*, 544 F.3d 22, 25 (1st Cir. 2008), the First Circuit understood the "clear message that the sentencing decisions of the district courts should generally be respected."   Indeed in that case, the Supreme Court twice remanded for further consideration (in light of first *Booker* and then *Gall*) following the First Circuit's vacating the sentence (twice) for being too lenient, and affirmed the sentence ("given *Gall*'s broader definition of the deference given to district judges' sentencing decisions") – even though the First Circuit maintained its disagreement with the sentence and the district court's rationale for it.  *Id*., at 26.

[6]  Indeed, the Court's opinion in *Pepper* opened with the following statement:

> [t]his Court has long recognized that sentencing judges "exercise a wide discretion" in the types of evidence they may consider when imposing sentence and that "[h]ighly relevant-if not essential-to

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 6 of 42

## II.    *Analysis of the §3553(a) Factors Compels a Sentence Substantially Below Mr. Kaziu's Applicable Sentencing Guidelines Range*

As discussed below, in applying to Mr. Kaziu both §3553(a)'s mandate that a sentence be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in" §3553(a)(2), and the sentencing factors set forth in §3553(a)(1)-(7), it is respectfully submitted that a sentence substantially below the applicable Guidelines range is appropriate.[7]

---

[the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

___ U.S. at ___, 131 S. Ct. at 1235, *quoting Williams v. New York,* 337 U.S. 241, 246-247 (1949).

[7]   The sentencing factors enumerated in §3553(a) are:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    need for the sentence imposed –

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established for –

(A)    the applicable category of offense committed by the

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 7 of 42

In considering those prescribed sentencing factors and identified purposes of sentencing,[8] several aspects of Mr. Kaziu's circumstances are relevant. Either independently or in combination, they amply justify a sentence well below life imprisonment.

A.   *The Terrorism Enhancement Always and Automatically Increases a Defendant's Guidelines Range Regardless of the Nature of His Conduct*

1.   *The Automatic Application of the Guidelines' Terrorism Enhancement Should Be Remedied By Resort to the §3553(a) Sentencing Factors*

The mere applicability of §3A1.4 does not end the analysis or dictate the sentence, as the

---

applicable category of defendant as set forth in the guidelines [. . .];

(5)    any pertinent policy statement [. . .];

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;  and

(7)    the need to provide restitution to any victims of the offense.

[8] Section 3553(a)(2) lists the following purposes of sentencing:

(2)    the need for the sentence imposed –

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner.

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 8 of 42

other §3553(a) sentencing factors, and the parsimony clause,[9] must be considered in counterpoint to the drastic impact of §3A1.4.  In that context, the Second Circuit's decision in *Dorvee*, in which the Court addressed essentially automatic but severe Guidelines enhancements in child pornography cases that placed Guidelines ranges at or near the statutory maximum(s), is particularly pertinent here, too.

In *Dorvee*, addressing enhancements relating to possession of child pornography (§2G2.2), the Circuit noted that "the district court was working with a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what §3553 requires."  616 F.3d at 184.[10]

Similarly, in *Dorvee* the Court noted the high frequency with which §2G2.2's component enhancements applied in child pornography cases ("to the vast majority of defendants sentenced under §2G2.2"), "resulting in a typical total offense level of 35[,]" which in turn led to Guidelines ranges at or beyond the statutory maximum even in routine cases.  616 F.3d at 186.  In the terrorism context, too, the scope of the terrorism enhancement in §3A1.4, as interpreted by the Second Circuit, is so broad that it invariably applies in every terrorism case.  *See, e.g., United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009);  *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010).

The Circuit also explained in *Dorvee* that §2G2.2 is different from most Guidelines in that it is not based on empirical data.  616 F.3d at 186.  Indeed, that was a defect in the crack-cocaine Guidelines at issue in *Kimbrough v. United States*, 552 U.S. 85 (2007).  The same is true with respect to §3A1.4 as well:  it represents merely a point in space chosen arbitrarily, and is not the result of the Sentencing Commission's core function, *i.e.*, assigning Guidelines levels that conform with conclusions based on data compiled from a statistically significant number of

---

[9]  In *Dorvee*, in discussing the "parsimony clause," the Second Circuit reiterated that "[p]lainly, if a district court were explicitly to conclude that two sentences equally served the statutory purpose of §3553, it could not . . . impose the higher."  616 F.3d at 184, *quoting United States v. Ministro-Tapia,* 470 F.3d 137, 142 (2d Cir.2006).

[10]  *See also United States v. Tutty*, 612 F.3d 128, 130-33 (2d Cir. 2010) (applying *Dorvee*);  *United States v. Bonilla*, 618 F.3d 102, at 110 (2d Cir. 2010) (extending *Dorvee* doctrine to the 16-point enhancement related to illegal reentry conviction);  *United States v. Hernandez*, 2010 WL 2522417, at *1 (E.D.N.Y. May 28, 2010) (acknowledging *Dorvee,* but noting that §3553(a) analysis would not alter sentence because defendant received the mandatory minimum term of five years).

.

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 9 of 42

cases.

In *Dorvee*, the Court further examined the extent to which a sentencing court owes deference to the Guidelines when a particular enhancement is not the product of empirical evidence, explaining that the ordinary

> deference to the Guidelines is not absolute or even controlling; rather, like our review of many agency determinations, "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 [] (1944); *see Kimbrough,* 552 U.S. at 109 [] (citing the crack cocaine Guidelines as an example of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role").

616 F.3d at 188.

In evaluating §2G2.2 in *Dorvee*, the Court identified specific problems with such enhancements. For example,

> [a]n ordinary first-time offender is therefore likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction.

616 F.3d at 186.

As a result, the Court in *Dorvee* recognized that under such circumstances

> adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories.

616 F.3d at 187.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 10 of 42

Confronted with that situation in *Dorvee*, the Court concluded that "[t]his result is fundamentally incompatible with § 3553(a)[,]" because "[b]y concentrating all offenders at or near the statutory maximum, §2G2.2 eviscerates the fundamental statutory requirement in §3553(a) that district courts consider 'the nature and circumstances of the offense and the history and characteristics of the defendant[.]'" *Id.*

In language particularly relevant here with respect to Mr. Kaziu, the Court in *Dorvee* added that mechanical application of such Guidelines enhancements

> violates the principle, reinforced in *Gall,* that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct. *See Gall,* 552 U.S. at 55 [] (affirming a sentence where "it is perfectly clear that the District Judge considered the need to avoid unwarranted disparities, but also considered the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated" (emphasis in original)).

*Id.*[11]

Thus, as the Court in *Dorvee* lamented with respect to §2G2.2, "sentencing enhancements cobbled together through this process routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases." 616 F.3d at 186. Yet, as the Court cautioned, "[i]n all events, even a statutory maximum sentence must be analyzed using the §3553(a) factors." 616 F.3d at 184.

Ultimately, the Court in *Dorvee* reminded that

> [d]istrict judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under §2G2.2 –

---

[11]   In *Dorvee*, the Court offered an example of how Guidelines like §2G2.2 create – via automatic substantial enhancements applied across a broad spectrum of a specific offense conduct – unwarranted *similarities* among dissimilar defendants: "[e]ven with no criminal history, this [defendant's] total offense level of 23 would result in a Guidelines sentence of 46 to 57 months. This is the same Guidelines sentence as that for an individual with prior criminal convictions placing him in a criminal history category of II, who has been convicted of an aggravated assault with a firearm that resulted in bodily injury.[]" 616 F.3d at 187 (footnote omitted).

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 11 of 42

ones that can range from non-custodial sentences to the statutory
maximum-bearing in mind that they are dealing with an eccentric
Guideline of highly unusual provenance which, unless carefully
applied, can easily generate unreasonable results.

616 F.3d at 188.

That "broad discretion" exists here as well, even when the specter of terrorism is present.
As the Court concluded in *Dorvee*, "[w]hile we recognize that enforcing federal prohibitions on
child pornography is of the utmost importance, it would be manifestly unjust to let Dorvee's
sentence stand." *Id*. Here, the same is true with respect to applying §3A1.4 to Mr. Kaziu,
notwithstanding the importance of counterterrorism policy and practice.

Here, as in *Dorvee*, "adherence to the Guidelines results in virtually no distinction
between sentences for the most dangerous offenders," and someone like Mr. Kaziu who did not
commit any violent acts and has not committed any offenses in the past. 616 F.3d at 187.
Sentencing Mr. Kaziu within the Guidelines range would result in a sentence that is
"fundamentally incompatible with § 3553(a)." *Id*.

> **2.** ***Increasing Mr. Kaziu's Criminal History Category From
> Category I to Category VI Grossly Overstates His Criminal History***

Notwithstanding application of the enhancement in §3A1.4 to Mr. Kaziu, the Court
should depart downward a significant amount, or impose a non-Guidelines sentence substantially
below the Guidelines range, because the prong of the enhancement that assigns Mr. Kaziu to
Criminal History Category VI, §3A1.4(b), constitutes a gross overstatement of his criminal
history, which otherwise would be Category I (lacking any prior criminal history, and therefore
having zero criminal history points). Also, as discussed below, the enhancement undermines the
structure of the Guidelines, and the role and purpose of the Criminal History Category in
maintaining individualized sentencing determinations.

As a result, the Court should correct the inequity created by §3A1.4(b) with a substantial
"horizontal" downward departure with respect to Mr. Kaziu's Criminal History Category. As the
Guidelines instruct, the Court may depart downward if:

> reliable information indicates that the defendant's criminal history
> category substantially over-represents the seriousness of the
> defendant's criminal history or the likelihood that the defendant
> will commit other crimes[.]

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 12 of 42

USSG § 4A1.3(b)(1).

   In addition, even without a formal departure on that ground, the distortion created by §3A1.4(b) provides further compelling justification for a non-Guidelines sentence, dramatically below the Guidelines range, based on the factors set forth in 18 U.S.C. §3553(a).

   As one District Court has recognized, "[a]fter applying § 3A1.4, Defendant's criminal history is maximized at category VI. For an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside of the conduct for which he is convicted, this clearly over-represents the seriousness of his criminal history." *United States v. Benkahla*, 501 F.Supp.2d 748, 759 (E.D.VA 2007) (granting a departure pursuant to USSG §4A1.3, and reducing the defendant's criminal history category from VI to I) (*affirmed*, 530 F.3d 300 (4th Cir. 2008).

   Encouraging flexibility in addressing the impact of §3A1.4 on a defendant's Criminal History, the Second Circuit has instructed that "[a] judge determining that §3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under §4A1.3 to depart downward in sentencing." *United States v. Meskini*, 319 F. 3d 88, 92 (2d Cir. 2003).

   Moreover, as the Introductory Commentary to Chapter Four of the Sentencing Guidelines (entitled "Criminal History and Criminal Livelihood") states, "[t]he Comprehensive Crime Control Act sets forth four purposes of sentencing. (*See* 18 U.S.C. § 3553(a)(2).) *A defendant's record of past criminal conduct is directly relevant to those purposes*. A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment." (Emphasis added).

   Here, the balance between the offense and the offender has been irremediably disrupted by the PSR's reflexive placement of Mr. Kaziu in Criminal History Category VI. In addition to ignoring the mandate of §3553(a)(1), and overstating Mr. Kaziu's Criminal History score as much as possible under the Guidelines (from zero to the maximum), the enhancement precludes any retention of individualized sentencing of Mr. Kaziu because it effectively removes from advisory Guidelines consideration the only axis that integrates a defendant's background and history into the advisory Guidelines equation.[12]

---

   [12] Justice Breyer, who chaired the Sentencing Commission, recounted the "trade-offs" that were part of the initial Sentencing Commission's compromises in formulating the Guidelines and their framework, including how the Criminal History Category was designed as the sole element that considered *offender* characteristics:

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 13 of 42

The only means of restoring any equilibrium to Mr. Kaziu's sentencing, and complying with the dictates of §3553(a)(1), is by departing downward based on Mr. Kaziu's lack of any prior criminal record, and/or imposing a non-Guidelines sentence grounded in the other §3553(a) sentencing factors listed **ante**, at 6 n.7.

Because the exclusion of consideration of the defendant's background and history in the ordinary advisory Guidelines calculation is typically offset by the Criminal History score, it is respectfully submitted that here the imbalance created by assigning Mr. Kaziu to Criminal History Category VI can be rectified only by a substantial "horizontal" downward departure. *See, e.g., Czernicki v. United States*, 270 F.Supp.2d 391, 393 (S.D.N.Y. 2003) (downward departure granted upon a finding that the Criminal History Category had overstated the defendant's criminal

---

[o]ne important area of such compromise concerns "offender" characteristics. The Commission extensively debated which offender characteristics should make a difference in sentencing; that is, which characteristics were important enough to warrant formal reflection within the Guidelines and which should constitute possible grounds for departure. Some argued in favor of taking past arrest records into account as an aggravating factor, on the ground that they generally were accurate predictors of recidivism. [] Others argued that factors such as age, employment history, and family ties should be treated as mitigating factors. [] [e]ventually, in light of the arguments based in part on considerations of fairness and in part on the uncertainty as to how a sentencing judge would actually account for the aggravating and/or mitigating factors, the Commission decided to write its offender characteristics rules with an eye towards the Parole Commission's previous work in the area.[] As a result, the current offender characteristics rules look primarily to past records of convictions. They examine the frequency, recency, and seriousness of past crimes, as well as age, treating youth as a mitigating factor. The rules do not take formal account of past arrest records or drug use, or the other offender characteristics which Congress suggested that the Commission should, but was not required to, consider.[] In a word, the offender characteristics rules reflect traditional compromise.

*See* Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1 (Fall 1988), at 19-20 (footnotes omitted).

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 14 of 42

history).

In the alternative, the automatic placement of Mr. Kaziu in Category VI should be remedied by a non-Guidelines sentence that accounts for the other §3553(a) factors that greatly outweigh the arbitrary application of the absolute and extreme horizontal Guidelines enhancement applied via §3A1.4(b).  *See also* United States Sentencing Commission March 2006 *Final Report on the Impact of* United States v. Booker *on Federal  Sentencing* , at 78 (excessive Criminal  History Category constitutes one of the four most common reasons post-*Booker* for non-Guidelines sentences imposed below the calculated range).

Accordingly, the effect of the terrorism enhancement, §3A1.4, should be neutralized, both vertically (regarding his offense level) and/or horizontally (regarding his Criminal History Category), through consideration of the §3553(a) factors consistent with the principles and concerns expressed in *Dorvee*.

**B.**      ***The Lack of Harm Caused By Mr. Kaziu's Offenses Is A Factor Contributing to a Sentence Substantially Below the Guidelines Range***

As noted above, among the problems identified by the Second Circuit in *Dorvee* is the manner in which enhancement applied in every instance with respect to a certain offense eliminates distinctions in the nature and severity of offense conduct by different defendants in different cases.  616 F.3d at 186-187.  *See also* **ante**, at 8-11.

Even at the inception of the Guidelines, Justice Breyer, in his capacity as Chair of the Sentencing Commission, assured the legal community that the system was intended to recognize that "particular crimes may be committed in different ways, which in the past have made, and still should make, an important difference in terms of the punishment imposed."  *See* Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. at 9.

Yet, here, the onerous and automatic character of the terrorism enhancement obscures any variance between Mr. Kaziu's offense conduct and that in which harm occurred as a result.  That distinction is a legitimate basis for a lower sentence, even in a case involving terrorism offenses.  For example, in *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), Judge Sack, writing for the majority, concluded that "it was not unreasonable for the district judge to decide that the fact that no injury occurred in the case mitigated the gravity of [a defendant's] offense."  *Id*., at 139 (footnote omitted).

As Judge Sack explained,

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 15 of 42

> [t]he criminal law often punishes the substantive commission of a crime more severely than an attempt to commit the same crime, even when that which separates an attempt from the substantive commission of an offense is not culpability but fortuity. Fortuitous events are not categorically irrelevant to the determination of a just punishment nor is their consideration necessarily inappropriate.

*Id.*, at 139-140.

Elaborating, Judge Sack pointed out that the Supreme Court had recently noted that

> although "[i]t is unusual to impose criminal punishment for the consequences of purely accidental conduct[,] it is not unusual to punish individuals for the unintended consequences of their unlawful acts." *See, e.g., Dean v. United States,* 556 U.S. 568, 129 S.Ct. 1849, 1857-58 (2009); *id.* at 1852 (concluding that a defendant who carried a firearm during and in relation to a bank robbery in violation of 18 U.S.C. § 924(c)(1)(A) is subject to a 10 year mandatory minimum pursuant to 18 U.S.C. §924(c)(1)(A)(iii) because his "firearm [was] discharged" in the course of the robbery, even though "the gun [went] off accidentally," was not pointed at anyone when it discharged, and nobody was hurt).

*Id.*, at 140 (brackets added by opinion in *Stewart*).

Concurring, Judge Calabresi agreed that while grounds propounded by the defendant did not "render the terrorism enhancement inapplicable in determining the relevant Guidelines range," nonetheless "the lack of evidence that any victim was harmed as a result of the charged offense[,] . . . if properly articulated, is, as a procedural matter, within the district court's discretion to consider in its application of the §3553(a) factors." *Id.*, at 153 (Calabresi, J., *concurring*) (footnote omitted).

Judge Calabresi noted he was "more ambivalent about the degree to which absence of harm is a valid ground on which to mitigate a sentence[,]" stating his "general view . . . that while a district court ought to be careful about giving too much weight to a factor like harm that might vary based on events beyond the defendant's control, we should not preclude a district court from giving lack of harm some weight, even for some crimes of terrorism." *Id.*, at 155 (Calabresi, J., *concurring*). *See also id.*, at 139, n. 33 (Judge Sack commenting that "[t]he weight that such a factor can bear in any particular instance, however, is an analytically separate, and

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 16 of 42

substantive, question" from whether lack of harm can be considered).

Examining the issue conceptually, Judge Calabresi pointed out that

> [w]hether it is fair to assign different levels of culpability in
> criminal sentencing to the same criminal conduct based on the
> fortuity of whether harm results has long been a contested question
> in Anglo-American jurisprudence.  *See* H.L.A. HART, THE
> CONCEPT OF LAW 131 (1968) ("Why should the accidental fact
> that an intended harmful outcome has not occurred be ground for
> punishing less a criminal who may be equally dangerous and
> equally wicked?").

*Id*., at 155 (Calabresi, J., *concurring*).

However, turning to the practical, Judge Calabresi recognized that "whatever significance
the consequences of a defendant's actions ought to have, it is an inevitable part of human nature –
and our law – that we as a society *do* give consequences considerable weight when we mete out
punishment and blame."  *Id*.  (footnote omitted).[13]  Judge Calabresi noted that "[t]his is deeply
entrenched in our legal system," adding that "[t]he majority opinion identifies the law of attempts
as one generally accepted instantiation of this tendency, Maj. Op. at 139-140**,** but there are many
others-such as crimes of culpable risk creation, like vehicular homicide."  *Id*.

Regarding the offense at issue in *Stewart*, and here as well, Judge Calabresi reasoned that

> while it is true that material support to terrorism is a complete
> crime rather than an inchoate one, and so fully punishable even if
> no further harm results, it simply does not follow that the amount
> of punishment may not at least in part depend on the harm that
> occurred.  The level of punishment for a completed crime varies all

---

[13]  The footnote cited the following sources:  Sanford H. Kadish, *The Criminal Law and
the Luck of the Draw,* 84 J. CRIM. L & CRIMINOLOGY 679, 688 (1994) ("While in principle
it's difficult to find good reasons for making desert turn on chance, here's the rub:  most of us do
in fact make judgments precisely of this kind");  *see generally* PAUL H. ROBINSON & JOHN
DARLEY, JUSTICE, LIABILITY AND BLAME: COMMUNITY VIEWS AND THE
CRIMINAL LAW (1995) (presenting studies suggesting public judgments about criminal
culpability turn significantly on the level of harm that results from an action).

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 17 of 42

the time based on the amount of harm that has occurred, and the
Guidelines themselves often directly embrace such a policy.

*Id.* (footnote omitted).[14]

In answer to Judge Walker's dissent that "suggests terrorism is different[,]" Judge
Calabresi responded that

> [e]ven if the Guidelines do not themselves make lack of harm
> relevant for the application of the terrorism enhancement – and
> they fail to do so only in the narrow sense that the enhancement
> does not positively reflect the existence of injury – the Supreme
> Court has made clear that a district court, which has "greater
> familiarity with [ ] the individual case and the individual
> defendant," may properly decide that sentencing judgments made
> by the Guidelines fail properly to reflect the § 3553(a)
> considerations. *See Rita v. United States,* 551 U.S. 338, 351
> (2007).

*Id.*, at 156 (Calabresi, J., *concurring*).

In addition, Judge Calabresi pointed out that "it is not at all unprecedented for a district
court to consider lack of harm relevant to sentencing in a terrorism case." *Id.*, at 156, n.6.  As
Judge Calabresi continued, "[i]ndeed, in a case that Judge Walker cites, the Eleventh Circuit
affirmed a district court decision that did just that." *Id.*, *citing United States v. Garey,* 546 F.3d
1359, 1363-64 (11th Cir.2008) (per curiam).  As Judge Calabresi recounted, in *Garey,* "the
district court found that the terrorism enhancement applied, but then granted a downward
variance based in part on the fact that the defendant had not carried out any violent acts at the
time of his apprehension." *Id.*  (Calabresi, J., *concurring*), *citing United States v. Garey,* 383
F.Supp.2d 1374, 1379 (M.D.Ga.2005) ("It is . . . troubling that another defendant who carried out
a threat to bomb public facilities, injuring and maiming (but not killing) thousands of people,
would face the same sentence as this Defendant who did not cause physical injury to a single
person").

---

[14]   Judge Calabresi acknowledged that Judge Walker, in partial dissent, "identifies several
[Guidelines] examples in his opinion, though he reaches a different conclusion about their
import." 590 F.3d at 155, n.5 (Calabresi, J., *concurring*), *citing id.*, at 175, n.11 (Walker, J.,
*dissenting in part*).

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 18 of 42

Moreover, "[i]n upholding the defendant's sentence as not unreasonable, the Eleventh Circuit specifically noted that the district court had already considered the defendant's arguments about the lack of actual harm and, on the basis of the §3553(a) factors, imposed a reasonable sentence below the advisory Guidelines range." *Id*. (Calabresi, J., *concurring*), *citing Garey,* 546 F.3d at 1364.

Expanding the analytical framework, Judge Calabresi cautioned that,

> [w]hat is more, the Court has evidenced profound skepticism toward arguments that certain policy judgments, which require departing from the Guidelines, have implicitly been taken off the table as a result of congressional silence or inaction. *See Kimbrough v. United States,* 552 U.S.85, 102-106 (2007).

590 F.3d at 156-57 (Calabresi, J., *concurring*).

Again citing *Kimbrough*, Judge Calabresi commented that "[a]s the Court [in *Kimbrough*] explained, it is usually inappropriate to draw inferences from congressional silence on sentencing practices because Congress has shown that, when it wants to, it knows how to direct levels of sentencing in express terms." 590 F.3d at 156 (Calabresi, J., *concurring*), *citing Kimbrough*, 552 U.S. at 103 (citing 28 U.S.C. § 994(h), which required Sentencing Commission to set Guidelines sentences for recidivist offenders at or near the statutory maximum).

Thus, as Judge Calabresi concluded,

> the fact that Congress increased the statutory maximum in 2001 for material support convictions that caused death, *see* Op. of J. Walker at 175**,** and did so without saying anything whatever about how a district court may treat harm when issuing a sentence that is less than the applicable maximum, cannot be read to diminish the discretion the district court otherwise has under § 3553(a).

*Id*.  (footnote omitted).

"Indeed," Judge Calabresi continued, "that Congress saw fit to increase the maximum sentence for material support based solely on whether death results can easily be understood to suggest that Congress thought amount of harm *does* matter in this context, even if, at times, that harm is largely fortuitous." *Id*., at 157, n. 7 (emphasis in original).

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 19 of 42

Drawing on the Circuit's *en banc* reminder that "sentencing discretion is like an elevator in that it must run in both directions[,]" *United States v. Cavera*, 550 F.3d 180, 194 (2010) (*en banc*), in *Stewart* Judge Calabresi determined that, in the context of evaluating the impact of harm, or lack thereof, on sentencing in terrorism cases,

> [t]o concede, as I think we must, that when hundreds of people are injured or killed rather than just one a district court may take the amount of harm into account and impose a higher sentence, but then to deny the court that same discretion to reach a lower sentence when, through fortuity, no harm results, would manifestly contravene that principle [set forth in *Cavera*].

*Id.*, at 157, n. 8 (Calabresi, J., *concurring*).

Indeed, unwarranted *uniformity* is just as antithetical to a just and individualized sentencing system as is the unwarranted disparity condemned in 18 U.S.C. §3553(a)(6). *See, e.g., Kimbrough*, 552 U.S. at 88 (noting that its opinion in *Booker*, 543 U.S. at 263, "recognized that some departures from uniformity were a necessary cost of the remedy [] adopted"). *See also* Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines*, 40 AM. CRIM. L. REV. 19, 20-21, 24, 83 (2003) (appellate courts have enforced the Sentencing Guidelines more rigidly than expected or required, creating "'unwarranted uniformity,' which is really just another type of unwarranted disparity").

Proportionality, and/or gradation of sentences, accomplishes several objectives without compromising any of the statutory purposes of sentencing (incapacitation, punishment, deterrence, and rehabilitation):[15]  (1)  achieving individualized sentencing that matches the punishment to the offender as well as the offense;  (2)  recognizing the connection between relative culpability (and responsibility) for criminal conduct and severity of punishment;  (3) matching relative penalty to relative profit from the criminal activity;  and (4)  serving notice upon offenders and the public that once a single serious crime is committed, there are

---

[15]  *See United States v. Shortt*, 485 F.3d 283 (4th Cir. 2007).  *See also* §3553(a)(2)(A)-(D); *United States v. Siegel*, 271 Fed. Appx. 115, 118 (2d Cir. 2008) (internal quotations omitted) ("the purposes [of sentencing] to be considered include punishment, deterrence, incapacitation, and the provision of necessary medical care or other correctional treatment");  *United States v. Denardi*, 892 F.2d 269, 276 (3d Cir. 1989) (Becker, J., *separate opinion*) ("the four purposes of sentencing set forth in subsection 3553(a)(2)"are "retribution, deterrence, incapacitation, and rehabilitation").

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 20 of 42

disincentives to commit further crimes (as opposed to the belief that since the maximum sentence will be imposed for the initial offense, there is no advantage to forgoing subsequent crimes because, if committed, they will not generate further punishment).

In that context, the influential 18th Century Italian philosopher and criminologist Cesare Beccaria, whose analysis was praised and quoted with favor by such varied readers as Voltaire, Jeremy Bentham, and John Adams, provided three incontestable reasons why proportionality in punishment represents an essential component of any justice system:

(1)     punishment should be only that severe enough necessary to deter crime, and any penalty in excess of that objective constitutes an abuse of power by the state;

(2)     the lack of any distinction between punishments for crimes of inequal kind or degree creates a dangerous and counterproductive equation:  an offender contemplating two offenses, a greater and a lesser, that are punished alike is presented no disincentive to forego the greater for the lesser.  If the punishments are identical, there is no greater risk in attempting the greater;[16]  and

(3)     the punishment should fit the crime, *i.e.*, those who defraud the public should build public works.

Cesare Beccaria, *On Crimes and Punishments* (1764), translated from the French edition by Edward D. Ingraham (Seven Treasures Publications: Lexington, Kentucky 2009), at 70-71, 97.[17]

---

[16]  *See also* Richard Posner, *An Economic Theory of the Criminal Law*, 85 Colum.L.Rev. 1193 (1985), at 1207 (footnote omitted) (noting, in regard to punishment of different crimes by the same, severe fine[,]" that "[t]his uniformity, however, eliminates marginal deterrence the incentive to substitute less for more serious crimes.[ ]  If robbery is punished as severely as murder, the robber might as well kill his victim to eliminate a witness.  Thus, one cost of making the punishment of a crime more severe is that it reduces the criminal's incentive to substitute that crime for a more serious one.  To put this differently, reducing the penalty for a lesser crime may reduce the incidence of a greater crime.  If it were not for considerations of marginal deterrence, more serious crimes might not always be punishable by more severe penalties than less serious ones").  *See also id.*, at 1206 n. 25 (noting that an increase in the length of prison sentences would not correspond to a commensurate decrease in the crime rate, and that the larger the increase in sentences, the larger the gap in crime reduction).

[17]  Beccaria also postulated that it was *certainty* of punishment, and not its *severity*, that deterred crime.  *Id.*, at 69-70.  *See also* Bernard E. Harcourt, *The Illusion of Free Markets:*

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 21 of 42

*See also United States v. Canova,* 412 F. 3d 331, 351 (2d Cir. 2005) (citing *Booker*, 541 U.S. at 263, for the proposition "that post-*Booker* sentencing contemplates consideration of Guidelines to serve goals of 'avoiding unwarranted sentencing disparities' and 'proportionality'").

Here, the lack of any negative consequences resulting from Mr. Kaziu's offense conduct constitutes a valid and compelling basis for a sentence that distinguishes his conduct from that generating any harm, much less *serious* harm. As the sentences in other terrorism-related cases, discussed **post**, at 25-34, demonstrate, Mr. Kaziu's offense conduct is at the least serious end of the spectrum, and his sentence should reflect that remote placement along the conduct continuum.

C.   ***The Four Offenses Are All Inchoate, and Charge the Same***
     ***Conduct Via Four Different and Mostly Interrelated Statutes***

While Mr. Kaziu has been convicted of four offenses, in fact they represent but one course of conduct charged under four different statutes, three of which are closely interrelated. In addition, all four counts constitute inchoate, uncompleted offenses. For example, Count One charges a *conspiracy* to murder overseas in violation of 18 U.S.C. §956(a). Count Two charges a *conspiracy* to provide material support, in violation of 18 U.S.C. §2339A, to the very same – and very limited in scope and personnel – §956(a) conspiracy charged in Count One. T. 989-92, 1144.[18]

Similarly, Count Three charges the *attempted* provision of material support, in violation of the companion "material support" statute, 18 U.S.C. §2339B, to a Foreign Terrorist Organization, *al Shabaab*, through the same conduct charged in Counts One and Two. Count Four charges a third *conspiracy*, in violation of 18 U.S.C. §924(o), with the object being – again through the same course of conduct charged in the first three counts – to possess a machine gun.

Nor were any of the offenses consummated: (1) the §956(a) conspiracy did not cause any harm or result in any violence; (2) the "material support" in Count Two was entirely abstract in nature (*i.e.*, Mr. Kaziu and a co-conspirator, Sulejmah Hadzovic, supplying themselves as "personnel" to their own Count One conspiracy); (3) neither Mr. Kaziu nor any

_____

*Punishment and the Myth of Natural Order* (Harvard University Press: 2011), at 106.

[18]   "T." refers to the trial transcript.

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 22 of 42

other confederate reached *al Shabaab*;  and (4)  Mr. Kaziu never possessed a machine gun.[19]

As set forth in Mr. Kaziu's Rule 29 motions, at 31-33 (and not repeated herein), in many respects those counts should merge for sentencing purposes.  Indeed, during the charge conference, the Court recognized that Count One was the functional "lesser included" offense of that charged in Count Two.  T. 891.  Thus, the charges merely multiply through available statutes a unitary scheme that never achieved fruition with respect to any of its aims.[20]

The dissent in *United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011), recognized the dangers of such functional multiplicity (even if not technically constituting multiplicity or double jeopardy), and its capacity to amplify punishment inappropriately.  In *Farhane*, the defendant was convicted of conspiracy to provide "services" by agreeing to provide medical support to *al Qaeda*.  He was also convicted of an attempt to provide himself as "personnel" based on that same agreement, which involved swearing an oath of allegiance to *al Qaeda* and providing contact numbers.

As Chief (District) Judge Dearie noted in his spirited dissent:

> by transforming offers to provide services into attempted provision
> of personnel, the majority's holding may sanction multiple
> punishments for a single offense.

*Id.*, at 181-82 (Dearie, C.J., dissenting).

Here, conviction on multiple charges should not affect analysis of Mr. Kaziu's one-dimensional offense conduct, or his ultimate sentence.

---

[19]  Mr. Kaziu's alleged transitory possession of an assault rifle, T. 320, 324;  *see also* GX1003, was in the company of someone who was not a co-conspirator.  *See* T. 1140.

[20]  Of course, nothing in this sentencing submission should be construed as waiving Mr. Kaziu's Rule 29 motions, or his challenge to the sufficiency of the evidence on any of the four counts of conviction.  However, for sentencing purposes, the jury's verdict must be accorded controlling weight.

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 23 of 42

**D.**     ***Mr. Kaziu's Age and Lack of Sophistication Substantially
Reduced His Chance of Completing the Charged Offenses***

Mr. Kaziu had just turned 21 when he and Sulemaj Hadzovic traveled to Egypt in
February 2009.  He had failed all three years of high school.  *See* PSR Addendum, at 1-2.  He had
never had any military or firearms training, or knowledge of or expertise with explosives or other
weapons.  He did not have any contacts in the world of violent *jihad* or terrorism.  He did not
speak any Somali language or dialect, Urdu, or Pashtu, and he began learning Arabic only after
he arrived in Egypt.

He did, however, have a considerable library of *jihadist* videos and audio recordings on
his laptop computer, and his Facebook page certainly featured *jihadist* slogans, images, and
videos.  Yet even under the most generous view of the government's evidence, Mr. Kaziu did
very little to manifest any *jihadist* ideations he may have entertained.  Even assuming his travel
to Egypt was for that purpose (as the jury's verdict requires at the sentencing stage), beyond that
his involvement and commitment were limited almost exclusively to internet viewing and
listening, without the type of active steps in pursuit of joining a *jihadist* group or engaging in
violent or terrorist activity that would have enhanced the chances of such a venture achieving
success.

Mr. Kaziu's fantasy videos – role-playing as drug kingpin or mafia boss – provided a
valuable window on Mr. Kaziu's immaturity, and the fundamental disconnect between his
rhetoric (and, according to the jury's verdict, his criminal intention) and his active, objective
conduct in furtherance of any such goals.  Accordingly, it is respectfully submitted that based on
the evidence, as well as Mr. Kaziu's age, background, education, and character, his utter lack of
sophistication and concerted effort substantially reduced his chances of completing the charged
offenses, and that his sentence should reflect that practical reality.

**E.**     ***The Sentences Imposed In Other Terrorism-Related Cases Involving Similar
or Far More Serious Criminal Conduct Mandate a Sentence for Mr. Kaziu
Significantly Below the Applicable Guidelines Range In Order to Avoid
Unwarranted Disparities Among Defendants In Accordance With §3553(a)(6)***

In sentencing a defendant the Court is required to consider "the need to avoid
unwarranted sentence disparities among defendants with similar records who have been found
guilty of similar conduct."  18 U.S.C. §3553(a)(6).  In that context, a Guidelines sentence for Mr.
Kaziu would be grossly disproportionate in light of the sentences imposed on others, as
demonstrated by a comprehensive canvass of sentences imposed on defendants convicted of – in
some instances similar, and in other instances far more serious – terrorism-related offense

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 24 of 42

conduct.

As set forth below, when compared with the facts of those other cases and the sentences imposed therein, Mr. Kaziu's offense conduct is either (1) far less serious and extensive than that in many terrorism-related cases in which the sentences have been life imprisonment or, in many such cases, far *less* than life imprisonment; or (2) commensurate with many offenders in terrorism cases in which the sentences have been substantially less than life imprisonment. For example, there are a number of cases in which defendants have been convicted of *substantive* offenses that involved violence and plots to harm U.S. nationals, or completed conspiracies that involved violence, but did *not* receive life sentences.

Perhaps most illustratively, even persons convicted in the Guantanamo Bay military commissions – described by Secretary of Defense Donald Rumsfeld as "the worst of the worst" – received sentences dramatically below that which the Guidelines prescribe for Mr. Kaziu. Salim Hamdan, the driver for Osama bin Laden in Afghanistan, was sentenced to time served (the approximately five years he had already served). David Hicks, who pleaded guilty to material support to *al Qaeda* in Afghanistan following the September 11, 2001, attacks, received a seven-year sentence (which amounted to an additional seven months served in Australia upon his release after five years at Guantanamo Bay). Another Guantanamo detainee convicted in the military commissions, Omar Khadr, a Canadian, pleaded guilty to killing a U.S. service member, and was sentenced to eight years' imprisonment, with the prospect of transfer to Canada after a year.

A Guidelines sentence for Mr. Kaziu would also be extreme in relation to the sentence imposed by the Scottish court upon the defendant convicted in the Lockerbie bombing of Pan Am flight 103, which resulted in 270 deaths. While sentenced to life imprisonment, Abdelbaset Ali Mohmed al-Megrahi was eligible for parole after 20 years by order of the Scottish court (and was released in 2009, well before that date).

The Scottish court noted that it ameliorated the minimum term because of Mr. al-Megrahi's age (49) and the fact that the Scottish prison in which he was to be confined was unfamiliar to him. *See The New York Times*, "Libyan Convicted By Scottish Court In '88 Pan Am Blast," February 1, 2001 (a copy of which is annexed as Exhibit 1). Here, Mr. Kaziu's conditions of confinement (*see* **post**, at 36-38), militate strongly in Mr. Kaziu's favor as well.[21]

---

[21]   Two other relatively recent releases merit mention, and demonstrate the relative, and inappropriate, severity of a Guidelines sentence for Mr. Kaziu:

.             •      Black September terrorist Khalid Al-Jawary, convicted of placing three

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 25 of 42

Regarding cases in the U.S. courts, the catalogue demonstrates that a life sentence for Mr. Kaziu would be disproportionate and create an unwarranted sentencing disparity:

- Pete Seda (Pirouz Sedaghaty) – three years for money-laundering and tax evasion related to helping relay $150,000 to Muslim fighters in Chechnya through a charity. *U.S. v. Pirouz Sedaghaty,* 05 Cr. 60008 (D. Ore.);

- Ali Saleh Kahlah Al-Marri – who conspired to provide material support to *al Qaeda* by providing himself as personnel, attending military training camps to learn how to mix poisons, and committing acts in furtherance of a terrorist plot in the United States – pleaded guilty pursuant to a plea agreement that capped his sentence at 15 years. *See* Plea Agreement in *United States v. Al-Marri*, 09 CR 10030 (C.D. Ill.) (annexed hereto as Exhibit 3). Ultimately, he was sentenced to 100 months' imprisonment. *See* Judgment, Dkt. #47;

- Jose Padilla, convicted of "material support" involving training in *al Qaeda* facilities in Afghanistan, and volunteering for violent activity overseas (and initially held as an "enemy combatant" on suspicion of traveling to the U.S. to detonate a "dirty bomb"), was sentenced after trial to 17 years' imprisonment, although that sentence has been vacated, and the matter remanded for re-sentencing. *See United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011). His co-defendants, Kifan Jayyousi and Adham Hassoun, who also proceeded to trial, were sentenced, respectively, to 152 months and 188 months in prison. *Id*.

- Tarik Shah, who pleaded guilty in the Southern District of New York to agreeing to provide martial arts training to *al Qaeda* operatives, received a 15-year

_____

powerful car bombs in New York City in 1973 (two on Fifth Avenue, and one at JFK Airport, to coincide with the visit of Israeli Prime Minister Golda Meir), was deported to Sudan February 26, 2009. He was convicted in 1993. The bombs failed to detonate. *See Black September Terrorist Gets Deported to Sudan*, Wall Street Journal, March 4, 2009 (annexed hereto as Exhibit 2); and

- Also, Fu Kikumura, a member of the Japanese Red Army arrested in 1988 on the New Jersey Turnpike carrying plans for a bombing in New York was released (in April 2009) after serving a 21-year sentence (reduced from 30 years after remand by the Third Circuit). *See United States v. Kikumura*, 918 F.2d 1084 (3d Cir. 1990).

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 26 of 42

sentence;[22]

- Dr. Rafiq Sabir, Mr. Shah's co-defendant, was sentenced to 25 years' imprisonment following his conviction after trial for attempted material support to *al Qaeda* in the form of pledging allegiance (*bayat*) to *al Qaeda* (to an undercover agent posing as an *al Qaeda* operative), and agreeing to provide medical care to anti-U.S. *al Qaeda*-affiliated insurgents in Iraq. *See United States v. Farhane*, 634 F.3d 127, 134 (2d Cir. 2011);

- Uzair Paracha was convicted after trial of material support for terrorism, document fraud, and related charges. *United States v. Paracha*, 2008 WL 2477392 (2d Cir. 2008). The evidence at trial demonstrated a plot in which Mr. Paracha agreed to support *al Qaeda* by helping a member of *al Qaeda*[23] obtain travel documents that would have allowed him to enter the U.S. for purposes of committing terrorist acts against gas stations. Mr. Paracha was sentenced to 30 years' imprisonment;[24]

- Ali Asad Chandia, convicted of providing material support for terrorism for purchasing military equipment and sending it overseas to a terrorist organization, received a sentence of 180 months' imprisonment. *See United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008);

- Javed Iqbal, convicted of providing material support and resources to *Hezbollah*

---

[22] *Bronx Martial Arts Instructor Sentenced to 15 Years in Prison for Conspiring to Provide Material Support to al-Qaeda*, United States District Attorney, Southern District of New York press release, available at <http://nefafoundation.org/miscellaneous/FeaturedDocs/U.S._v_TShah_DOJPR_Sentencing.pdf>.

[23] That person whom Mr. Paracha allegedly assisted, as well as another person allegedly involved in the plot, were among the 14 "High-Value Detainees" held by the United States at secret locations outside the U.S. before being transferred to the U.S. Naval Base at Guantanamo Bay, Cuba, in late 2006.

[24] *Pakistani Man Convicted of Providing Material Support to Al Qaeda Sentenced to 30 Years in Federal Prison*, United States District Attorney, Southern District of New York press release, at 2 (July 20, 2006), available at <http://www.usdoj.gov/usao/nys/pressreleases/July06/parachasentencingpr.pdf>.

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 27 of 42

by broadcasting *al Manar* (*Hezbollah*'s television station) in the U.S., received a sentence of 69 months' imprisonment.  *See* Judgment, *United States v. Javed Iqbal*, 06 Cr. 1054 (RMB) (S.D.N.Y.), Dkt. #111;

- Ehsanul Islam Sadequee, convicted after trial in the Northern District of Georgia, received a sentence of 17 years' imprisonment for making "casing" videos of national landmarks in Washington, D.C., and sending them to *al Qaeda*-associated persons overseas for the purpose of facilitating terrorist attacks on those landmarks.  *See* Judgment, *United States v. Ehsanul Islam Sadequee*, 06 Cr. 147 (N.D. Ga.), Dkt. #622.  His co-defendant, Syed Haris Ahmed, received a sentence of 13 years' imprisonment.  *See* Amended Judgment and Commitment in *United States v. Syed Haris Ahmed*, 06 Cr. 147, Dkt. #651.

- the defendants commonly known as the "Lackawanna Six"[25] were arrested in 2002 for traveling to Afghanistan and training at an *al Qaeda* camp.  The defendants were trained in war tactics, explosives, and weapons.[26]  All six defendants were convicted of providing material support to *al Qaeda*, the sentences ranged from seven years to ten years imprisonment;[27]

- another group, commonly known as the "Portland Seven,"[28] was charged with conspiracy to levy war against the U.S. and material support for terrorism.  The defendants possessed weapons and trained for combat in the United States, then traveled to China with the intention of entering Afghanistan to fight against the U.S..[29]  The sentences for the Portland Seven ranged from seven to eighteen years;

---

[25] Shafal Mosed, Yahya Goba, Sahim Alwan, Mukhtar Al-Bakri, Yasein Taher, and Elbaneh Jaber.

[26] *'Lackawanna Six' Member Says Al Qaeda Ran Afghanistan Camp Linked to Padilla*, Fox News, May 18, 2007, available at http://www.foxnews.com/story/0,2933,273755,00.html.

[27] *Department of Justice Examples of Terrorism Convictions Since Sept. 11, 2001*, available at http://www.usdoj.gov/opa/pr/2006/June/06_crm_389.html.

[28] Maher Hawash, October Martinique Lewis, Habis Abduallah Al-Saoub, Patrice Lamumba Ford, Ahmed Ibrahim Bilal, Muhammed Ibrahim Bilal, and Jeffery Leon Battle.

[29] *3 Members of Terrorist Cell Sentenced,* Los Angeles Times, February 10, 2004, available at <http://articles.latimes.com/2004/feb10/nation/na-portland10>.

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 28 of 42

- Iyman Faris was convicted of material support for terrorism based on his admission that he had traveled to an *al Qaeda* training camp, where he met Osama bin Laden. *United States v. Faris*, 107 Fed.Appx. 308, 311-312 (4th Cir. 2004). While at the training camp, Mr. Faris researched ultralight airplanes, ordered sleeping bags for use by *al Qaeda*, helped obtain extensions on airline tickets for members of *al Qaeda*, and discussed the possibility of destroying the Brooklyn Bridge. *Id.* at 312. Additionally and significantly, Mr. Faris returned to the U.S., traveled to New York City, inspected the Brooklyn Bridge, and relayed his assessment of the feasability of destroying the bridge to members of *al Qaeda*. *Id*. Mr. Faris received a sentence of 20 years imprisonment for his conduct;[30]

- Mohammed al-Moayad and Mohamed Zayed were convicted after trial in the Eastern District of New York for providing material support, in the form of fundraising, to *Hamas*. Mr. al-Moayad was initially sentenced to 75 years' imprisonment, and Mr. Zayed received a sentence of 45 years' imprisonment. After their convictions were vacated, *see United States v. al-Moayad*, 545 F.3d 139 (2d Cir. 2008), and their cases remanded for retrial, they pleaded guilty and were sentenced to time-served (approximately 5½ years at MDC and ADMAX Florence), and deported. The reasons for the resolution were provided in an August 5, 2009, letter from (then) United States Attorney Benton J. Campbell, which included Mr. al-Moayad's "failing health" as a basis. A copy of Mr. Campbell's letter is annexed hereto as Exhibit 4;

- Sayed Mustajab Shah, Ilyas Ali, and Muhammed Abid Afridi were convicted of distributing large quantities of heroin and hashish, and material support for terrorism.[31] The defendants made arrangements to exchange the heroin and hashish for four anti-aircraft "Stinger" missiles.[32] Mr. Afridi and Mr. Ali were both sentenced to 57 months' imprisonment.[33] Mr. Shah received a sentence of

---

[30] *DoJ Examples Since 2001*.

[31] *DoJ Examples Since 2001*.

[32] *U.S. Arrests Seven in Two Drugs-for-Weapons Deals, November 6, 2002*, available at <http://www.usembassy.it/file2002_11/alia/a2110604.htm>.

[33] *DoJ Examples Since 2001*.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 29 of 42

225 months (less than 19 years' imprisonment).[34]  *See also United States v. Naji Antoine Abi Khalil* (E.D. Ark.), Dkt. #13 (60 months' imprisonment);

- Hamid Hayat was convicted after trial for material support to terrorism for having attended a terrorist training camp in Pakistan and then returning to the United States to await orders.[35]  Mr. Hayat was sentenced to 24 years' imprisonment;[36]

- Abdul Tawala Ibn Ali Alishtari pleaded guilty in 2009 to one count of terrorism financing for facilitating the transfer of $152,000 for the purpose of funding a terrorism training camp in Afghanistan and one count of wire fraud conspiracy. He faces a maximum sentence of 20 years in prison on the terrorism financing charge and an additional five years in prison for the wire fraud conspiracy;[37]

- Nuradin Abdi pleaded guilty to conspiracy to provide material support to *al Qaeda* for his plan to travel to Ethiopia for the purpose of obtaining military-style training in radio usage, guns, guerilla warfare and bombs, in preparation for violent jihad.  He was sentenced to ten years in prison;[38]

- Yassin Muhiddin Aref, convicted after trial of offenses including conspiracy to

---

[34]  *Federal Prosecution of Terrorism-Related Offenses:  Conviction and Sentencing Data in Light of the "Soft-Sentence" and "Data-Reliability" Critiques,* Robert M. Chesney, available at <http://www.lclark.edu/org/lclr/objects/LCB_11_4_Art2_Chesney.pdf> (hereinafter "Chesney, *Federal Prosecution*").

[35]  *DoJ Examples Since 2001.*

[36]  *Hamid Hayat Sentenced to 24 Years in Connection With Terrorism Charges*, Department of Justice press release, *available at* http://www.usdoj.gov/opa/pr/2007/September/07_nsd_700.html.

[37]  *See Westchester Man Pleads Guilty to Terrorism Financing and Perpetrating Multimillion-Dollar Investment Fraud*, U.S. DoJ Press Release, available at <http://www.usdoj.gov/usao/nys/pressreleases/September09/alishtariabdultawalaibnalipleapr.pdf>.

[38]  *See Ohio Man Sentenced to Ten Years Imprisonment for Conspiracy to Provide Material Support to Terrorists*, U.S. DoJ Press Release, available at <http://nefafoundation.org/miscellaneous/FeaturedDocs/U.S._v_Abdi_DOJPR_Sent.pdf>.

LAW OFFICES OF
## DRATEL & MYSLIWIEC, P.C.

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 30 of 42

provide material support in connection with an attack with a weapon of mass destruction (a shoulder fired surface to air missile), two substantive acts of material support in connection with an attack involving a weapon of mass destruction, conspiracy to provide material support to a known terrorist organization, two substantive acts of material support to a designated terrorist organization, and one count of lying to the FBI regarding whether he knew the founder of terrorist group Ansar al Islam, was sentenced to 15 years in prison. His co-defendant, Mohammed Mosharref Hossain was also sentenced to 15 years imprisonment;[39]

- Kevin James conspired to levy war against the U.S. government through terrorism, and to oppose the force of authority of the U.S. government. While in a California prison he formed a domestic terrorist group that planned to attack military and Jewish facilities in the Los Angeles area. After pleading guilty he was sentenced to 16 years in prison.[40] His co-defendants Levar Washington and Gregory Patterson, who recruited others into the plot, and took other steps to further the goals of the conspiracy, were sentenced to 22 years and 151 months in prison, respectively;[41]

- Monzer Al Kassar and Moreno Godoy were found guilty after trial of: (1) conspiracy to murder U.S. nationals; (2) conspiracy to murder U.S. officers; (3) conspiracy to acquire and export anti-aircraft missiles; (4) conspiracy to provide material support and resources to a designated foreign terrorist organization; and (5) money laundering. Mr. Al Kassar was sentenced to 30 years in prison for those offenses. His co-defendant Mr. Godoy was sentenced to 25 years in prison

---

[39] *See Albany, New York Man Sentenced to a 15 Year Term in Federal Prison Following His Convictions for Money Laundering, Conspiracy, and Attempting to Provide Material Support and Resources to a Terrorist Organization*, U.S. DoJ Press Release, available at <http://www.nefafoundation.org/miscellaneous/FeaturedDocs/US_v_Aref_DOJPR_Sentencing.pdf>.

[40] *See Man Who Formed Terrorist Group That Plotted Attacks on Military and Jewish Facilities Sentenced to 16 Years in Federal Prison*, U.S. DoJ Press Release, available at <http://www.nefafoundation.org/miscellaneous/FeaturedDocs/US_v_James_dojprsent.pdf>.

[41] *Id.*

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 31 of 42

for his role in the conspiracy;[42]

- British arms dealer Hemant Lakhani, who was convicted of attempting to provide material support for terrorists by selling a shoulder-fired missile with the understanding it would be used to shoot down an American commercial plane, and other charges, was sentenced to 47 years in prison;[43]

- John Walker Lindh, charged with conspiring to murder U.S. nationals and conspiring to provide material support to terrorists, for attending an al-Qaeda training camp, agreeing to conduct operations against the United States and Israel and participating in a violent prison uprising that resulted in the death of a CIA agent, pleaded guilty to supplying services to the Taliban and carrying an explosive during the commission of a felony.  He was sentenced to 20 years in prison;[44]

- Christopher Paul pleaded guilty to conspiring with others to use weapons of mass destruction (explosives) against a U.S. national outside the U.S. and against targets (including popular American tourist destinations) in Europe and the U.S. He was sentenced to 20 years in prison;[45]

- Derrick Shareef, who pleaded guilty to attempting to use a weapon of mass

---

[42] *See International Arms Trafficker Monzer Al Kassar and Associate Sentenced on Terrorism Charges*, U.S. DoJ Press Release, available at <http://www.nefafoundation.org/miscellaneous/FeaturedDocs/US_v_Kassar_dojprsent.pdf>.

[43] *See British Arms Dealer Sentenced to Maximum Sentence – 47 Years – for Attempting to Aid Terrorists, U.S. DoJ Press Release*, available at <http://www.nefafoundation.org/miscellaneous/FeaturedDocs/U.S._v_Lakhani_DOJPR_Sentencing.pdf>.

[44] *See* Sentencing Memorandum of United States District Judge T.S. Ellis, III, available at <http://www.nefafoundation.org/miscellaneous/FeaturedDocs/u.s._v_lindh_sentencingmemo.pdf>.

[45] *See Ohio Man Sentenced to 20 Years for Terrorism Conspiracy to Bomb Targets in Europe and the United States*, U.S. DoJ Press Release, available at <http://www.nefafoundation.org/miscellaneous/FeaturedDocs/US_v_Paul_dojprsent.pdf>.

LAW OFFICES OF
## DRATEL & MYSLIWIEC, P.C.

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 32 of 42

destruction to bomb a shopping mall in Illinois, was sentenced to 35 years imprisonment;[46]

- Mohammed Jabarah pled guilty to a five-count criminal information charging him with, among other things, conspiracy to kill nationals of the United States and conspiracy to use weapons of mass destruction against nationals and property of the United States. While he feigned cooperation with the government, weapons and papers seized from Jabarah during an impromptu search of his prison quarters left little doubt that Jabarah was bent on carrying out a martyrdom mission to murder the "infidel" agents and prosecutors whom he considered responsible for his capture. Among other items, agents found hidden steak knives and ropes, directions on making explosives, and handwritten materials bearing the initials of agents and prosecutors with whom Jabarah met, the context of which strongly suggests that they were being targeted for murder. There were also volumes of writings, drafted while he was in custody, that demonstrated his commitment to waging jihad against infidels, killing his captors, and presumably himself. *See United States v. Jabarah*, 02 Cr. 1560 (BSJ), Dkt. #7 (Government's Sentencing Memorandum);

- Ahmed Omar Abu Ali was found guilty after trial of providing material support and resources to *al Qaeda*, as well as receipt of funds from *al Qaeda*; conspiracy to assassinate the President of the United States; conspiracy to commit air piracy; and conspiracy to destroy aircraft. He received training from members of his *al Qaeda* cell in weapons and explosives, plotted to carry out personally the assassination of the President, and engaged in a conspiracy to hijack and destroy civilian airliners. At his initial sentencing, Mr. Abu Ali was sentenced to 30 years' imprisonment. The government appealed and the Fourth Circuit vacated the sentence and remanded for re-sentencing. Upon re-sentencing, Mr. Abu Ali received a life sentence. *See United States v. Abu Ali*, 528 F.3d 210 (2008).

- Shahawar Matin Siraj was convicted of conspiring to plant explosives at the Herald Square subway station in Manhattan. He received a sentence of 30 years

---

[46] *See Shareef Sentenced to 35 Years for Foiled Plot to Bomb a Shopping Mall During Holiday Season*, U.S. DoJ Press Release, available at <http://www.justice.gov/archive/opa/pr/2008/September/08-nsd-872.html>.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 33 of 42

in prison;[47]

- Fawzi Mustapha Assi pleaded guilty to providing material support to *Hezbollah* and was sentenced to ten years' imprisonment. His offense conduct consisted of boarding a plane to Lebanon with two Boeing global positioning satellite modules, night vision goggles and a thermal imaging camera that he intended to sell to a man who was purchasing the equipment for *Hezbollah*;[48]

- Wesam al-Delaema pleaded guilty to conspiracy to murder Americans overseas, in part by planting roadside bombs targeting U.S. soldiers in Fallujah, Iraq and demonstrating in videos how these explosives would be detonated to destroy vehicles and people. He was sentenced to 25 years imprisonment;[49]

- Ronald Allen Gregula pleaded guilty to attempting to provide material support to *al Qaeda* by negotiating to build and sell an explosive device to terrorist groups targeting Americans in the U.S. He was sentenced to five years in prison;[50]

- several defendants in a plot commonly referred to as "Operation White Terror" were convicted of arrangements to exchange drugs worth $25 million for shoulder fired anti-aircraft missiles, 9,000 assault rifles, nearly 300,000 grenades, and 300

---

[47] *See Shahawar Matin Siraj Sentenced to 30 Years of Imprisonment for Conspiring to Place Explosives at the 24th Street Subway Station in New York*, U.S. DoJ Press Release, available at <http://nefafoundation.org/miscellaneous/FeaturedDocs/U.S._v_Siraj_DOJPRSentencing.pdf>.

[48] *See* Judgment in *United States v. Fawzi Mustapha Assi*, 98-CR-80695-1- GER, available at <http://www.investigativeproject.org/documents/case_docs/798.pdf>. *See also Michigan Man Pleads Guilty to Supporting Hizballah*, U.S. DoJ Press Release, available at <http://nefafoundation.org/miscellaneous/FeaturedDocs/U.S._v_Assi_DOJPR_GuiltyPlea.pdf>.

[49] *See Iraqi-Born Dutch Citizen Sentenced to 25 Years In Prison for Terrorism Conspiracy Against Americans In Iraq*, FBI Press Release, available at <http://www.nefafoundation.org/miscellaneous/FeaturedDocs/US_v_Delaema_fbiprsent.pdf>.

[50] *See Ronald Gregula Sentenced to Prison in Plot to Sell Bomb to Terrorists*, U.S. DoJ Press Release, available at <http://www.nefafoundation.org/miscellaneous/FeaturedDocs/US_v_Grecula_DOJPRSentencing.pdf>.

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 34 of 42

pistols.[51]  The plot was extinguished only after the weapons were delivered, yet only one defendant received a sentence longer than 360 months.  The other defendants received sentences ranging from 168 months to 300 months;[52]

● after conviction in *United States v. Hassan Makki* 03 Cr. 80079 (E.D. Mich.), Dkt. #203, for deliberately raising money (sometimes under false pretenses) for the purpose of financing *violent* terrorist activities overseas, the defendant was sentenced to 57 months' imprisonment.  *See also United States* v. *Mahmoud Youssef Kourani*, 03 Cr. 81030 (E.D. Mich.), Dkt. #45 (54 months' imprisonment);  and

● in *United States v. Cedric Carpenter* and *Lamont Ranson* (S.D. Miss.), a case involving facilitating the illegal entry of terrorists into the U.S. for purposes of committing violent terrorist acts, including obtaining false travel documents, Ranson was sentenced to 29 months' imprisonment and Carpenter (who also pleaded guilty to possessing a firearm at the time of his arrest) was sentenced to 63 months' imprisonment;
.

Even as a whole, the statistics establish that a sentence of life imprisonment well exceeds the average for terrorism-related charges and cases.  The Center on Law and Security at New York University Law School has periodically compiled a "Terrorist Trial Report Card" that catalogs terrorism-related prosecutions and their results.  The three most recent versions, published in 2006, 2010, and 2011, each analyze the data somewhat differently, but provide illuminating figures.  The September 11, 2008, edition of that Terrorist Trial Report Card, based on the sentences imposed on the 370 defendants convicted of terrorism offenses (and sentenced) between September 11, 2001, and September 2008 reported that the average sentence for all defendants convicted of terrorism charges was approximately twelve years and eight months

---

[51]  *Operation 'White Terror' A Tale of Drugs, Guns, and Murder*, Federal Bureau of Investigation press release, November 15, 2006, *available at* <http://www.fbi.gov/page2/nov06/white_terror111506.htm>.

[52]  *Terrorist Trial Report Card: U.S. Edition*, Appendix B at 10, New York University School of Law Center on Law and Security, available at <http://www.lawandsecurity.org/publications/TTRCComplete.pdf> (hereinafter "*Terrorist Trial Report Card 2006*").

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 35 of 42

(12.67 years),[53] and the average sentence for convictions for material support for terrorism were 14.75 years (18 U.S.C. §2339A) and 11.92 years (§2339B).  Even for violations of 18 U.S.C. §2332 (murder of U.S. nationals outside the U.S., a potential capital offense), the average sentence was 26 years.[54]

The 2010 version of the Terrorist Trial Report Card, which covered U.S. federal prosecutions between September 11, 2001, and September 11, 2009, provided slightly different nomenclature: (i)  the "average sentence for persons convicted of terrorism" was 16 years (191.9 months);  (ii)  the "average sentence for persons charged with terrorism" was 19.7 years (236 months);  (iii)  the "average sentence for persons charged with national security violations but not terrorism" was 10.4 years (124.5 months);  and (iv)  the "average sentence for persons convicted of national security violations and not charged with terrorism" was 7.5 years (90.3 months).[55]

The September 2011 edition of the Terrorist Trial Report Card, covering September 11, 2001, through September 11, 2011, again alters the characterization, and provides the following average sentences s graphically (and not in precise numbers):

(i)      for "Terror or National Security Top Charge":  between 10 and 15 years;

(ii)      for "Material Support Top Charge":  also between 10 and 15 years, but less than for "Terror or National Security Top Charge;"

(iii)      for "Material Support Lesser Charge":  slightly less than 15 years;

(iv)      for "National Security Charge Conviction":  slightly more than 15 years;

(v)      for "Terror Charge Conviction":  also slightly more than 15 years, but slightly more than for "National Security Charge Conviction;" and

---

[53]  *Terrorist Trial Report Card, September 11, 2008*, available at <http://www.lawandsecurity.org/Portals/0/documents/03_Sept08TTRCFinal1.pdf>.

[54]  *Id.*

[55]  *Terrorism Trial Report Card, September 11, 2001-September 11, 2009* (published January 2010), at 13, available at <http://www.lawandsecurity.org/Portals/0/documents/01_TTRC2010Final1.pdf>.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 36 of 42

(vi)    for "Terror and National Security Charge Conviction":  25 years.[56]

Also, Mr. Kaziu's offense conduct is essentially indistinguishable from that of Mr. Hadzovic.  However, Mr. Hadzovic pleaded guilty and cooperated.  While a shorter sentence for Mr. Hadzovic can be justified because of his cooperation, that difference in circumstances cannot justify a Guidelines sentence for Mr. Kaziu, and a maximum 15-year sentence for Mr. Hadzovic (who pleaded guilty to one "material support" count under 18 U.S.C. §2339A, carrying a 15-year statutory maximum) – who may well not even receive that severe a sentence.

Whatever the benefits that accrue to a defendant as a result of pleading guilty and/or cooperating with the government, they cannot be responsible for such a vast difference in sentences.  Otherwise, the effect is that Mr. Kaziu would be punished – most severely – for exercising his right to trial.  The disparity is particularly striking as it applies to a first offender like Mr. Kaziu, and cannot account for a manifold distinction, and manifest disparity, in sentences.

These individual examples and collective statistics demonstrate that a sentence of significantly below life imprisonment for Mr. Kaziu in this case is certainly "sufficient, but not greater than necessary," to achieve §3553(a)(2)'s stated goals of sentencing, and would, as required by 18 U.S.C. §3553(a)(6), avoid creating an unwarranted sentencing disparity between Mr. Kaziu and other defendants whose offense conduct was either equivalent or demonstrably worse.

**F.    *Mr. Kaziu Has Spent 29 Months In Pre-Trial Confinement at MCC***

Mr. Kaziu has been in custody since August 27, 2009 – first in Kosovo, upon his arrest, and then, once he was returned to the U.S., at MCC, where the difficult conditions of pretrial confinement have been considered grounds for either a downward departure, or non-Guidelines sentence based on §3553(a)'s sentencing factors.  In addition, the prospect of Mr. Kaziu being placed in a Communications Monitoring Unit upon designation by the Bureau of Prisons further compels accounting for the harsh *future* conditions of confinement in fashioning an appropriate sentence.

The harsh conditions at MCC have been observed by several courts.  *See, e.g., United States v. Behr*, 2006 WL 1586563 (S.D.N.Y. 2006).  *See also Bell v. Wolfish*, 441 U.S. 520 (1979); *United States v. Gallo*, 653 F.Supp. 320, 336 (E.D.N.Y. 1986).  In *Behr*, the court noted

---

[56] *Terrorism Trial Report Card, September 11, 2001-September 11, 2011,* at 7, available at <http://www.lawandsecurity.org/Portals/0/Documents/TTRC%20Ten%20Year%20Issue.pdf>.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 37 of 42

that a judge had recently, "reduced an individual's sentence by one third based upon the harsh conditions in Unit 11-South at MCC[.]" *Behr*, at * 5.  In light of the harsh conditions at MCC, the defendant in *Behr* was sentenced to a non-Guidelines sentence.  *Id.*

Mr. Kaziu has been at MCC nearly 29 months, all of them spent on the very same Unit 11-South at issue in *Behr*.  This prolonged incarceration in harsh conditions warrants a non-guidelines sentence.  Indeed, Judge Feinberg, concurring in *United States v. Melendez-Carrion*, 790 F.2d 1008 (2d Cir. 1986), commented that such lengthy pretrial incarceration is "rendered so harsh by its length that it . . . degenerate[s] into punishment."  790 F.2d at 1008 (Feinberg, J., *concurring*).

Even prior to *Booker*, courts held that pre-sentence confinement conditions could in appropriate cases constitute a permissible basis for a downward departure.  *See United States v. Carty*, 264 F.3d 191 (2d Cir. 2001);  *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir.1997) (harsh conditions of confinement constitute valid ground for departure);  *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996).  *See also United States v. Brinton*, 139 F.3d 718, 725 (9th Cir. 1998);  *United States v. Mateo*, 299 F. Supp.2d 201 (S.D.N.Y. 2004); *United States v. Francis,* 129 F. Supp.2d 612, 616 (S.D.N.Y. 2001), *citing United States v. Sutton*, 973 F. Supp. 488, 491-495 (D.N.J. 1997).

In *Carty*, 264 F.3d at 196, the Second Circuit recognized the validity of downward departures due to the conditions of pre-trial confinement.  In *Carty*, the defendant was held for eight months in a prison in the Dominican Republic before extradition to the United States. 264 F.3d at 193.  In addressing the defendant's claim, the Circuit noted that "[t]he Sentencing Commission has not categorically proscribed consideration of this factor, and we cannot say that conditions of pre-sentence confinement may not be so severe as to take a particular case 'outside the heartland of the applicable Guideline.'" 264 F.3d at 196, *citing and quoting Koon v. United States*, 518 U.S. 81, 109 (1996).  *See also United States v. Pressley*, 345 F.3d 1205 (11th Cir. 2003) (citing *Carty*).  *Cf. United States v. Jayyousi*, 657 F.3d 1085, 1118  (11th Cir. 2011) (endorsing conditions of pretrial confinement as a basis for reducing a sentence below the Guidelines range, but finding the extent of the reduction unreasonable).

As a result, in *Carty* the Circuit held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departure." 364 F.3d at 196.  *See also United States v. Hernandez*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996) (remanding for reasons for downward departure due to "harsher incarceration" due to unavailability of programs).[57]

---

[57] In *Carty*, the Circuit did not decide whether the defendant was entitled to the departure, but instead remanded the matter to the District Court for a factual determination in the

LAW OFFICES OF

**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 38 of 42

Similarly, courts have also granted downward departures based on the severity of anticipated *post*-sentence conditions of incarceration. *See, e.g.*, *United States v. Bruder (Schwarz)*, 103 F. Supp.2d 155 (E.D.N.Y. 2000); *United States v. Volpe*, 79 F. Supp.2d 76 (E.D.N.Y. 1999). *See also United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994) (remand to permit District Court to depart downward because defendant's status as deportable alien increased severity of confinement); *United States v. Lara*, 905 F2d 599 (2d Cir. 1990) (affirming downward departure due to more restrictive confinement as a result of defendant's physical vulnerability).[58]

Here, there exists the distinct possibility that Mr. Kaziu could be designated to serve his sentence at the Communications Management Unit at either FCI Terre Haute or FCI Marion, at which a significant number of persons convicted of terrorism-related offenses are confined. *See, e.g., Facility Holding Terrorism Inmates Limits Communication*, Washington Post, February 5, 2007, available at <http://www.washingtonpost.com/wp-dyn/content/article/2007/02/24/AR2007022401231.html>. Those conditions would be far more onerous than at an ordinary BoP facility, thereby justifying a shorter sentence to account for the enhanced hardship during the sentence itself. *See, e.g.,* Christopher S. Stewart, "'Little Gitmo,'" *New York Magazine*, July 10, 2011, available at <http://nymag.com/news/features/yassin-aref-2011-7/>;  Scott Shane, "Beyond Guantanamo, a Web of Prisons for Terrorism Inmates," *The New York Times*, December 10, 2011, available at <http://www.nytimes.com/2011/12/11/us/beyond-guantanamo-bay-a-web-of-federal-prisons.html ?pagewanted=4&n=Top/Reference/Times%20Topics/Subjects/I/Islam?ref=islam>.

The conditions of confinement to which Mr. Kaziu has been and will be subjected to throughout the term of his sentence constitute an important factor, as their harsh nature makes each day of incarceration for Mr. Kaziu more onerous, and, in effect, constitute more *punishment* than ordinary defendants suffer in ordinary cases.

---

first instance. 364 F.3d at 197.

[58]  The 20-year minimum sentence imposed on the convicted defendant in the Lockerbie bombing case, as discussed **ante**, at 24, was, in effect, a downward departure in part due to the anticipated conditions of confinement, *i.e.*, the difficulty of imprisonment in an unfamiliar environment.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 39 of 42

G.     *Sentencing Commission Statistics Demonstrate That the Large
         Majority of EDNY Sentences Are Below the Applicable Guidelines Range*

The United States Sentencing Commission (hereinafter "the Sentencing Commission")
publishes each quarter an abstract of federal sentencing statistics entitled *U.S. Sentencing
Commission Preliminary Quarterly Data Report* (hereinafter "*Quarterly Data Report*").[59]   The
figures in the most recent version, the *4th Quarter Release, Preliminary Fiscal Year 2011 Data*,
which covers sentences imposed from September 30, 2010 through October 1, 2011, demonstrate
that the Guidelines no longer constitute the predominant factor in the majority of sentences in the
Eastern District of New York (or the Southern District of New York, either).

For example, the *Quarterly Data Report* reveals that within the Second Circuit, the
majority of sentences, 60.6%, were *not* within the calculated Guidelines range.  *See Quarterly
Data Report*, at 2.[60]   The EDNY figures are even more dramatic:  68.9% of sentences were
outside the Guidelines range (along with 67% in the Southern District of New York), ranking
EDNY fourth nationally among districts with the lowest rates of sentences within the Guidelines.
*Id.*[61]   Those numbers represent a continuing trend since *Booker* was decided January 12, 2005:  in
the first quarter of 2005, 70.5% of sentences nationally were within the Guidelines range.  *Id.*, at
12.  That number initially decreased to 61.8% by the first quarter of 2006, then remained
essentially steady (60.7% for first quarter 2007, and 60.0% for first quarter 2008), before
resuming its decline in 2009 and again through fiscal 2010.  *Id.*

In addition, only a minute fraction – 1.6% – of all EDNY sentences were *above* the
Guidelines range, while 67.4% were *below* the range.  In addition, the reasons for sentences

---

[59]   The *Quarterly Data Report* is available at
<http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/Quarterly_Sentencing_
Updates/USSC_2011_4th_Quarter_Report.pdf>.  Prior quarterly data is also available on the
Sentencing Commission's web site, www.ussc.gov.

[60]   Nationally, 54.6% of sentences were *within* the Guidelines range.  *Quarterly Data
Report*, at 2.

[61]   EDNY trails only the Eastern District of Wisconsin, the Southern District of California
(which includes a significant number of "fast track" departures in immigration cases), and the
District of Minnesota.  *See Quarterly Data Report*, at 2-6.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 40 of 42

below the Guidelines have evolved as well.  Currently, in EDNY, only 23.3% of sentences[62] are attributable to government-sponsored motions,[63] while §3553(a) factors, Guidelines downward departures, and/or a combination thereof are responsible for 44.1% (all of which were *below* the Guidelines range).  *Quarterly Data Report*, at 3.[64]  That represents the fourth highest percentage of non-government sponsored below-Guidelines sentences among all districts.[65]  Also, the proportion of §3553(a)-based below-Guidelines sentences relative to government-sponsored below-Guidelines has increased dramatically since *Booker.  Compare*, *U.S. Sentencing Commission Preliminary Quarterly Data Report*, 3rd Quarter Release, Preliminary Fiscal Year 2006 Data, Through July 30, 2006, at 3.

Thus, in EDNY, a sentence *below* the Guidelines range is the *norm*, and *not* the exception.  Even excluding cases involving §5K1.1 (or other government-sponsored) motions, the incidence in SDNY of a below-Guidelines sentence based on §3553(a) factors and/or Guidelines downward departures (44.1%) still exceeds the ratio of within-Guidelines sentences (31.1%) by nearly half.

The Second Circuit and EDNY figures since *Booker* reflect the reality of reflexively long Guidelines sentences.  As this Court has noted, "the federal prison population has exploded under the Guidelines, and the average sentence lengths have increased dramatically."  The Honorable John Gleeson, *The Sentencing Commission and Prosecutorial Discretion:  The Role of the Courts in Policing Sentencing Bargains*, 36 Hofstra L. Rev. 639, 657 (2008).

---

[62]  The percentages are of *all* sentences within the District, as that is how the figures are presented in the *Quarterly Data Report*.

[63]  Of those, 19.8% are the result of motions pursuant to §5K1.1, and the remaining 3.5% are listed merely as "Other Government Sponsored."  *Quarterly Data Report*, at 3.

[64]  The components of below-Guidelines sentences in EDNY (other than government-sponsored) were as follows:  (1) downward departures alone:  3.4%;  (2)  downward departure with §3553(a) factors:  5.2%; (3)  §3553(a) factors alone:  34.3%;  and (4)  "remaining below range" (uncategorized):  1.2%.  *Quarterly Data Report*, at 3.

[65]  The Southern District of New York leads with 51.2%.  In contrast, while only 28.4% of sentences imposed in the Southern District of California were within the Guidelines range, only 10.7% below-Guidelines sentences were attributable to non-government sponsored reasons (with §5K1.3 early disposition departures (so-called "fast track" departures) accounting for 51.9% of the below-Guidelines sentences).  *See Quarterly Data Report*, at 7.

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 41 of 42

     In its article, the Court also pointed out that as a result of certain threshold choices by the Sentencing Commission – harmonizing Guidelines ranges with "onerous minimum sentences," and classifying white collar offenses as meriting imprisonment, *id*., at 658 – "the Guidelines have never achieved their goal of carving out "heartland" sentences, at least not if twenty years of judicial application of them is the measure."  Rather, the Court explained in its article,

> [i]f they had, that is, if the Guidelines range were truly the heartland in each case, you would expect over the years there would have been a roughly equal number of departures upward as there were downward.  Aggravating circumstances appear just as frequently as mitigating ones.  But in the history of the Guidelines, downward departures have consistently dwarfed upward ones.

*Id*., at 659.

     Answering its own question, "Why?" the Court replied,

> [b]ecause the ranges have always been too high – severe enough to accommodate virtually all aggravated sentences, but too severe to accommodate large numbers of mitigated ones.  In short, the Commission may consider the Guidelines to stake out "heartland" sentences, but the judiciary, which uses them, never has.

*Id*.

     Thus, any support for a Guidelines sentence for Mr. Kaziu in this case not only ignores all §3553(a) factors other than the Guidelines, but also defies empirical reality in this district and in this Circuit.  As a result, the Guidelines simply no longer reflect a sentence "sufficient but not greater than necessary," and Mr. Kaziu's situation presents a paradigmatic example why they do not.

**IV.**    *Mr. Kaziu's Objections to the PSR*

     While Mr. Kaziu acknowledges the jury's verdict, and its controlling character at sentencing, he objects to the factual recitation contained at ¶¶ 6-21 of the PSR to the extent it alleges that he committed any of the charged offenses.  While Mr. Kaziu certainly traveled to Cairo, Egypt, and Kosovo, he maintains he did not do so with the intent to commit any illegal conduct, including conspiracy to kill persons overseas, material support to such a conspiracy, material support to *al Shabaab*, or conspiracy to possess a machine gun.  Nor did he so conspire

LAW OFFICES OF
**DRATEL & MYSLIWIEC, P.C.**

Hon. John Gleeson
United States District Judge
Eastern District of New York
January 26, 2012
Page 42 of 42

or intend to do so while in the U.S. (or after his arrival in Cairo or Kosovo).

  Mr. Kaziu also points out, with respect to ¶ 10, there was not any evidence that he fired any weapon while in Kosovo.  The PSR also fails to mention that Mr. Kaziu intended to travel from Kosovo to Macedonia to visit family (and not to Pakistan to engage in violent *jihad*).

**Conclusion**

  Accordingly, for all the reasons set forth above, it is respectfully submitted that Mr. Kaziu should be sentenced to a term of imprisonment substantially below the applicable Guidelines range, and that the Court should recommend he be designated to a facility as close as possible to his family in Brooklyn.

Respectfully submitted,

Joshua L. Dratel

JLD/
Encls.

cc: Shreve Ariail
   Seth D. DuCharme
   Ali Kazemi
   Assistant United States Attorneys
   (By ECF & Electronic Mail)

EXHIBIT 1

Case 1:09-cr-00660-JG   Document 256   Filed 01/26/12   Page 44 of 77 PageID #: 2505

**The New York Times**

# World

# THE LOCKERBIE VERDICT: THE OVERVIEW; LIBYAN CONVICTED BY SCOTTISH COURT IN '88 PAN AM BLAST

By DONALD G. McNEIL Jr
Published: February 01, 2001

A Scottish court today found a Libyan intelligence official guilty of murder in the bombing of Pan Am Flight 103 in 1988, when 270 died, but did not convict the second defendant and released him.

The investigation into the bombing pitted Libya and its leader, Col. Muammar el-Qaddafi, against the West, with international sanctions costing Libya an estimated $30 billion before it finally handed over the suspects in 1999 under a diplomatic compromise that brought the trial to the Netherlands.

But the White House said today that the verdict would not end a ban on business deals with Libya or flights there by Americans, which has been in place since 1986. And President Bush said he would press Libya to apologize for the terrorism and compensate the families, many of whom watched the verdict in person or at closed-circuit broadcasts around the world, including New York and Washington.

The verdict appeared to satisfy many families who lost members when Flight 103, on its way from London to New York, dropped out of the sky onto Lockerbie, Scotland, on Dec. 21, 1988. They said it would help their civil case against Libya, which names Colonel Qaddafi as the chief plotter in the bombing, which took the lives of 189 Americans.

Bruce M. Smith, a retired Pan Am pilot whose wife, Ingrid, was killed, said he regretted that the trial had not been in an American federal court "so we could have gotten a death sentence." And Bryan Flynn, whose elder brother, J. P., was killed, said the verdict proved the bombing had been "an orchestrated strike against the Western world." He and other family members want sanctions renewed and Colonel Qaddafi tried as a war criminal.

The three judges, in an 82-page written decision, admitted that the prosecution's case had "uncertainties and qualifications," that key witnesses had repeatedly lied and that the prosecution had not explained how a bomb got aboard the plane.

But they nonetheless unanimously concluded "there is nothing in the evidence which leaves us with any reasonable doubt as to the guilt" of the Libyan intelligence officer, Abdelbaset Ali Mohmed al-Megrahi.

Mr. Megrahi's fellow defendant in the nine-month trial, Al Amin Khalifah Fhimah, a former airline manager, was told he was "discharged and free to go." Draped in a white toga and wearing a flat black fez, he rose to walk out a side door to freedom. His legal team stalked out the opposite door with curt bows to the judges.

Mr. Megrahi remained alone, slumped slightly forward, listening to his lawyer, who gave a brief, strained plea that Mr. Megrahi still maintained his innocence. He was told sentence would be passed after lunch, and Mr. Megrahi returned in three hours, looking stooped and wan, his toga hugged tightly around him. He was told that a life sentence was mandatory under Scottish law, and that the court, "in view of the horrendous nature of the crime," wished him to serve 20 years before any parole consideration.

Were it not for his age, 49, and that a Scottish prison will be foreign to him, Chief Judge Lord Ranald Sutherland said, the court would have recommended an even longer wait. Even so, Peter Lowenstein, father of a young American killed in the crash, said afterward: "Twenty years for 270 murders is less than a month per victim. It's just not right."

As the court attendees sat in stony silence while the clerk recorded the verdict, the public gallery on the other side of the soundproof glass was aflutter with nervous concern because Jim Swire, a tall, white-haired doctor who had sat through most of the trial and speaks for many of the British families, had suddenly gone pale and slid down his chair with his jaw agape. Ushers carried him out to an ambulance, but apparently he had only fainted from the tension.

United Nations Secretary General Kofi Annan said after the verdict, "Justice has taken its course and the authority and legitimacy of the legal process must be respected." United Nations sanctions inposed on Libya in 1992 were suspended during the trial, but could be reinstated.

Libya's ambassador to the European Union, Hamed al-Hudhairy, on hand for the verdict, said he thought there was "no possibility of sanctions being re-imposed." That threat was "something we have heard for a long time from the families," who he said were trying to "take the whole Libyan people hostage."

Mr. al-Hudhairy called the verdict "a political decision," asking how it was possible to conclude that a defendant accused of arranging the bombing could be guilty if the defendant accused of helping him get the bomb aboard was innocent.

But the court did not conclude that Mr. Fhimah was innocent; it concluded that the prosecution had not proved beyond a reasonable doubt that he was guilty, though the court did not choose the "not proven" verdict available under Scottish law.

The three judges did vote unanimously to find Mr. Megrahi guilty, which in theory reduces his chances of winning any appeal because in

Case 1:09-cr-00660-JG   Document 256   Filed 01/26/12   Page 45 of 77 PageID #: 2506

Scottish courts, a unanimous verdict tends to carry more weight than a split decision. The decision on Mr. Fhimah was also unanimous.

Although Mr. Megrahi was convicted, the court's written reasons (available at www.scotcourts .gov.uk/html/lockerbie.htm) show that it did not think the prosecution had proved all elements of its case.

The judges agreed that forensic evidence proved that the bomb, triggered by a Mebo MST-13 timer, was inside a Toshiba radio-cassette player in a brown Samsonite suitcase with clothing bought at Mary's House, a store in Malta.

But, they added, "the absence of any explanation of the method by which the primary suitcase might have been placed aboard KM 180 is a major difficulty for the Crown case." If there was an unaccompanied bag with a bomb on KM 180, an Air Malta flight from Malta to Frankfurt, there was evidence that such a bag could have moved through Frankfurt's airport to Pan Am Flight 103.

The judges were scathing about two important witnesses: Abdul Majid Giaka, a Libyan secret service turncoat, and Edwin Bollier, an owner of Mebo, a Swiss electronics firm.

"Putting the matter shortly, we are unable to accept Abdul Majid as a credible and reliable witness on any matter except his description of the J.S.O.," the court concluded, referring to Libya's intelligence agency, the Jamahariya Security Organization, at which Mr. Majid had started his career as an auto mechanic. It rejected all his testimony about plastic explosives hidden in desks, conversations with the defendants about the Pan Am bombing and his claim to have seen Mr. Megrahi with a brown Samsonite.

Mr. Bollier, the court found, was an "untruthful and unreliable witness," and some of his testimony "belongs in the realm of fiction where it may be best placed in the genre of the spy thriller."

Tony Gauci, the owner of the clothing store in Malta, was "doing his best to tell the truth," the court found, and was believable when describing the clothes he sold. Of his visual identification of Mr. Megrahi, it said, "there are undoubtedly problems," because he had picked other people out of photo displays.

Still, the court convicted Mr. Megrahi on several grounds: He was a Libyan intelligence agent "of fairly high rank" and traveled on a false passport. Libya bought Mebo bomb timers; he was in military procurement and had dealt with Mebo. Mr. Gauci identified him as the buyer of the clothing in the bomb suitcase, though it was "not an unequivocal identification." He was in Malta's airport at the time the bomb was presumably sent on its way.

All in all, the court concluded, Mr. Megrahi's movements "form a real and convincing pattern."

The only evidence against Mr. Fhimah, the court found, were his diary entries about luggage tags and meeting Mr. Megrahi, and the prosecution conceded that it had not proved that he was a member of Libyan intelligence. Even if he gave Mr. Megrahi the suitcase tags, the court found, there was no evidence that he knew that doing so was part of a bomb plot, so he was acquitted.

At 6 p.m. today, Mr. Fhimah, bare-headed and in a denim shirt, left Camp Zeist in the back of a car, waving to the Scottish officers who had guarded him for two years.

A cousin, Ali Fhimah, using an Arabic expression for a family member, had said earlier: "We're happy that our son has been released, but we came here to see both of them let go. We believe that al-Megrahi is as innocent as our son, but we believe in Scottish justice and will continue to fight until he is acquitted, too."

Libyan television said today that Mr. Megrahi would appeal. In the Scottish courts, he has two weeks to ask permission from the same court, and six weeks more to file his reasons. If the court agrees, the appeal could be heard by at least five judges who would have to be appointed to hear the case. They would sit here, where Mr. Megrahi must be kept under the agreement with Libya until his conviction is final; if he waives his right to be present, they would sit in Edinburgh.

If his appeals fail, Mr. Megrahi is expected to serve his sentence in Barlinnie Prison in Glasgow.

Home | Times topics | Member Center

Copyright 2012   The New York Times Company | Privacy Policy | Help | Contact Us | Work for Us | Site Map | Index by Keyword

EXHIBIT 2

Case 1:09-cr-00660-JG   Document 56  Filed 06/16/12   Page 47 of 77 PageID #: 2508

## Black September Terrorist Gets Deported to Sudan

A recently released Black September terrorist convicted of placing three powerful car bombs in New York City in 1973 has been deported to Sudan, the nation that once sheltered Osama bin Laden and other terrorists.

Khalid Al-Jawary, 63, was flown out of Denver International Airport on Thursday and arrived Tuesday in Khartoum, said Carl Rusnok, a U.S. Immigration and Customs Enforcement spokesman.

Details of his deportation were released after Mr. Al-Jawary's federal escorts had safely left the country that was once the site of a bloody Black September attack in the '70s.

His deportation came 36 years to the day that he placed bombs in two cars on Fifth Avenue and a third at John F. Kennedy International Airport timed to coincide with the arrival of Israeli Prime Minister Golda Meir.

He was convicted in 1993 of planting the bombs, which failed to detonate.

*Associated Press*

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

FILED

APR 3 0 2009

PAMELA E. ROBINSON, CLERK
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 09-CR-10030 |
| | ) | |
| ALI SALEH KAHLAH AL-MARRI, | ) | |
| | ) | |
| Defendant. | ) | |

## PLEA AGREEMENT AND STIPULATION OF FACTS

Pursuant to Rule 11(c) of the Federal Rules of Criminal Procedure, the United

States of America, by its attorneys, the United States Attorney for the Central District of

Illinois, acting through Assistant United States Attorney David E. Risley, and Michael J.

Mullaney, Chief of the Counterterrorism Section of the Department of Justice, acting

through Trial Attorney Joanna Baltes, and the defendant, Ali Saleh Kahlah al-Marri,

personally and by his lead attorney, Lawrence S. Lustberg, hereby enter into this plea

agreement.

1.      This document contains the complete and only plea agreement between the

United States Department of Justice and the defendant.  This agreement supersedes and

replaces any and all prior formal and informal, written and oral, express and implied, plea

agreements between the parties.  No other agreement, understanding, promise, or

condition between the United States Department of Justice and the defendant exists,

except as set forth in this plea agreement.

2.     This agreement is made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(A) and (B), and therefore if the Court does not accept the recommendations of the parties, the defendant does not have the right to withdraw his plea of guilty.

**CHARGE, ELEMENTS, AND PENALTIES**

3.     The defendant will plead guilty to count 1 of the indictment, in which he is charged with conspiracy to provide material support or resources to a foreign terrorist organization, namely al Qaeda, in violation of Title 18, United States Code, Section 2339B(a)(1).

4.     The defendant has read the charge to which he is pleading guilty, and the charge has been explained to him by his attorney.  Furthermore, the defendant acknowledges that he fully understands the nature and elements of the crime to which he is pleading guilty.

5.     The term "terrorist organization" as defined in Title 18, United States Code, Section 2339B(g)(6), means an organization designated as a terrorist organization by the United States Secretary of State pursuant to Section 219 of the Immigration and Nationality Act.  On October 8, 1999, al Qaeda was so designated as a foreign terrorist organization by the Secretary of State, and has remained designated. A "conspiracy" is defined as an agreement between two or more persons to accomplish an unlawful purpose (in this case, the provision of material support or resources to al Qaeda).

6.    The phrase "material support or resources," as defined in Title 18, United States Code, Section 2339A(b)(1), means, among other things, personnel, which may be or include oneself.

7.    To sustain the charge of conspiracy to provide material support or resources to al-Qaeda in the form of personnel as charged in count 1, the government must prove the following propositions beyond a reasonable doubt:

- First, that al-Qaeda was, at the time of the offense, a designated foreign terrorist organization;

- Second, that the defendant knowingly agreed with at least one other person to provide material support or resources to al Qaeda in the form of personnel, including himself, to work under al Qaeda's direction or control;

- Third, at the time of that agreement, the defendant knew either that al Qaeda was a designated terrorist organization, or that al Qaeda had engaged or was engaging in terrorist activity or terrorism; and

- Fourth, the defendant entered into that agreement with the intent to further the terrorist activity or terrorism objectives of al Qaeda.

8.    The defendant understands and agrees that the potential penalties for the offense to which he will plead guilty are:

- up to 15 years in prison,

- up to a $250,000 fine,

- up to a life term of supervised release, and

- 3 -

- a $100 mandatory special assessment.

9.      The defendant further understands that upon violation of any of the terms of his supervised release, the supervised release may be revoked and he may be imprisoned for all or part of the supervised release period without credit for time previously served.

10.      The defendant understands and agrees that the Court may be required to order him to pay restitution.  The parties to this agreement have not reached a determination on the issue of restitution.  Restitution may include the cost of incarceration and supervision.  The parties acknowledge that the Court may order restitution in whatever amount it deems proper.

## STATUTORY AND GUIDELINE WAIVERS

### Waiver of Right of Appeal from Conviction

11.      The defendant is aware that federal law, specifically, Title 28, United States Code, Section 1291, affords a defendant a right to appeal a final decision of the district court and that federal law, specifically, Title 18, United States Code, Section 3742, affords a defendant a right to appeal the conviction and/or sentence imposed.  Understanding those rights, and having thoroughly discussed those rights with his attorney, the defendant agrees not to appeal and knowingly and voluntarily waives the right to appeal any and all issues relating to this plea agreement and conviction.  The defendant reserves the right to appeal or collaterally attack the imposed sentence, including any fine or restitution, within the maximum provided in the statutes of conviction, and the manner in which the sentence,

- 4 -

including any fine or restitution, was determined, on any ground whatever. In particular, the defendant reserves the right to challenge on appeal or otherwise, any determination as to whether and to what extent he is given credit toward the service of his term of imprisonment, pursuant to 18 U.S.C. § 3585(b) or by way of a reduction in sentence, for the time he has spent in custody since his arrest on December 12, 2001.

### Waiver of Right to Collateral Attack

12.     The defendant also understands that he has a right to attack the conviction and/or sentence imposed collaterally on the grounds that it was imposed in violation of the Constitution or laws of the United States; that he received ineffective assistance from his attorney; that the Court was without proper jurisdiction;  or that the conviction and/or sentence was otherwise subject to collateral attack. The defendant understands such an attack is usually brought through a motion pursuant to Title 28, United States Code, Section 2255. The defendant and his attorney have reviewed Section 2255, and the defendant understands his rights under the statute. Understanding those rights, and having thoroughly discussed those rights with his attorney, the defendant knowingly and voluntarily agrees not to file and waives his right to file a collateral attack on the conviction and/or sentence except to the extent (a)  he wishes to argue that he was provided ineffective assistance of counsel or (b) such attack is provided for in paragraph 11 above. The defendant's attorney has fully discussed and explained the defendant's right to attack the conviction and/or sentence collaterally with the defendant.

- 5 -

## ADVISORY SENTENCING GUIDELINES

13.     The defendant understands that the Court will calculate the defendant's offense level and criminal history category under the United States Sentencing Guidelines, and that the Court will use those calculations to arrive at an advisory sentencing range under the Guidelines.  The defendant understands that the Court must consider the advisory Sentencing Guideline range when imposing sentence.  The defendant understands that the Court shall also consider the other factors listed under Title 18, United States Code, Section 3553(a) in determining the specific sentence to be imposed.  The defendant understands that although the Sentencing Guidelines are advisory, the Court may choose to impose sentence in accordance with the Sentencing Guidelines.

14.     Based on the information currently available, the defendant and the United States agree on the following points regarding the application of the United States Sentencing Guidelines to the offense to which the defendant is pleading guilty:

a.     The parties agree, based upon facts currently known by the United States, that the defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct in accordance with Section 3E1.1 of the Sentencing Guidelines and, therefore, a two-level reduction in the offense level is appropriate.  Acceptance of personal responsibility shall include cooperating fully and being truthful with the United States Probation Office in the preparation of a presentence report.  This agreement does not preclude the United States from changing its position if

- 6 -

new evidence to the contrary is discovered or if the defendant later demonstrates a lack of

acceptance of personal responsibility for the defendant's criminal conduct, such as by

frivolously contesting his relevant conduct or related sentencing enhancements.

b.    The parties also agree that the defendant qualifies, and the government

agrees to move, for an additional one-point reduction in his offense level pursuant to

United States Sentencing Guidelines Section 3E1.1(b)(2) because he timely notified the

United States of his intention to enter a plea of guilty, thereby permitting the United

States to avoid further trial preparation and permitting the Court to allocate its resources

efficiently.

c.    The parties agree that the terrorism enhancement of Sentencing Guidelines

Section 3A1.4 applies.  The parties further agree that by application of the terrorism

enhancement that the defendant is facing the statutory maximum sentence of fifteen years.

d.    The defendant reserves the right to argue that under the sentencing factors

set forth in Title 18, United States Code, Section 3553 a sentence below fifteen years is

applicable in this matter.  The government reserves the right to oppose any such

argument.

15.    The defendant and the United States agree that the above statements

regarding Sentencing Guidelines calculations are not binding on the Court, and relate only

to the positions the parties take regarding the applicable advisory sentencing guideline

range based upon the information of which they are currently aware.  The Court will

remain free to make its own independent determination of the applicable advisory sentencing guideline range and to impose whatever sentence it deems appropriate.

16.     The defendant understands and agrees that at the time of sentencing, the Court will not be bound by any recommendation made by any party and that the Court will be free to impose whatever sentence it deems appropriate up to the statutory maximum. The defendant understands and agrees that he will not be allowed to withdraw his guilty plea because of an objection to the calculation of the sentencing guidelines or to the Court's sentencing findings or rulings.

## **DEFENDANT'S FURTHER OBLIGATIONS**

17.     In addition to pleading guilty to count 1 of the indictment, the defendant agrees to pay the mandatory $100 special assessment for that count at or before the time of sentencing by delivering a check or money order made payable to the United States District Court, and agrees that he will be required to do so as a condition of this plea agreement.

18.     Defendant agrees not to oppose his removal from the United States to Qatar or Saudi Arabia, by prisoner transfer, deportation or otherwise, and specifically agrees to stipulate to deportation before an immigration judge should he not be transferred before the conclusion of his sentence.  Defendant understands that he will not be deported until he has served any criminal sentence imposed upon him and he waives any right to appeal, reopen or challenge a deportation order properly entered against him.

## THE UNITED STATES ATTORNEY'S OBLIGATIONS

19.     The government agrees that at the time of sentencing it will move to dismiss count 2 of the indictment.   The defendant acknowledges that the count the United States agrees to dismiss was brought in good faith and not for any vexatious or frivolous reason on the part of the United States.

The government further agrees that it will not bring any further criminal charges or seek to detain the defendant as an enemy combatant (or any similar designation reflecting military or non-criminal detention) based upon the defendant's admitted involvement with al-Qaeda through his arrest on December 12, 2001 as set forth in paragraph 20 below or based on any material facts known to the government at the time of his plea.

## FACTUAL BASIS

20.     The defendant will plead guilty because he is in fact guilty.  In pleading guilty the defendant admits that he knowingly conspired and agreed with Khalid Sheikh Mohammed and others to provide material support and resources to al Qaeda in the form of personnel, including himself, to work under al Qaeda's direction and control; that at the time of this agreement, the defendant knew that al Qaeda had engaged and was engaging in terrorist activity as that term is defined under United States law; and that he entered into the agreement with the intent to further the terrorist activity and terrorism objectives of al Qaeda.  The defendant further agrees that on October 8, 1999, al Qaeda was designated as a foreign terrorist organization by the United States Secretary of State, pursuant to

- 9 -

Section 219 of the Immigration and Nationality Act, and has remained designated ever since. The defendant admits to the following facts.

Between 1998 and 2001, the defendant attended various terrorist training camps because he wished to engage in jihad. While at these terrorist training camps, the defendant participated in a number of courses where he learned, among other things: 1) basic military training, including the use of various weapons and basic operational security tradecraft that al Qaeda associates employed which allowed those engaged in terrorist operations to avoid detection, conceal the true nature of their communications, and generally protect their operations. These methods included the use of prearranged codes and various other techniques to protect communications, counter-surveillance techniques, and the protection of information on computers.

During these trips to the training camps, the defendant stayed in safehouses in Pakistan which the defendant agrees the government would prove were run by and for the benefit of al Qaeda. While in the terrorist training camps and in the safehouses, the defendant used the nickname Abdul-Rahman al-Qatari. In addition, the defendant provided contact information to the al Qaeda operators of the safehouses. This information included his camp nickname, Abdul Rahman al-Qatari, the name of his father, Saleh al Marri, and telephone numbers for his house, his father, and his brother in Qatar. The defendant agrees that the government would establish at trial that such information was generally provided by al Qaeda members so that al Qaeda could inform their families

should they be killed or "martyred" during an al Qaeda mission.

During this same time period, the defendant met Khalid Sheikh Mohammed and other members and associates of al Qaeda. The defendant offered his services to al Qaeda. In 2001, the defendant was approached by Khalid Sheikh Mohammed, who was then the external operations chief for al-Qaeda, about assisting al Qaeda operations in the United States. The defendant agreed to do so and knew at the time that he entered into the agreement with Khalid Sheikh Mohammed to assist al Qaeda operations in the United States that he was providing himself to al Qaeda to further al Qaeda's terrorist objectives. The defendant was instructed by Khalid Sheikh Mohammed to enter the United States no later than September 10, 2001, with an understanding that he was to remain in the United States for an undetermined length of time.

When the defendant agreed to the operation, he was aware that al-Qaeda was responsible for attacks against the United States, including the 1998 bombings of two United States embassies in East Africa, and the 2000 attack on the USS Cole. In addition, the defendant was aware of the 1996 and 1998 "fatwas" issued by Usama bin Laden against the United States.

Khalid Sheikh Mohammed also directed the defendant to meet with an associate of Khalid Sheikh Mohammed who was a member of al Qaeda. The defendant agrees that the government would prove at trial that this was Mustafa al Hawsawi. (hereinafter al-Hawsawi). Khalid Sheikh Mohammed gave the defendant contact information for

al-Hawsawi in Dubai, UAE, and told the defendant that al-Hawsawi would provide him with money for his mission. The defendant knew that al-Hawsawi was associated with al Qaeda and agrees that the government would prove at trial that al-Hawsawi was a primary financier of the September 11th attacks.

Khalid Sheikh Mohammed and the defendant set up a communications code through which the defendant and Khalid Sheikh Mohammed communicated. The defendant was instructed to conceal telephone numbers and other numbers to be used in email addresses by using a numeric code (hereinafter "10-code"). The defendant agrees that the government would prove at trial that this code was used by al Qaeda members, including al-Hawsawi and some of the September 11th hijackers to conceal telephone numbers so as to avoid detection. The defendant was also provided contact information, including telephone numbers, for several al Qaeda associates which he stored in his personal PDA (Personal Digital Assistant) using the 10-code.

Khalid Sheikh Mohammed and the defendant also used a pre-arranged code to disguise their email communications. The prearranged communication method referred to Khalid Sheikh Mohammed as "Muk." The defendant was to communicate with Khalid Sheikh Mohammed by sending emails to an email account used by Khalid Sheikh Mohammed. The account was *HOR70@hotmail.com*. In the email communications, the defendant was to refer to himself as "Abdo." Through these emails, the defendant was to keep Khalid Sheikh Mohammed apprised of information related to his efforts to enter the

- 12 -

United States, his contact information, and his efforts to advance al Qaeda's mission in the
United States. Khalid Sheikh Mohammed was also going to use these email
communications to pass on instructions to the defendant. The defendant agrees that the
government would prove at trial that the details of the prearranged code were stored in an
address book which was found in an al Qaeda safehouse in Pakistan. The book contained
the email address to be used by the defendant which was listed as *farwaa@yahoo.com*
along with the identification number for the defendant of "038." Using the 10-code to
decipher "038," the defendant, consistent with the code, used the email address of
*farwaa72@hotmail.com*. The book also listed Khalid Sheikh Mohammed's email address
as *HOR70@hot*[mail.com].

From approximately June 2001 through August 2001, the defendant communicated
via email with Khalid Sheikh Mohammed, as directed and agreed upon, regarding the
defendant's attempts to gain entry into the United States via a student visa from Bradley
University in Peoria, Illinois. Initially, the defendant tried to communicate with Khalid
Sheikh Mohammed using the *farwaa@yahoo.com* account. He received no reply. On July
15, 2001, the defendant created the *farwaa72@hotmail.com* account using the name
"Abdo Abdo." He then contacted Khalid Sheikh Mohammed at the *hor70@hotmail.com*
account with an email sent from the correct email address and using the correct coded
language, including addressing the email to "Muk" and signing it "Abdo." Khalid Sheikh
Mohammed responded to the email, and criticized the defendant for his failure in the

- 13 -

earlier email to follow the prearranged code. Khalid Sheikh Mohammed then directed the defendant to contact him once he was settled in the United States.

The defendant applied online to Bradley University using the same email address that he used to communicate with Khalid Sheikh Mohammed. In order to expedite his admission into the United States, the defendant applied for a second bachelor's degree instead of a master's degree as recommended by the University Registrar. Once the defendant was advised that he had been re-enrolled in Bradley University, he traveled to Dubai, UAE to meet with al-Hawsawi. In Dubai, the defendant received $10,000 from al-Hawsawi to purchase material in support of al-Qaeda, including a laptop computer. Subsequently, the defendant traveled to Pakistan to meet Khalid Sheikh Mohammed. In Pakistan, the defendant provided Khalid Sheikh Mohammed with items that Khalid Sheikh Mohammed had requested, including electronic devices. Upon his return to Qatar, the defendant applied for a new Qatari passport.

The defendant also obtained his student visa at that time. The defendant did not admit a trip the defendant had taken to the United States in 2000 on this visa application. During the trip in 2000, the defendant had used his Saudi Arabian passport to enter the United States. He had also established a fictitious business using a false name and stolen Social Security number, fraudulently obtaining a number of credit cards and opening several business accounts. The defendant admitted none of this on his visa application.

The defendant and his family arrived in the United States on September 10, 2001, over three weeks after the beginning of the fall semester at Bradley University. On his first day at Bradley University, although understanding that international students were expected to take 12 credit hours, the defendant requested that he be allowed to take 6 credit hours. Officials at Bradley University agreed that the defendant could take 9 credit hours to allow him and his family time to adjust to their entry into the United States. The defendant rarely attended classes and was in a failing status by the end of his first semester.

On September 21, 2001, the defendant traveled to another university in the central Illinois area and created five new email accounts under different aliases. By this time, the defendant knew that al Qaeda was responsible for the September 11, 2001 attacks on the United States and fully understood why Khalid Sheikh Mohammed had directed him to be in the United States before that date. Pursuant to Khalid Sheikh Mohammed's prior directions, the defendant used these accounts to inform Khalid Sheikh Mohammed that he had arrived safely in the United States, that he had been forced to enroll for a total of nine credits, and that he had been attempting to reach Khalid Sheikh Mohammed on a different email account. The defendant also provided Khalid Sheikh Mohammed with his Peoria cellular telephone number, concealed in 10-code format.

From September 23, 2001 through November 4, 2001, the defendant made a number of attempts to contact al-Hawsawi and other individuals he knew were al Qaeda

- 15 -

operatives using the telephone numbers that he had been provided in Pakistan, and which were disguised in 10-code in his PDA. These calls were unsuccessful. In order to conceal his communication with al Qaeda figures, the defendant used prepaid calling cards at various public pay phones in and around central and northern Illinois to place the calls. Although the initial calls were made from payphones in the Peoria area, after the defendant was interviewed by the FBI on October 2, 2001, he expanded the calling area, sometimes traveling over 160 miles away from his home in Peoria, Illinois, to place the calls.

The defendant researched online information related to various cyanide compounds. The defendant's focus was on various cyanide substances, including hydrogen cyanide, potassium cyanide, and sodium cyanide. The defendant reviewed toxicity levels, the locations where these items could be purchased, and specific pricing of the compounds. The defendant also studied various commercial uses for cyanide compounds. The defendant also explored obtaining sulfuric acid. The defendant agrees that the government would prove at trial that sulfuric acid is a well known binary agent which is used in a hydrogen cyanide binary device to create cyanide gas, and that this is the method taught by al Qaeda for manufacturing cyanide gas. The defendant further agrees that the government would prove at trial that his research into various cyanide compounds is consistent with the type of research conducted by persons trained in camps teaching advanced poisons courses to terrorist organizations, including al Qaeda. The defendant also agrees that the government would prove at trial that an almanac recovered

- 16 -

in the defendant's residence was bookmarked at pages showing dams, waterways and tunnels in the United States, which is also consistent with al Qaeda attack planning regarding the use of cyanide gases.

The defendant employed an "anonymizer" program on his laptop computer when surfing the internet. The defendant agrees that the government would prove at trial that these types of programs are designed to allow individuals to anonymously search internet websites and programs, and that the program on his computer also erased all historical internet searches on a regular basis.

## WAIVER OF CONSTITUTIONAL RIGHTS

21. The defendant understands that by pleading guilty he surrenders the following rights, among others:

b. The right to plead not guilty or persist in the plea of not guilty if already made. If the defendant persisted in a plea of not guilty to the charges the defendant would have the right to a public and speedy trial.

c. The right to a trial by jury. The defendant has an absolute right to a jury trial. The jury would be composed of twelve persons selected at random. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that the defendant is presumed innocent, and that it could not convict the defendant unless, after hearing all the evidence, it was persuaded that the United States had met its burden of proving the defendant guilty beyond a reasonable

- 17 -

doubt.  The defendant could also ask for a trial by the Judge instead of a trial by a jury.

         d.      The right to the assistance of counsel.  The defendant has the right to be represented by an attorney at every stage of the proceedings and, if the court finds the defendant is unable to afford an attorney, one will be appointed to represent the defendant at no cost to the defendant.

         e.      The right to confront and cross-examine adverse witnesses.  At a trial, the United States would be required to present its witnesses and other evidence against the defendant.  The defendant would be able to see and hear those government witnesses and  the defendant's attorney would be able to cross-examine them.  In turn, the defendant's counsel could present witnesses and other evidence on the defendant's behalf. If the witnesses for the defendant refused to appear voluntarily, their attendance could be required through the subpoena power of the court.

         f.      The right against compelled self-incrimination.  At a trial, the defendant would have a privilege against self-incrimination so that the defendant could decline to testify, and no inference of guilt could be drawn from the defendant's refusal to testify.  If the defendant desired to do so, the defendant could testify on the defendant's own behalf.

         22.      The defendant understands that by pleading guilty the defendant is waiving all the rights set forth in the prior paragraphs.  The defendant's attorney has explained those rights to  the defendant and the consequences of the waiver of those rights.

- 18 -

**AGREED:**

**Defendant's Attorney:**

       I have discussed this plea agreement fully with my client, and I am satisfied that he fully understands its contents and terms. No threats, promises, or representations have been made, nor agreements reached, express or implied, to induce my client to plead guilty other than those stated in this written Plea Agreement. I have reviewed with my client United States Sentencing Guidelines Sections 1B1.3 and 1B1.4 (relevant conduct).

s/ Lawrence Lustberg

Date: 4/30/09

Lawrence S. Lustberg
Attorney for Ali Saleh al-Marri

**Defendant:**

       I have read this entire Plea Agreement carefully and have discussed it fully with my attorney. I fully understand this Agreement, and I agree to it voluntarily and of my own free will. I am pleading guilty because I am in fact guilty, and I agree that the facts stated in this agreement about my criminal conduct are true. No threats, promises, or commitments have been made to me or to anyone else, and no agreements have been reached, expressed or implied, to influence me to plead guilty other than those stated in this written Plea Agreement. I am satisfied with the legal services provided by my

attorney. I understand that by signing below I am stating I agree with everything stated in this paragraph, and I am accepting and entering into this Plea Agreement.

s/ Ali Saleh Al-Marri

Date: 30-4-2009

Ali Saleh Al-Marri
Defendant

**United States:**

On behalf of the United States of America, we accept and agree to this Plea Agreement.

MICHAEL J. MULLANEY, CHIEF
COUNTERTERRORISM SECTION

s/ Joanna Baltes

Date: 04/30/09

UNITED STATES ATTORNEY s/ David E.Risley

Date: 04/30/09

David E. Risley, Assistant United States Attorney

- 20 -

EXHIBIT 4



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

_____

*271 Cadman Plaza East*
*Brooklyn, New York 11201*


August 5, 2009


<u>Via Hand Delivery</u>
The Honorable Dora L. Irizarry
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re:  United States v. Mohamed Al-Moayad, et al.
         <u>Criminal Docket No. 03-1322 (DLI)</u>

Dear Judge Irizarry:

     The Department of Justice and the United States Attorney's Office for the Eastern District of New York (hereinafter, "the government") respectfully submit this letter to request that the Court accept proposed plea agreements pursuant to Rule 11(c)(1)(C), attached as Exhibits A and B. (A copy of this letter without exhibits is being provided to defense counsel and electronically filed.) Under the agreements, the defendants will plead guilty to Count Three of the superseding indictment, charging conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). In exchange the government will dismiss the remaining counts of the superseding indictment and the underlying indictment. In addition, the parties will stipulate to sentences of 80 months, which is the time that the defendants have already served in custody since their arrest in Germany in January 2003. As set forth below, this agreement is in the interests of justice for several reasons: 1) the defendants will acknowledge their guilt and plead guilty to conspiracy to provide material support to Hamas; 2) retrial in this matter may be significantly delayed in light of defendant Mohamed Al-Moayad's rapidly deteriorating health, and the pleas provide a certain and prompt resolution; 3) the pleas obviate certain evidentiary challenges resulting from the Second Circuit's decision reversing the convictions and remanding for retrial; 4) the pleas put Mohamed Zayed, the less culpable of the defendants, in the same position as Al-Moayad; and 5) the pleas address broader national security concerns.

I.    FACTUAL BACKGROUND AND PROPOSED PLEA AGREEMENT

        In November 2001, Mohammed Al-Anssi, a Yemeni national,
approached the Federal Bureau of Investigation ("FBI") with
information about the involvement of Al-Moayad and others in
providing material support to terrorists.  Al-Anssi met with the
FBI and explained, inter alia, that Al-Moayad, a prominent cleric
in Yemen, had recruited *Mujahidin* for the *Al Qaeda*-led armed
conflicts in Bosnia, Chechnya and Afghanistan.   This information
was later corroborated by, among other things, an *Al Qaeda*
training camp form found in Afghanistan in late 2001 reflecting
that Al-Moayad was the "sponsor" of one of the trainees, and
pocket litter found in the possession of *Mujahidin* who had fought
in Bosnia reflecting their association with Al-Moayad.

        Between January and September 2002, the FBI sent Al-
Anssi to Yemen three times to gather additional information and
evidence regarding Al-Moayad's material support activities.
During his second trip to Yemen in May 2002, at the FBI's
instruction, Al-Anssi and Al-Moayad discussed the idea of Al-
Moayad meeting "Saeed," an American Muslim who wanted to donate
millions of dollars to support *Mujahidin* with weapons.  Al-Moayad
proposed meeting in Germany.

        Working with Germany's federal law enforcement
authority, the FBI made arrangements for Al-Anssi and a second
government informant who played the role of "Saeed," a Muslim
from Brooklyn, to meet with Al-Moayad and defendant Zayed, who
was Al-Moayad's assistant and military bodyguard, at a Sheraton
Hotel in Frankfurt, Germany in January 2003.  The meetings
between the defendants and informants in Germany, which took
place between January 7 and 10, 2003, were captured on videotape,
as were the defendants' private conversations in their hotel
room.  During these meetings, the defendants, inter alia, agreed
to deliver approximately $2 million for Saeed to terrorist
organizations, including specifically *Hamas* and *Al Qaeda*.  The
defendants were detained by German law enforcement on January 10,
2003, and were extradited to the United States in November 2003.

        In March 2005, the defendants were convicted after a
jury trial of conspiring to provide material support to *Al Qaeda*
and *Hamas,* and attempting to provide material support to *Hamas*,
in violation of 18 U.S.C. § 2339B.  Al-Moayad alone was convicted
of providing material support to *Hamas* and attempting to provide
material support to *Al Qaeda*.  The jury acquitted Al-Moayad of
providing material support to *Al Qaeda* and acquitted Zayed of
attempting to provide material support to *Al Qaeda*. Both

defendants received the maximum sentence: Al-Moayad was sentenced to 75 years and Zayed was sentenced to 45 years.

On October 2, 2008, the Second Circuit vacated the convictions of both defendants on all counts and remanded for retrial. United States v. Al-Moayad, 545 F.3d 139 (2d Cir. 2008). The Court reversed the defendants' convictions on the basis of several evidentiary rulings by the district court, finding that the admission of certain evidence was improper and/or unduly prejudicial. The government filed a petition for rehearing en banc, which was denied on February 18, 2009.

The defendants have been incarcerated since January 2003 and have been in the custody of the United States since November 16, 2003.

Under the terms of the proposed plea agreements, the defendants will plead guilty to Count Three of the superseding indictment, charging a violation of 18 U.S.C. § 2339B(a)(1). This count carries a statutory maximum sentence of 15 years in prison, but the parties will stipulate to sentences of 80 months – i.e., time served. The defendants will also consent to their immediate removal from the United States.

## II.  LAW REGARDING PLEA AGREEMENTS PURSUANT TO RULE 11(c)(1)(C)

Under Rule 11(c)(1)(C), the government and a criminal defendant may reach a plea agreement under which the defendant pleads guilty and the government, in return, "agrees that a specific sentence . . . is the appropriate disposition of the case . . . ." Fed. R. Crim. P. 11 (c)(1)(C). If the Court accepts the plea agreement, the agreed-upon sentence "binds the court . . . ." Id.

It is the law of this Circuit that Rule 11(c)(1)(C) pleas are governed by the Federal Rules of Criminal Procedure rather than the United States Sentencing Guidelines (the "Guidelines"). For example, in United States v. Cunavelis, 969 F.2d 1419, 1421-22 (2d Cir. 1992), the Court reasoned that the provisions of U.S.S.G. § 5K1.1 "are simply inapplicable to plea agreements governed by [Rule 11(c)(1)(C)]." See also United States v. Braimah, 3 F.3d 609, 611-12 (2d Cir. 1993) (describing Cunavelis as standing for the proposition that by entering into a "sentence" plea agreement pursuant to Rule 11(c)(1)(C), a "defendant effectively waives his right" to be sentenced pursuant to the Guidelines).

In <u>United States v. Williams</u>, 260 F.3d 160 (2d Cir. 2001), the Second Circuit affirmed Judge I. Leo Glasser's acceptance of a Rule 11(c)(1)(C) plea agreement that provided for a stipulated sentence considerably below the applicable Guidelines range.  Judge Glasser stated during the plea allocution that although he "would normally explain what the guidelines are all about and what the estimated guidelines in this case might be," he did not do so in that case because it was "superfluous" where the defendant entered into a Rule 11(c)(1)(C) agreement.  <u>Id</u>. at 163.  Moreover, "Judge Glasser was not required to, and in fact did not," calculate an offense level, "was crystal clear in his belief the Guidelines were irrelevant" and ultimately "made no determination at all as to the guideline sentence that would apply in the absence of a . . . stipulated sentence."  <u>Id</u>. at 172 (Haden, J, concurrence); <u>see also</u> <u>United States v. Pimentel</u>, 932 F.2d 1029, 1033-34 (2d Cir. 1991) (rejecting the notion that sentence bargains are "undue or unseemly intrusions on the judicial function" and suggesting that district courts should look favorably on Rule 11(c)(1)(C) plea agreements); <u>United States v. Aquilar</u>, 884 F. Supp. 88, 91-92 (E.D.N.Y. 1995) (noting that pursuant to Rule 11(c)(1)(C), "a large class of defendants may be sentenced outside the Guidelines.").

"Moreover, if there was any doubt whether a court may impose a sentence outside of the Sentencing Guidelines range" pursuant to a Rule 11(c)(1)(C) plea agreement, "that doubt has been erased by the Supreme Court's recent decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005)."  <u>United States v. Cieslowski</u>, 410 F.3d 353, 363 (7th Cir. 2005); <u>see also</u> <u>United States v. Kling</u>, 516 F.3d 702, 704 (8th Cir. 2008) (en banc) (holding that "Rule 11(c)(1)(C) plea agreements remain permissible post-<u>Booker</u>"); <u>United States v. Bundy</u>, 359 F. Supp.2d 535, 538 (W.D.Va. 2005) ("After <u>Booker</u>, of course, there can be no reasonable argument that the court does not have the authority to accept an agreed sentence below the guideline range").  Indeed, "<u>Booker</u> actually strengthens the case for the validity of sentences imposed under Rule 11(c)(1)(C) plea agreements that deviate from the Guidelines range."  <u>Cieslowski</u>, 410 F.3d at 363.

Even though they operate totally outside the Guidelines, Rule 11(c)(1)(C) pleas are nonetheless consistent with larger sentencing goals and objectives.  The Guidelines provide that district courts can accept such agreements if "the agreed sentence departs from the applicable guideline range for justifiable reasons" and do not "undermine the basic purposes of sentencing."  U.S.S.G. § 6B1.2(c).  As Judge John Gleeson has written, since "the phrase 'justifiable reasons' can easily

5

accommodate all of the real-world factors that cause prosecutors and defense counsel to strike sentence bargains," and because "those concerns [have] long been considered legitimate reasons for courts to accept sentence bargains, it [is] easy to conclude that accepting these agreements [does] not 'undermine' any purpose of sentencing, let alone the 'basic' ones." John Gleeson, <u>The Sentencing Commission and Prosecutorial Discretion: The Role of the Courts in Policing Sentence Bargains</u>, 36 Hofstra L. Rev. 639, 644 (2008).

In his article, Judge Gleeson elaborated, citing an example from his own courtroom experiences:

> [T]he very same reasons that we grant [prosecutors] the power to decline to prosecute--their expertise in assessing the strength of a case, their interest in best allocating their resources, and their superior ability to weigh the crime control implications of their actions--counsel in favor of allowing prosecutors to bargain for lesser sentences. Here's an example from my own experience as a prosecutor: A decision to strike a seven-year sentence bargain with a seventy-year old mobster charged with murder. That bargain reflected a considered judgment about the risk that defendant posed to the community at the time, the risk he would pose when released after such a sentence, and the likelihood that a jury would convict based on the evidence I knew would be presented. Similarly, a sentence bargain that would fend off a long money laundering trial could easily reflect a decision to staff a wiretap with agents who otherwise would be tied up in that trial. These are important crime control and resource allocation decisions, and they are exactly the kinds of decisions we want our prosecutors to make . . . Just like the decision whether or not to charge, the decision what sentence to pursue in plea negotiations is a crime control judgment that prosecutors are best situated to make.

Gleeson, <u>supra</u>, at 655-57 (internal citations omitted).

This pragmatic analysis of the utility of such an agreement is particularly applicable in the national security

context, where complex balancing is performed by federal prosecutors in evaluating national security interests during the course of its criminal prosecutions, a unique function of the executive branch.

III.  <u>JUSTIFICATION FOR THE PROPOSED PLEA AGREEMENTS</u>

The proposed plea agreements pursuant to Rule 11(c)(1)(C) constitute a just and justifiable resolution of this case because of the uncertainty related to the start of a new trial as a result of Al-Moayad's deteriorating health condition, increased litigation risks as a result of the Second Circuit's decision reversing the district court's admission of several important items of evidence, the need to ensure that the less culpable defendant does not face more time than the more culpable defendant and broader national security considerations.

Al-Moayad's significant health issues may delay retrial in this matter indefinitely.  This is a significant consideration for the government given that six years have elapsed from the criminal activity in this matter.  Al-Moayad is 60 years old. Since his arrest in January 2003, his health has seriously and substantially deteriorated as a result of several serious, chronic medical conditions.  Al-Moayad suffers from, among other ailments: cirrhosis of the liver; Hepatitis C; portal hypertension; esophageal varices (bleeding); diabetes; severe anemia; and leukopenia (a deficiency in low white blood cells). In particular, the condition of Al-Moayad's liver significantly compromises his life expectancy - which has been estimated at a few months to a few years - and the esophageal varices, if not responsive to medication, could result in severe bleeding and death.  These conditions often require that Al-Moayad be hospitalized for significant periods of time for medical procedures such as blood transfusions.  Although management of these conditions is possible for a period of time while the defendant is incarcerated, Al-Moayad's long-term prognosis under current conditions is poor.

While, in an ordinary case, a defendant's health condition would likely not be a valid basis for a lenient sentence when the defendant has committed such serious crimes, this case is extraordinary.  First, despite the best efforts of Bureau of Prisons medical staff, there is a significant possibility that Al-Moayad will be too ill to stand trial.  Given the international importance of this case and the fact that more than five years has elapsed since the defendants were extradited to the United States to face charges, the government feels strongly that a prompt and final resolution of this matter - in

which the defendants acknowledge their guilt and are removed to Yemen – is in the interests of justice.

Second, as discussed, the Second Circuit reversed the convictions of Al-Moayad and Zayed on the basis of several evidentiary rulings by the district court, finding that the admission of certain evidence was improper. While the government continues to have a strong case against the defendants, the Court's decision increases the burden on the government to prove the defendants' "knowledge" that *Hamas* and *Al Qaeda* engage in terrorism, a necessary element under the material support statute. Moreover, much of the excluded evidence is relevant to prove the defendants' predisposition to support *Hamas* and *Al Qaeda*, which the government was required to do in the first trial because the defendants asserted entrapment defenses. If the defendants assert entrapment again – and we expect they will – proving predisposition will be more difficult at a second trial.

With respect to defendant Mohamed Zayed, the government further believes that Zayed, who participated in the charged crimes solely as Al-Moayad's assistant, should receive the same sentence as Al-Moayad.

Finally, the proposed resolution addresses broader national security implications.

IV. <u>CONCLUSION</u>

The government has carefully considered whether the terms of these plea agreements satisfy the ends of justice and provide a fair a just resolution to this matter. In evaluating all the factors enumerated in this letter and weighing this case as a whole, the government has concluded that this is a fair and just resolution to this matter. Accordingly, for all of the reasons set forth in this letter, the government respectfully

8

requests that the Court accept the proposed Rule 11(c)(1)(C) plea agreements in the above-captioned case.

Respectfully submitted,

BENTON J. CAMPBELL
United States Attorney

By: _____/s/_____
Jeffrey H. Knox
Pamela K. Chen
Assistant U.S. Attorneys

DAVID S. KRIS
Assistant Attorney General
National Security Division

By: _____/s/_____
Michael Mullaney
Chief
Counterterrorism Section
National Security Division