

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMB:SA/SDD/AK                            *271 Cadman Plaza East*
F. #2009R01764                           *Brooklyn, New York 11201*

February 28, 2012

**Via Hand and ECF**

Honorable John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

            Re:  United States v. Betim Kaziu
                 Criminal Docket No. 09-660 (S-1)(JG)

Dear Judge Gleeson:

            The government submits this letter in connection with
the defendant's sentencing, which is scheduled for March 2, 2012,
and in response to the defendant's sentencing letter dated
January 26, 2012. In that letter the defendant requests that he
be "sentenced to a term of imprisonment significantly below the
Sentencing Guideline range" set forth in the Pre-sentence
Investigation Report ("PSR"). (Def. Br. at 1, 6).  Specifically,
the defendant argues that such a "significant[]" or
"substantial[]" reduction is appropriate because: (1) § 3A1.4 of
the Guidelines, the terrorism enhancement, provides a
"[d]raconian" assessment of the defendant's criminal conduct and
otherwise "grossly overstates Mr. Kaziu's criminal record," (2)
the defendant's offense conduct "did not result in any injury or
harm to any person or property," (3) the "four offenses are all
inchoate" and "interrelated," (4) the defendant's "age and lack
of sophistication substantially reduced his chance of completing
the charged offenses," (5) other terrorism defendants received
lower sentences, (6) his "extended pretrial confinement" at the
MCC is a mitigating factor, and (7) judges in the Eastern
District of New York sentence a majority of defendants below the
applicable Guidelines range.  The government addresses these
arguments in turn below and otherwise discusses the appropriate
factors the Court should consider in fashioning a sentence for
the defendant that is "sufficient but not greater than necessary"
to achieve the purposes of sentencing enumerated in 18 U.S.C. §
3553(a).

While the government does not contend that a Guidelines sentence of life is the only appropriate sentence, the government respectfully disagrees with the defendant's assessment that a "significant[]" or "substantial[]" reduction from the Guidelines is appropriate.  For the reasons set forth below, the government respectfully submits that a sentence at or near the Guidelines sentence of life would be appropriate in this case.

## I.   Background

While the Court is obviously familiar with the relevant facts, a brief recounting is appropriate in anticipation of the defendant's sentencing.  As set forth in the PSR, and as established at trial, in 2008, the defendant and coconspirator Sulejmah Hadzovic pursued a growing interest in radical Islam.[1] Together, they searched the internet for information relating to jihad and global terrorism and formed a plan to travel overseas in order to provide themselves in service of a jihadist group. In January 2009, the defendant and Hadzovic agreed to travel together to Cairo, Egypt, for the purpose of joining such a group and supporting its activities.  Kaziu and Hadzovic also agreed to acquire weapons, including AK-47s, in furtherance of their plot. They contemplated fighting in Palestine, Afghanistan, Iraq, and Somalia.  (PSR ¶ 7).  Ultimately, they focused on traveling to two areas: Waziristan in the Federally Administrated Tribal Area (the "FATA") of Pakistan, where they hoped to join with al-Qaeda and the Taliban to fight and kill U.S. troops in Afghanistan, and

---

[1] A more detailed summary of the evidence presented at trial is set forth in the government's response in opposition to the defendant's motion for acquittal pursuant to Federal Rule of Criminal Procedure 29.  At trial, the defendant also presented a case compromised partially of court-ordered depositions conducted in Prizren, Kosovo.  One of those depositions was not admitted in evidence at trial and was not discussed in the defendant's PSR. A summary of the relevant facts elicited during the deposition is set forth below for inclusion in the PSR:

> During a deposition conducted in a Prizren Court, an associate of the defendant admitted that while in Kosovo (1) the defendant and he regularly watched al-Qaeda propaganda videos on the defendant's laptop computer, (2) the defendant possibly told him that he wanted to join al-Qaeda, and (3) the defendant told him that he wanted to die a martyr for the cause of Islam.

Somalia, where they hoped to join al-Shabaab and to fight and kill Somali government officials.

On February 19, 2009, the defendant and Hadzovic departed John F. Kennedy Airport ("JFK") in Queens, New York, for Cairo.  Once in Cairo, they sought out like-minded individuals to assist them in carrying out their plot.  Individuals who aided and conspired with them included a self-proclaimed imam from Prizren, Kosovo, named Armend Kalanderi, and a man of Somali descent identified as "Ahmed" who helped them plan routes into Somalia to join al-Shabaab.  While in Egypt, the defendant also made efforts to obtain weapons, including assault rifles and machine guns.  (PSR ¶ 8).

In or about June 2009, Hadzovic had a change of heart about their plans.  Hadzovic left the defendant in Egypt and traveled to the Balkans to meet up with his family en route back to the United States.  Hadzovic and the defendant maintained contact however, and, before Hadzovic left, the defendant attempted to persuade Hadzovic to join him in an attack on American troops serving as North Atlantic Treaty Organization ("NATO") peacekeepers in the Balkans.[2]  (PSR ¶¶ 9-10).  On July 21, 2009, the defendant also traveled from Egypt to the Balkans, specifically to Prizren, Kosovo, with an associate of Kalenderi. There, the defendant made plans to travel onwards to Pakistan on September 15, 2009 for the purpose of reaching the FATA and joining with al-Qaeda or the Taliban to fight and kill U.S. troops in Afghanistan.

Based on information provided by U.S. authorities, shortly before Kaziu's planned trip to Pakistan, law enforcement officials in Kosovo launched an investigation into the defendant, and obtained significant evidence during the execution of search warrants on premises occupied by the defendant in Prizren. During a search of the defendant's Prizren apartment on August 27, 2009, the Kosovo Police Service recovered a number of items including a shotgun brochure, and the defendant's camera, which contained a martyrdom video of the defendant in which he discussed his imminent plans to "depart" to "Jannah," or paradise in the afterlife of the Islamic faith.  (PSR ¶ 11).  Officers also discovered an AK-47, ammunition, and hand grenades well-

---

[2] On August 8, 2009, Hadzovic returned to the United States. After meeting with investigators and confessing to his role in their plot, Hadzovic self-surrendered on September 18, 2009. (PSR ¶ 9).

hidden in a compartment of the couch in the apartment.[2]  At
another location in Prizren that the defendant had recently
visited, the Kosovo Police Service found, among other items, the
defendant's laptop, which contained significant inculpatory
materials confirming the defendant's intent to join a foreign
terrorist organization and to fight and kill U.S. troops and
foreign government officials.  Such materials included a poem
written by the defendant in which he declared his desire to die a
martyr for Islam.  The defendant was arrested by Kosovar law
enforcement officers in Prizren on the same day.  The government
also obtained email messages between the defendant and his
coconspirator and associates that confirmed the defendant's
intentions.

        The defendant was subsequently indicted in the Eastern
District of New York.  The defendant was initially charged with
conspiracy to commit murder in a foreign country, in violation of
18 U.S.C. Section 956, and conspiracy to provide material support
to terrorists, in violation of 18 U.S.C. Section 2339A.  The
defendant was then expelled from Kosovo and transferred into U.S.
custody.  He was arraigned on these charges in the Eastern
District of New York on September 24, 2009.

        On May 20, 2011, a grand jury returned a superseding
indictment, charging the defendant with two additional counts,
attempted material support for a foreign terrorist organization,
in violation of 18 U.S.C. Section 2339B, and conspiracy to use a
firearm, in violation of 18 U.S.C. Section 924(o).  Trial
commenced on June 27, 2011 and, on July 7, 2011, the defendant
was convicted of all counts.

## II.  **Applicable Law**

        It is settled law that "a district court should begin
all sentencing proceedings by correctly calculating the
applicable Guidelines range.  As a matter of administration and
to secure nationwide consistency, the Guidelines should be the
starting point and the initial benchmark."  <u>Gall v. United
States</u>, 552 U.S. 38, 49 (2007) (citation omitted).  Next, a
sentencing court should "consider all of the § 3553(a) factors to
determine whether they support the sentence requested by a party.
In so doing, [it] may not presume that the Guidelines range is
reasonable. [It] must make an individualized assessment based on
the facts presented."  <u>Id</u>. at 50 (citation and footnote omitted).

---

        [2]    The government does not seek to prove the defendant's
knowledge of or association with those weapons.

4

Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

> (2) the need for the sentence imposed--

>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>> (B) to afford adequate deterrence to criminal conduct; [and]

>> (C) to protect the public from further crimes of the defendant.

Section 3553 also recognizes the need to afford the defendant opportunities for rehabilitation.  18 U.S.C. 3553(a)(2)(D).  Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence.  The district court must also "remain cognizant of them throughout the sentencing process." Gall, 552 U.S. at 50 n.6.

## III. __Guidelines Calculation__

As set forth in the PSR, the defendant's total adjusted offense level for Counts One through Four is 45.  (PSR ¶¶ 24-51).  The defendant's adjusted offense level is predicated on the greater of the adjusted offense levels for each of the charged counts, here Count 1, pursuant to § 3D1.4.  The Guidelines for Count 1 are calculated as follows:

| | |
|---|---|
| Base Offense Level: (2A1.5; 2X2.1) | 33 |
| Plus: Terrorism Enhancement (3A1.4(a)) | +12 |
| Adjusted Offense Level: | <u>45</u> |

The defendant is not entitled to an adjustment for acceptance of responsibility pursuant to § 3E1.1.  Additionally, pursuant to Guidelines Section 3A1.4(b),[3] the defendant's criminal history

---

[3]  Section 3A1.4 of the Sentencing Guidelines applies where "the offense is a felony that involved, or was intended to

5

category is VI.  Category VI provides for an applicable advisory
Guidelines sentence of life imprisonment.

---

promote, a "federal crime of terrorism" as defined in 18 U.S.C. §
2332b(g)(5).  <u>Id</u>. at comment n.1.  Section 2332b(g)(5), in turn,
provides the following definition:

> [T]he term "Federal crime of terrorism' means
> an offense that -
>
> (A) is calculated to influence or affect the
> conduct of government by intimidation or
> coercion, or to retaliate against government
> conduct; and
>
> (B) is a violation of [one of certain
> enumerated statutes].

18 U.S.C. § 2332b(g)(5).  The Second Circuit has indicated that
by requiring that the underlying crime "be calculated to
influence or affect . . . or to retaliate against government
conduct," the statute does not require "proof of a defendant's
particular motive."  <u>United States v. Awan,</u> 607 F.3d 306, 317
(2d. Cir. 2010).  "[A] person may intend and may commit an
offense that is so calculated even if influencing or retaliating
against government is not his personal motivation."  <u>Id</u>.  By way
of example, "a person who murders a head of state" commits an act
of terrorism if he knows "that his crime will influence or affect
the conduct of government . . . even if his particular motivation
in committing the murder is to impress a more established
terrorist with his abilities."  <u>Id</u>. (emphasis in original).  In
this case, Counts One through Three charged violations of
statutes enumerated in 18 U.S.C. § 2332b(g)(5)(b).  Additionally,
the evidence presented at trial established that the defendant's
criminal conduct was designed to "influence or affect . . . or to
retaliate against" United States and Somali government conduct
through the defendant's attempts to join al-Qaeda, the Taliban
and al-Shabaab and his plans to kill U.S. soldiers in Afghanistan
or Kosovo and foreign government officials in Somalia.  18 U.S.C.
§ 2332b(g)(5)(A).  Therefore, the terrorism enhancement is
appropriately applied here.

6

IV.  **Sentencing Analysis**

    A.    Consideration of the 3553(a) Factors Requires a
            Sentence at or Near the Guidelines Sentence of Life
            Imprisonment

            The defendant does not dispute the Guidelines
calculation set forth in the PSR, including the application of
the terrorism enhancement set forth in § 3A1.4, but rather
argues that the Guidelines are overly harsh in punishing
terrorism offenses, and that a sentence of life imprisonment is
greater than necessary to satisfy the statutory sentencing
factors under Section 3553(a).  Specifically, for reasons
discussed in his January 26, 2012 letter, the defendant argues
that a "significant[]" or "substantial[]" reduction from a
Guidelines sentence is appropriate here.  The government
respectfully disagrees.

            As an initial matter, the government does not contend
that a life sentence is the only reasonable sentence in this
case.  Nonetheless, the government opposes any "significant[]" or
"substantial[]" reduction in the sentence from the Guidelines,
given the abhorrent nature of the defendant's criminal conduct,
the need for adequate deterrence, and the critical need for
incapacitation given the defendant's likelihood of recidivism.
For these reasons, set forth in more detail below, the government
respectfully submits that a sentence at or near the Guidelines
sentence of life would be appropriate in this case.

    B.    The Applicable Guidelines and the Terrorism Enhancement
            Appropriately Account for the Significance of the
            Defendant's Egregious Criminal Conduct

            In seeking a "significant[]" sentence reduction or one
"substantially below the applicable Guidelines," the defendant
argues that "(a) the nature of the sentencing Guidelines for
terrorism offenses . . . apply [d]raconian enhancements . . .
with respect to both the offense level and Criminal History
category . . . and [a sentence within the Guidelines would]
negate any distinction between Mr. Kaziu's conduct and the most
serious terrorism offenses and offenders."  (Def. Br. at 1-2,
6.).  The government respectfully disagrees.

            Beyond question, the Sentencing Guidelines treat
terrorism offenses severely and thus provide an appropriate
touchstone from which to begin the 3553(a) analysis.  As the
Second Circuit noted in 2010, "the Guidelines signal that any
crime promoting terrorism is to be viewed as extremely serious."

United States v. Stewart, 597 F.3d at 521 (2d Cir. 2010). Likewise, "the strong need to deter terrorism is evident from the Guidelines recommendation that a terrorism defendant be accorded a criminal history of VI, the highest level possible, without regard to [a defendant's] actual criminal record." Id.

While conceding the application of terrorism enhancement under §3A1.4(b), the defendant argues that this rigid application of the Guidelines does not provide a "'distinction between sentences for the most dangerous offenders' and someone like [the defendant] who did not commit any violent acts and has not committed any offenses in the past." (Def Br. at 11).

Such an argument is misplaced. As the Second Circuit has held, "Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under §3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." United States v. Meskini, 319 F.3d 88, 92 (2d. Cir. 2003). Indeed, "[c]onsidering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level." Id.

Moreover, in the instant case, the Guidelines are plainly rational and compelling. The defendant plotted to join with terrorists seeking to kill United States soldiers fighting overseas in Afghanistan or acting as NATO peacekeepers in Kosovo. He also plotted to join with terrorists seeking to kill Somali government officials in Somalia. The defendant sought to join three of the world's most dangerous organizations, each of which professes to be at war with the United States: al-Qaeda, al-Shabaab and the Taliban. He took substantial steps to carry out those goals. He nearly completed his plans and was stopped only by the substantial efforts of the United States and Kosovo governments. A sentencing Guideline that presumes a sentence of life in prison for this defendant is well within the bounds of reason.

The defendant spends much time in his letter expounding on the appropriateness of proportionality in sentencing (referencing Voltaire, Jeremy Bentham, John Adams and Cesare Beccaria). While the Court should obviously heed concerns of proportionality in its sentencing, those concerns are necessarily less relevant when the offense conduct involves the most serious criminal activity. At the highest level of culpability, where

8

deterrence and incapacitation are most important, mitigating
factors such as relative youth are relevant, but certainly do not
counsel a substantially lower sentence.  Rather, at most, they
counsel minor variations within the context of the highest
available sentences.

      The defendant substantially downplays the seriousness
of his terrorist conduct, suggesting that the terrorist acts he
committed can somehow be differentiated from more "serious
terrorism offenses and offenders," and that his "offense conduct
is at the least serious end of the [terrorism] spectrum."  (Def.
Br. at 1, 2, 21, 23-24).  Such a distinction is without merit
here.  There is no indication in the substantial factual record
here that the defendant's failure to murder others in pursuit of
his political goals was due to his lack of culpability.  Rather,
he was arrested days before traveling to the tribal areas of
Pakistan with the intent to martyr himself.  Had the defendant
succeeded in his plans and had the government failed to connect
the dots, we might have only heard of the defendant after a
successful attack on U.S. military personnel in Kosovo or
Afghanistan.[4]

    C.    The Potential Disparity of Sentences Between Co-
           Conspirators and Among Defendants in Unrelated
           <u>Cases Does Not Warrant a Non-Guidelines Sentence</u>

      The defendant also argues that the prospective
disparity of a sentence between himself and (1) his co-defendant,
who abandoned their terrorist aims, pleaded guilty and cooperated
with the government, and (2) defendants in unrelated cases,
including cases prosecuted in military tribunals and foreign
countries, warrants a "substantial[]" or "significant[]"

---

     [4]    The defendant also argues that the Court should depart
substantially from the Guidelines because "the four offenses are
all inchoate, and represent simply different – but primarily
interrelated – statutory means of charging the same course of
conduct, and serve to amplify the possible sentence in a manner
both disproportionate and unnecessary." (Def. Br. at 2, 14, 21).
     The defendant is correct that the charges are both
"different" and "interrelated."  <u>Id</u>.  However, the defendant's
Guidelines range is not increased by the number of counts,
because the relevant sentencing Guidelines provision, Section
2X1.1, incorporates the offense level for the object of the most
serious conspiracy, which was a conspiracy to commit murder in a
foreign country.  The offense level for Count One alone results
in a Guidelines sentence of life imprisonment.

reduction from the Guidelines.  (See Def. Br. at 23-36).  Such a
reduction would be inappropriate.

        As an initial matter, Congress's primary concern in
enacting Section 3553(a)(6) was to minimize sentencing
disparities nationwide rather than among co-defendants.  United
States v. Joyner, 924 F.2d 454, 460 (2d Cir. 1991).  Post-Booker,
this Court has not decided whether Section 3553(a)(6) can be used
to address the differences between defendants in the same case.
United States v. Fernandez, 443 F.3d 19, 31 & n.9 (2d Cir. 2006);
see also United States v. Boscarino, 437 F.3d 634, 638 (7th Cir.
2006) (suggesting § 3553(a)(6) is concerned with unjustified
differences across judges or districts rather than defendants in
a single case); but see United States v. Ortiz-Zayas, 2005 WL
1430489, *3 (S.D.N.Y. 2005) (applying § 3553(a)(6) where one
defendant would have received a sentence five times longer than
his co-defendant under the Guidelines).  Moreover, even assuming
arguendo, that Section 3553(a)(6) references sentencing
disparities within a single case, its application would
necessarily be limited to "similarly situated" co-defendants,
meaning only to "defendants with similar records who have been
found guilty of similar conduct," 18 U.S.C. § 3553(a)(6));
Fernandez, 443 F.3d at 32.

        First, the defendant argues that he should not be given
a sentence significantly greater than that which may be imposed
on Sulejmah Hadzovic, the defendant's co-conspirator, who faces a
maximum sentence of fifteen years' incarceration.  (See Def. Br.
at 36).  However, the evidence at trial established that the
defendant's culpability was substantially greater than that of
Hadzovic.  Indeed, from the outset, the defendant was the ring-
leader of the plot.  He was the first to propose a plan to travel
overseas to join a terrorist group and to kill Americans in
Afghanistan and foreign government officials in Somalia.  The
defendant, not Hadzovic, believed that al-Qaeda's suicide attacks
on the World Trade Center in New York were permissible. (Trial
Tr. 485).  Kaziu bought and paid for Hadzovic's ticket and pushed
him to join him on the trip.

        When Hadzovic began to change his mind about their
plans to fight and kill U.S. soldiers and foreign government
officials with al-Qaeda, the Taliban and al-Shabaab, the
defendant chastised him for his receptiveness to President
Obama's message of Islamic-American reconciliation: "[D]on't let
it fool you.  It's like throwing sand in your eyes, just to blind
you from the truth."  (Trial Tr. 494).

When Hadzovic undertook a process of "istikhara," the defendant tried to steer him away from reconciliation with his family and a return to the United States. (Trial Tr. 497-501). Hadzovic, who was clearly frightened by the defendant's anger, even took steps to hide the fact that he wanted to return home. Before he left for the Balkans, Hadzovic tried to convince the defendant that he was going to be married. (Trial Tr. 502-503). Ultimately, the defendant learned of Hadzovic's intentions and confronted him about his failure to follow through with their plans: "[W]hy are you going back to the disbelieving lands? What about our plans to fight [jihad]?" (Trial Tr. 504). In an attempt to pull Hadzovic back to the path of violence, the defendant proposed an alternative plan to attack NATO troops in the Balkans. (Trial Tr. 504-05).

After their confrontation and after Hadzovic left for the Balkans, the defendant continued to press Hadzovic to seek death for the sake of Islam. The defendant sent Hadzovic emails encouraging him to return, and even after Hadzovic traveled to the United States, the defendant continued with his plans to join al-Qaeda or the Taliban and to kill U.S. soldiers in Afghanistan.

Moreover, Hadzovic accepted responsibility for his crime and pleaded guilty, saving the Court and the government the expense of a lengthy trial, while providing substantial assistance to law enforcement in its investigation. While the defendant availed himself of his constitutional right to trial, he cannot now complain that he faces a sentence disparate from a co-defendant who accepted responsibility, pleaded guilty and cooperated with the government. Indeed, without Hadzovic's cooperation and testimony at the trial, the defendant may well have continued on his violent and destructive path. Section 3553(a)(6) cautions against unwarranted disparity in sentencing between similarly situated defendants. Disparity in sentencing based on compelling distinctions is plainly not proscribed, but rather endorsed by Congress.

Second, the defendant contends that he should receive a non-Guideline sentence on the basis that his offense conduct is either "(1) far less serious and extensive than that in many terrorism-related cases in which the sentences have been life imprisonment or, in many such cases, far <u>less</u> than life imprisonment; or (2) commensurate with many offenders in terrorism cases in which the sentences have been substantially less than life imprisonment." (<u>See</u> Def. Br. at 24). The defendant then summarizes sentences imposed in numerous unrelated terrorism-related cases and argues, on proportionality grounds,

11

that his sentence should be significantly less than the Guideline
range of life imprisonment.

      As an initial matter, the defendant's discussion of
sentences imposed in military tribunals (see Def. Br. at 24) and
foreign jurisdictions (see id. and n.21), which operate under
different systems of law, is irrelevant to the sentencing
responsibility of this Court.  Further, the defendant's summary
of sentences imposed in other federal terrorism cases in the
United States does not sufficiently account for, among other
things: (1) the separate Section 3553(a) analyses undertaken by
other sentencing courts, (2) whether the defendants in those
cases pled guilty and accepted responsibility or whether they
were convicted following trial; (3) the strength and nature of
the evidence in each case; (4) the national security concerns
that may have been protected by the disposition of those cases,
and (5) whether the defendants in those cases cooperated with the
government.  The defendant's failure to account for such factors
- especially in the national security and terrorism context -
renders his sweeping comparison of sentences unhelpful.

      Finally, even taking the defendant's list at face
value, the sentences cited by the defendant range from twenty-
nine months' incarceration to seventy-five years' incarceration.
(See id. at 25, 34).  A sentence near the Guidelines in this case
falls squarely within that range.  Thus, the defendant's claim
that sentencing disparities warrant a sentence significantly
below the Guidelines should be denied.

      D.   Kaziu's Conditions of Confinement at the MCC
           Do Not Warrant a Non-Guideline Sentence

      The defendant also argues that the "harsh" conditions
of his pre-sentence confinement warrant a non-Guideline sentence.
Specifically, the defendant notes that he has been housed for
nearly twenty-nine months in Metropolitan Correctional Center
("MCC") "Unit 11-South," a "Communications Monitoring Unit."
(See Def. Br. at 36-37).  The defendant's claim is meritless.

      In United States v. Carty, the Second Circuit held that
"pre-sentence confinement conditions may in appropriate cases be
a permissible basis for downward departures."  264 F.3d 191, 196
(2d Cir. 2001) (per curiam).  However, the Court did not decide
whether the conditions alleged by the defendant in Carty
warranted a downward departure.  Thus, although conditions of
pre-sentence confinement can be a valid basis for a departure,
such departures are discretionary and should be granted only in
extraordinary circumstances.  See United States v. Teyer, 322 F.
Supp. 2d 359, 377-78 (S.D.N.Y. 2004) (denying departure request

based on conditions at a Belizean jail described as "an
extraordinarily harsh environment filled with fear, danger,
violence, rape and corruption" and noting that defendant must
present "evidence of truly horrific conditions"), remanded on
other grounds sub nom. United States v. Magana, 147 Fed. Appx.
200 (2d Cir. 2005).  This is not such a case.

        The burden is firmly on the defendant to prove by a
preponderance of the evidence that a downward departure or a
reduction in his sentence is appropriate in this case.  See
United States v. Valdez, 426 F.3d 178, 184 (2d Cir. 2005).  To
satisfy the burden of showing that pretrial conditions of
confinement warrant a reduction in sentence, a defendant must
show that (1) the conditions of his confinement were "'extreme to
an exceptional degree'" and (2) those conditions fell upon him
"'in some highly unique or disproportionate manner.'"  Teyer, 322
F. Supp. 2d at 377 (quoting United States v. Mateo, 299 F. Supp.
2d 201, 208 (S.D.N.Y. 2004); accord Rickenbacker v. United
States, 365 F. Supp. 2d 347, 351-52 (E.D.N.Y. 2005) (finding that
alleged substandard conditions of rat-infested food did not meet
requirement of extraordinariness).

        Here, the defendant does not allege any "exceptional"
or even specific condition of confinement that he has been
subjected to at the MCC.  Nor does he allege that any condition
at the MCC fell upon him "in some highly unique or
disproportionate manner." Instead the defendant generally states
that he has been held in a "Communications Monitoring Unit" at
the MCC.  Id.  As such, he is not entitled to any reduction in
his sentence on that ground.[5]

_____

[5] The defendant also notes that a defendant in an unrelated
case, United States v. Behr, 2006 WL 1586563 (S.D.N.Y. 2006), was
sentenced to a non-Guideline sentence following twenty-nine
months of presentence detention at the MCC.  See Def. Mem. at 36-
37.  Notably, in Behr, the defendant pled guilty to conspiracy to
commit mail fraud in violation of 18 U.S.C. § 1349, and mail
fraud in violation of 18 U.S.C. §§ 1341, 1342, two offenses that
are far less serious than the four violent, terrorism-related
offenses of which the defendant was convicted after trial.  Behr,
2006 WL 1586563, at *1.  Additionally, the defendant in Behr
faced a Guideline range of 37 to 46 months' incarceration.  See
id. Therefore, the imposition of a time-served sentence of
twenty-nine months' incarceration constituted only a modest
departure of eight months from the defendant's Guideline range.

13

E.   The Nature and Circumstances of the Offense Weigh in
     Favor of Sentence at or Near the Guidelines

     The defendant argues that the Court should depart
substantially from the Guidelines because "[the defendant's]
offense conduct did not result in any injury or harm to any
person or property." (Def. Br. at 2,14-21).  In support of this
proposition, the defendant cites the Second Circuit's language in
Stewart that "it was not unreasonable for the district judge to
decide that the fact that no injury occurred in the case
mitigated the gravity of [a defendant's] offense." Stewart, 590
F.3d at 139.  Reliance on such language is inappropriate here.
As the majority noted, that quotation was addressed to a case
like that of Stewart's co-defendant, "where the terrorism enhance
[was] found not to apply." Id. at 139 n.33 (emphasis added).[6]
Indeed, District Judge Koeltl, mindful of the Circuit's
admonition, did not "attach much weight to this mitigating
factor" in his resentencing of Lynne Stewart.  See Transcript of
Resentencing, United States v. Stewart, 02-CR-395 (July 15,
2010).

     Moreover, whatever consideration might be appropriately
given to the fact that the defendant was unable to carry out his
goal of killing U.S. soldiers or Somali government officials
overseas should be minimal at best given that it is likely that
the defendant would have joined al-Qaeda, the Taliban or al-
Shabaab, and would have carried out his attacks against U.S.
soldiers in Afghanistan or Kosovo and foreign government
officials in Somalia, but for the intervention of law
enforcement.

---

     [6]   The Court specifically noted that it did "not address
whether . . . the apparent lack of substantial harm caused by
[the defendant's] criminality, [could] bear the weight assigned .
. . [and noted the Court's] general view that a district court
should be cautious in determining the significance of the fact
that no harm may have occurred where a defendant intended such
harm." Id.  Moreover, the Circuit's decision denying en banc
review provided a mixed assessment of the appropriateness of such
a consideration.  United States v. Stewart, 597 F.3d 514 (2d.
Cir. 2010) (en banc).  Noting Judge Walker's strenuous dissent on
this point, Judges Jacobs, Wesley and Hall found that "[a]ny
discount based on the fortuitous lack of harm resulting from
Stewart's offense [was] error (whether procedural, substantive,
or both)" and that while "injury and death can serve as
aggravating factors in sentencing . . . the absence of injury and
death cannot serve as mitigating factors." Id. at 516.

14

Indeed, the nature and seriousness of the defendant's crimes including conspiring to kill U.S. troops and foreign government officials overseas, conspiring to provide material support to terrorists, attempted material support of al-Shabaab, and conspiring to use a machine gun, and the need to provide just punishment for those crimes weigh strongly in favor of a sentence at or near the Guidelines in this case.  See 18 U.S.C. § 3553(a)(1) and (a)(2)(A).  The defendant's role as the moving force behind the criminal enterprise should be given due consideration as well.

F.    The Defendant's History and Characteristics Merit at Most a Minor Reduction from the Guidelines

The defendant argues that he is entitled to substantial leniency at sentencing because "[his] age and lack of sophistication substantially reduced his chance of completing the charged offenses, all of which are either conspiracies or attempts."  (Def. Br. at 2, 23.).  The record indicates otherwise.  With little assistance from others, the defendant was able, among other things, to (i) educate himself about violent jihad, (ii) form a concrete plan to join with multiple terrorist groups, including al-Qaeda, al-Shabaab and the Taliban, (iii) obtain a passport and purchase international airline tickets for himself and Hadzovic; (v) travel to Egypt and rent an apartment there; (v) learn Arabic, (vi) identify and enlist multiple confederates in his plans, and otherwise take numerous steps towards the killing of U.S. soldiers and foreign government officials overseas.  Nothing in the record suggests that the defendant would not have succeeded in his plans absent intervention by Kosovo and U.S. law enforcement authorities.

The government does not oppose the Court considering the young age of the defendant at the time he committed his crimes.  The defendant is now 23 and has a long life ahead of him.  As the defendant points out, he "had just turned 21 when" he and Hadzovic traveled overseas to carry out their criminal enterprise. (Def. Br. 23).  The defendant's youth is appropriately considered in fashioning a sentence; however, any leniency that the Court may consider should be tempered by Congress's and the Sentencing Commission's clear goals in implementing the terrorism enhancement and the evident need to incapacitate the defendant, as discussed below, to prevent him from carrying out any future terrorist acts against the United States.

15

G.   A Sentence at or Near the Guidelines Sentence of Life
     Would Reflect the Seriousness of the Offenses, Promote
     Respect for the Law, and Provide Just Punishment

     There are few more serious offenses in the federal
criminal code than conspiring to kill overseas, conspiring to
provide material support to terrorists, attempting to provide
material support to a designated foreign terrorist organization
and conspiring to use a machine gun in furtherance of those
crimes.  A sentence at or near the Guidelines would reflect the
seriousness of the offenses, promote respect for the laws and
provide just punishment for the defendant's criminal conduct.  18
U.S.C. § 3553(a)(2)(A).

H.   The Deterrence Factor Weighs Heavily in Favor of a
     Sentence at or Near Life in Prison

     Deterrence is a key factor in the Court's assessment of
the appropriateness of the defendant's sentence.  A sentence at
or near the Guidelines in this case would appropriately send a
message to the community at large that the United States does not
tolerate such abhorrent criminal conduct.  Given the compelling
need to deter the continued threat that home-grown terrorists
like the defendant pose to the United States and our allies, a
sentence at or near the Guidelines would send a clear message to
any would-be jihadists that such conduct is not tolerated by the
U.S. government.

I.   Protecting the Public Requires a Sentence at or Near
     the Guidelines Sentence of Life

     Most significantly, the evidence adduced at trial and
reflected in the demeanor of the defendant throughout the
proceedings reflects the continued commitment of the defendant to
al-Qaeda, the Taliban, al-Shabaab and the global jihadist cause.
From the start of his criminal venture, the defendant
consistently pressed onward to his goal.  Confronted with
Hadzovic's financial inability to join in this plan, the
defendant paid for his ticket.  When his connection to al-Shabaab
fell through, the defendant pressed on to the FATA.  When the
Egyptians were cracking down on Islamists in the summer of 2009,
the defendant showed his determination to die a martyr and told
his friend that his mother, his father and his sisters would rot
in hell for being disbelievers.  When his best friend tried to
abandon the criminal plot, he did his utmost to stop him.  He
devised a new plan to kill U.S. peacekeepers in Kosovo.  Just
days before his arrest and shortly before his planned trip to the
FATA, the defendant composed the following poem:

They say he who believes in Allah is a
terrorist.

He who when the call to Jihad is made doesn't
snore.

When the cry of Muslim women and children is
made doesn't wait no more.

Sharp is his spear. He's ready to strike.

For the hur al-ayn he will delight.

In the green bird his soul will fly.

In jannah with wine and thrones raised high.

In front of Allah leaking in blood he will be
asked why.

For you my rubb I wanted to die.

Betim Kaziu.

(Gov. Ex. 304).  And while he waited for his flight to Pakistan,
the defendant read up on shotguns, handled firearms, and prepared
his last will and testament.

In Court during appearances and at trial, with his
liberty on the line, the defendant appeared to care little about
his fate.  Moreover, and despite his request for leniency, the
defendant has never expressed any remorse for his crimes or even
acknowledged that what he did was wrong, let alone shown any
tendency towards rehabilitation.  He continues to maintain his
innocence in the face of overwhelming evidence.  All of these
facts point to a steadfast commitment to the jihadist cause and
to a disturbing indifference to significance of the crimes he has
committed.

During summation, counsel suggested that the defendant
was not committed to jihad, but the evidence showed that the
defendant moved forward at every step to his goal to fight, kill
and die a martyr.  On every occasion that he had an opportunity
to come back from the brink, he brushed it off and he continued
forward.  The only thing that stopped the defendant from
attacking U.S. troops in Kosovo and traveling to Pakistan to join
with al-Qaeda was his arrest.

17

During summation, the Court noted that trials are meant to be "backwards looking." (Trial Tr. at 1067). Sentencings, however, are not. The evidence, the defendant's demeanor, his unwillingness to accept responsibility for his criminal conduct, and his lack of remorse established that the defendant was, and remains, a committed terrorist who believes his actions were justified. The sentence imposed in this case must protect against the possibility that the defendant will, if released from prison, again attempt to inflict violence against United States service members and our allies here and abroad. Because the defendant is a such a serious danger, only a sentence at or near the Guidelines sentence of life would be "sufficient but not greater than necessary" to achieve that goal and to protect the public from the defendant's return to violent jihad. 18 U.S.C. § 3553(a).

## V.   <u>Conclusion</u>

For the reasons set forth above, the government respectfully submits that a sentence at or near the Guidelines sentence of life imprisonment would be appropriate in this case.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:   _____/s/_____

Shreve Ariail
Seth D. DuCharme
Ali Kazemi
Assistant United States Attorneys
(718) 254-6616/6021/6124

CC: Joshua Dratel, Esq.
    Henry Steinglass, Esq.
    David Stern, Esq.