1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - -     X

UNITED STATES OF AMERICA,     :     09cr660

                              :

     -against-                :
                                    United States Courthouse
                                    Brooklyn, New York

BETIM KAZIU,                  :

                                    March 2, 2012
          Defendant.          :     3:30 p.m.

- - - - - - - - - - - -     X

                    TRANSCRIPT OF SENTENCE
                BEFORE THE HONORABLE JOHN GLEESON
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:           LORETTA E. LYNCH
                              United States Attorney
                              BY: SHREVE ARIAIL
                                  SETH DuCHARME
                                  ALI KAZEMI
                              Assistant United States Attorneys
                              271 Cadman Plaza East
                              Brooklyn, New York

For the Defendant:            JOSHUA DRATEL, ESQ.
                              HENRY STEINGLASS, ESQ.

Court Reporter:               Burton H. Sulzer
                              225 Cadman Plaza East
                              Brooklyn, New York
                              (718) 613-2481
                              Fax )718 613-2505


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

BHS     OCR     CM     CRR     CSR

2

1          (Open court-case called.)

2          MR. DRATEL:  Mr. Stern could not be here.  He had

3    surgery today.

4          THE COURT:  Give him my best.

5          MR. DRATEL:  He wanted to be here.  He didn't want

6    to delay what has been already delayed.

7          THE COURT:   All right.  Can I have appearances,

8    please.

9          MR. ARIAIL:  Shreve Ariail for the United States

10   with AUSA Seth DuCharme, Special Agent Stefanie Roddy with the

11   FBI and the others.

12          A VOICE:  Michele Espinosa from the Probation

13   Department.

14          THE COURT:  Thank you for being here.

15          MR. DRATEL:  Good afternoon, your Honor, Joshua

16   Dratel for Mr. Kaziu.  Also with me is Henry Steinglass and a

17   paralegal from Mr. Stern's office, Mayerlin Ulerio.

18          THE COURT:   Hello, Mr. Kaziu.

19          Are you ready to proceed, Mr. Dratel?

20          MR. DRATEL:  Certainly, your Honor.  May I go to the

21   podium?

22          THE COURT:   Yes, come on up.

23          Obviously, there is an objection to the factual

24   recitations to the presentence report, I understand that.

25   Based on the trial record, that objection is overruled.

3

1          You've read the presentence report, obviously?

2          MR. DRATEL:  Yes, sir.

3          THE COURT:  Mr. Kaziu, have you read the presentence

4    report?

5          THE DEFENDANT:  Yes.

6          THE COURT:  There are a couple of addenda as well.

7    Have you gotten them and been over them with your client?

8          MR. DRATEL:  Yes.

9          THE COURT:  Is that right?

10         THE DEFENDANT:  Yes.

11         THE COURT:  Have you had enough time to go over with

12   your lawyers the presentence report?

13         THE DEFENDANT:  Yes.

14         THE COURT:   All right.

15         Before we turn to the more important business of

16   what the appropriate sentence is, anything you want to address

17   with regard to the presentence report?

18         MR. DRATEL:  No, your Honor, just that factual

19   portion, paragraph 6 to 21, specifically, I guess, paragraph

20   10.

21         There's one specific fact that we raised with

22   respect to his intention to travel to Kosovo after his time --

23   I'm sorry, to Macedonia to visit family after his time in

24   Kosovo.  Other than that, it's pretty straightforward.

25         THE COURT:  That one is not available to me.

4

1        MR. DRATEL:  If you look at, I guess, exhibit to the

2   earlier letter of January, I think it's exhibit --

3        THE COURT:  I read your material.  You're referring

4   to paragraph ten of the presentence report?

5        MR. DRATEL:  Yes.  The last page, page 42 of the

6   initial sentencing letter points out with respect to paragraph

7   10, there is not any evidence that he fired a weapon while in

8   Kosovo.

9        It also failed to mention that Mr. Kaziu intended to

10  travel from Kosovo to Macedonia to visit family and not to

11  Pakistan.

12       MR. ARIAIL:  The government concedes that there was

13  not any evidence that he fired a gun in Kosovo.  I think the

14  Macedonia point -- there is nothing wrong with that as well.

15       THE COURT:  Let's strike that sentence, which is the

16  penultimate sentence in paragraph ten.

17       Everybody agree with that?

18       MR. DRATEL:  Yes, your Honor.

19       THE COURT:  And we'll add -- you can provide

20  language to Miss Espinosa regarding the intention to go to

21  Macedonia.

22       You can please add that to the presentence report.

23       PROBATION OFFICER:  Yes.

24       THE COURT:  Thank you.

25       Beyond that, anything else I need to rule upon with

5

1    regard to the presentence report or the addenda?

2              MR. DRATEL:  I don't believe so, your Honor.

3              THE COURT:  Do you agree?

4              MR. ARIAIL:  That's correct, your Honor, we do

5    agree.

6              THE COURT:  Do you want to be heard with regard to

7    the appropriate sentence?

8              MR. DRATEL: I do, your Honor.

9              THE COURT:  Thank you for your submissions, both

10   sides, it has been very helpful.

11             MR. DRATEL:  My intention, your Honor, is not to

12   repeat what is in the submissions because I know that you have

13   read them.

14             THE COURT:  I have, but take the time you want and

15   the time you need.

16             MR. DRATEL: I want to talk more about just in terms

17   of -- having thought a lot about sentencing, unfortunately in

18   this business we have ample opportunity to think a lot about

19   sentencing and, in particular, sufficient but not greater than

20   necessary from 3553(a), which I think is important not only as

21   a statutory standard but in this case is extremely important

22   as a benchmark in a case with such a wide range available to

23   the court for sentencing.

24             For me, the most difficult part -- trying to put

25   myself in the perspective of a court imposing a sentence, the

1  most difficult part, I think, would be trying to project into

2  the future as to what someone will be like, what the defendant

3  will be like a certain number of years from now.

4          So, what is sufficient but not greater than

5  necessary to accomplish the goals of sentencing that are most

6  relevant in this case?

7          Even taking the government's and the Probation

8  Department's presence report's recommendation and the

9  government's position, even giving them their due, deterrence

10 and recidivism seem to be what both the government and the

11 Probation Department are concentrating on with respect to

12 Mr. Kaziu.

13         THE COURT:  Recidivism meaning incapacitating?

14         MR. DRATEL:  Yes, your Honor.

15         I think in that context, the concept of sufficient

16 but not greater than necessary is obviously critically

17 important in trying to project that into the future as to what

18 the necessary sentence is and not anything greater than that.

19         So that a sentence, for example, of 30 years, like

20 the presence report recommends, I think would be much

21 greater than would be necessary for that purpose if you look

22 at the defendant, his age, his conduct and his level of

23 maturity, his level of education, all of the things that I

24 think will markedly change in the next 10 or 15 years in a

25 custodial situation.

1   I think that that is what makes it difficult, but,

2   also, I think that the sufficient but greater than necessary

3   part of it requires the court to give the defendant the

4   benefit of the doubt in that context.

5   So, in the sense that when you think about what is a

6   sufficient sentence for those purposes, the world's is going

7   to be a very different place in 15 years, I hope, and if it's

8   not we'll probably have more problems than we know what to do

9   with, but in that context it's going to be a very different

10  world that he would be reentering.

11  All of that goes to the question of who he is now

12  versus what he may be or what he will be in the future -- it's

13  hard to project, again, but, again, I think you have to give

14  the benefit of the doubt.

15  Looking at Mr. Kaziu as someone with really not --

16  not under educated, but at least someone who has not taken

17  advantage of education, has not gone far in school, didn't

18  really complete a year of high school; twenty-one at the time

19  that these events occurred that he's being sentenced for

20  today, twenty-four now.

21  His maturity level -- I think the court knows from

22  the evidence, from what you saw from the videos and other

23  things, that regardless of intention and what they showed in

24  that regard, just the full range of them, a kind of childlike

25  quality that unfortunately is there that is going to be gone

1   within a range of time I think that will be well short of the

2   30 years that the presentence report recommends.

3          THE COURT:  You're referring to those mob boss

4   videos?

5          MR. DRATEL:  Yes, other --

6          THE COURT:  Drug dealer video?

7          MR. DRATEL:  I'm not sure if the court saw them.  We

8   had proffered them.  There were some with young kids, with

9   mirrors, but we never introduced those in evidence, but it's

10  just a certain level of interaction that was not adult in that

11  regard.  Again, that will change long before we get to that

12  stage where both the government and the presentence report are

13  in terms of a sentence.

14         What the government and the presentence report also

15  don't do is put this particular case and this defendant in the

16  context of a wide range of cases that have certain

17  similarities and a lot of dissimilarities.

18         The dissimilarities are for people who have received

19  the types of sentences that the government and the presentence

20  report are recommending, people who actually did something

21  with a foreign terrorist organization, participated in a plot

22  more than what we have in this case.

23         This case is much more like those cases in which the

24  defendants received -- and some of them pled guilty and were

25  capped at 15 years, but that was a government decision as to

1    what they thought the reasonable sentence was, so that's part

2    of the equation, too, in that sense because very few of those

3    people were facing one count and pled guilty to the only count

4    that existed in the indictment.

5           It was an equation reached by the government that --

6    and everybody knowing that the guidelines are going to max out

7    beyond the statutory max, and everybody understanding when

8    someone pleads to a crime like that that they're going to get

9    a 15-year sentence, for the most part, but there are so many

10   of these cases -- and we tried to present as many of them as

11   we could catalogue -- that give a court a range that shows

12   that this is not a one-size-fits-all type of sentencing

13   exercise which I think, in the terrorism context, the

14   government and the presentence report treat it as.

15          The guidelines do that in a way that the courts --

16   the Second Circuit has already moderated in the context of

17   child pornography, which went through a long phase where it

18   was sort of in-for-a-penny-in-for-a-pound, there was no

19   gradation among defendants and conduct for purposes of

20   sentencing, but Dorvee has reversed that trend and now we see

21   a much wider distribution of sentences in that context.

22          I think here the same thing, the terrorism

23   enhancements both lateral and vertical, is so extreme that it

24   takes it out of the realm of ordinary cases and any kind of

25   exercise of discretion within a guidelines range for the

1    court, and what you have are statutes that start at zero.  One

2    goes up to life, but the others don't, but you have such a

3    wide variance in where it can fall and yet the guidelines and

4    the government would like it just to be just one answer.

5         We know from Dorvee, we know from even cases the

6    government cited like Stewart, we know that it's all along the

7    range.  Stewart initially got 28 months and then got ten

8    years.

9         The co-defendant in that case, one codefendant who,

10   was Abdel Rahman's right-hand man, passed messages to a

11   foreign terrorist organization, the context of a 956

12   conspiracy because it was 2339(a), but --

13        THE COURT:  Slow down a little.

14        MR. DRATEL:  Sorry.  According to the court that

15   sentenced, he was fully aware of the context of what he was

16   doing and designed to promote the agenda of a violent

17   organization in Egypt that was dedicated to the overthrow of

18   the Egyptian government through violence and was a part of

19   that organization; he got 24 years.

20        Miss Stewart ultimately got ten years.  The

21   interpreter, who the court found and the jury found was a

22   knowing participant who provided material support to a

23   terrorist organization that was dedicated to violence, that

24   had committed egregious acts of violence against civilians --

25   you know, not at the time that the conduct occurred but

1    shortly before -- he got 20 months, and that sentence was not

2    reversed and the court found that sentence reasonable.

3         So he was looking at 24.  I think that is well

4    beyond -- when you look at the conduct of Sittar in that case

5    it's well beyond the conduct of Mr. Kaziu here.  There is a

6    grown adult mature person doing that.  Here you have a kid in

7    what I would say is a state of prematurity, certainly, and I

8    think that all should have an impact on the court's sentence

9    and should militate for the kind of discretion that 3553(a)

10   provides even if the guidelines do not.

11        Like I say, it's the kind of situation that we've

12   had everything from child pornography to crack sentences, I

13   think that this deserves the same level of scrutiny and the

14   same level of moderation.

15        THE COURT:  All right.

16        MR. DRATEL:  I don't know if you have any questions.

17   I don't want to --

18        THE COURT:  I won't be bashful if I do.  Thank you.

19        You have a right to speak.  Anything you'd like to

20   say before sentence is imposed?

21        THE DEFENDANT:  I wrote a letter.

22        THE COURT:  Would you like me to read it or would

23   you like to say it out loud?

24        THE DEFENDANT:  I'll say it out loud.

25        THE COURT:   All right.

1          THE DEFENDANT:  From here?

2          THE COURT:    You can come up.

3          THE DEFENDANT:  About three pages.

4          THE COURT:  Take your time, take all the time you

5     want.

6          THE DEFENDANT:  Begin?

7          THE COURT:    Go ahead.

8          THE DEFENDANT:  Dear Judge Gleeson, before I get a

9     sentence I want to make a few things clear.  I just want to

10    bring to light that although I had certain beliefs or thoughts

11    I never reached the point of committing any violent act of

12    terrorism.

13         You only know what is apparent in this case but you

14    don't know what was going on in my mind or my intentions

15    before my arrest.  I want to share some things that no one

16    knows about.  Your Honor, you can only know -- you can only

17    judge me based on what you see I guess either in the evidence

18    or what the lawyer and the prosecutors say.  That's why I want

19    you to know before I am judged in this courtroom what are and

20    were my thoughts in the past.

21         I see that since my lawyers weren't able to defend

22    me appropriately, and since Joshua didn't want to point out

23    certain facts of the case today because of the fear of causing

24    your judgment that supposedly you agree with the jury, it

25    might harm me if I go back to what happened or if I tell you

1    I'm innocent it might harm me in the sense that you might give

2    me more time.

3            He told me that -- and I'm just paraphrasing what he

4    said -- quote, we don't want the judge to think that you

5    haven't repented the crimes or charges since he believes

6    you're guilty.

7            While I believe that he's wrong because how I can

8    be -- how can I be sentenced while many facts haven't reached

9    you?  I was never able to express to you my thoughts and

10   feelings.

11           I admit that I have -- excuse me.  I admit that I

12   may have had certain radical thoughts and opinions but I never

13   decided to go and kill or harm anyone in any way.  If you look

14   at where I was going and where my co-defendant ended up going,

15   you will see that there was no plan to kill or harm anyone.

16           I ask you to look at my answers and not my words or

17   the words of the individuals in the videos.  I want to

18   reiterate what would have been my last action.

19           Although I did say I purchased a plane ticket to

20   Pakistan, it was a lie.  Blerim Skoro bought that ticket

21   without me being aware of it.  He spoke to me about fighting

22   jihad, killing American soldiers and committing illegal and

23   violent acts.

24           I made a decision to leave Kosovo that moment and I

25   didn't want any part of it.  I wrote my sister saying that I

1    want to visit my relatives in Macedonia.  That following day I

2    asked a young friend of mine, Suhejb, to tell me how I can go.

3    He directed me to a bus that was close by.  I went and got

4    information that the bus was soon going to leave for Skopje

5    maybe about two days later.

6            No sooner did I go back to receive money for the

7    trip at the bank, my credit card got stuck.  I made some

8    effort to try to get back -- to get it back but days later I

9    was arrested.

10           With that said, I do regret that at one point I

11   allowed myself to be influenced by these videos and

12   individuals and I wish I never went down this path, but I ask

13   you to sentence -- but I ask you to sentence me based on my

14   actions and not my words or opinions that I had -- that I held

15   at that time.  I completely regret what I did in that phase of

16   my life.

17           All I want to do after my imprisonment is to be able

18   to care for my parents in their time of need and to settle

19   down and get married and have family.  This is the path my

20   mother wanted to take and this is what I regret not doing.

21           If given a second chance, I will fulfill my mother's

22   wishes.  And I just wanted to mention also about what he said

23   that I guess I need some time or -- to change, but I think

24   that that's absolutely -- that's incorrect because I'm already

25   changed and almost three years in jail is enough time.

1          THE COURT:   You've changed how?

2          THE DEFENDANT:  I mean, just my view on life.  I

3     realize that life is so precious.  I regret a lot of things I

4     did in the past.  I just want to go back home.

5          THE COURT:   Thank you.

6          Who wants to be heard from the government?

7          MR. ARIAIL:  I'm speaking for the government, your

8     Honor. Obviously we set forth most of our arguments in papers

9     so I won't go over them in too much detail.

10          I will say that I think in this case,

11     notwithstanding some of what the defendant just said here, I

12     think the primary concern on the part of the government is the

13     need to protect society and the public.  That's really what is

14     driving the government's recommendation in this case.

15          We have a defendant who, throughout the course of

16     this conspiracy --

17          THE COURT:  Forgive me for interrupting.

18          Mr. Dratel mentioned the government's recommendation

19     as well.  I didn't see a recommendation.

20          MR. ARIAIL:  We didn't actually make a specific

21     numerical recommendation, your Honor.  We requested that the

22     court sentence the defendant at or near the guidelines of

23     life.  We took into account some of the factors that

24     Mr. Dratel raised.

25          THE COURT:   My understandings is right, you didn't

1    propose a specific number?

2              MR. ARIAIL:  I have not at this point.

3              THE COURT:   Sorry to interrupt.

4              MR. ARIAIL:  Throughout the course of this

5    conspiracy, this defendant had a number of setbacks.  He

6    managed though at each and every time to sort of press forward

7    to the ends of that conspiracy.

8              When his best friend didn't have enough money to buy

9    a ticket to fly to Cairo, he put the money up for him, he

10   bought the ticket and took him with him.  When he got to

11   Cairo, he set up a route to go to Somalia with an al Shabbab

12   facilitator named Ahmed and when that fell through he quickly

13   changed his course and he looked for another person to get him

14   to the fatah.

15             His best friend in Cairo started having second

16   thoughts and instead of telling Mr. Kaziu he hid the facts

17   from him and he sought to go home because he was afraid of how

18   Mr. Kaziu as going to react.

19             Ultimately, though, the defendant found out, and

20   notwithstanding the fact that his best friend abandoned him in

21   Cairo, he continued on; not only did he continue on, but he

22   proposed to Mr. Hadzovic that they go and kill troops in

23   Kosovo, presumably at Camp Bondsteel.

24             His friend left him behind and after he left him he

25   continued to encourage him to return to wage violent jihad and

1    to continue with their criminal enterprise.  Mr. Hadzovic

2    ultimately came home and was approached by law enforcement and

3    agreed to cooperate.

4              After Mr. Hadzovic left, Mr. Kaziu carried on the

5    plot.  He flew to Kosovo, he made a martyrdom video in which

6    he declared he was imminently departing for Jenneh and he was

7    set to fly to Pakistan to go to the fatah, to join with al

8    Qaeda, to fight with the Taliban and to kill American soldiers

9    there.

10             The only thing that stopped Mr. Kaziu was United

11   States and Kosovo law enforcement.  I can't tell you the

12   resources that were expended by the United States government

13   in order to track down this man as he headed off the cliff

14   into the battlefield to go and kill the United States

15   servicemen.

16             There's a row of federal agents and detectives from

17   the New York City Police Department who spent hours, days

18   trying to track him down and they did, and it worked and we

19   stopped him.  But I have to say that it was an extraordinarily

20   successful event and it could have gone either way.

21             I think ultimately, if it hadn't worked, we would

22   have read about Mr. Kaziu in the newspapers in a different way

23   when he blew himself up in front of a base in Kosovo or was

24   killed running a suicide mission in Afghanistan taking down a

25   U.S. soldier.  So that's the history of Mr. Kaziu and the

1    history of this case.

2         Since his arrest, as far as I can tell, up until

3    today he has said nothing in the slightest to express any

4    remorse for his conduct.  During trial his demeanor suggested

5    that he did not care about what was happening.

6         Defense counsel's letter, his submissions here, I

7    think it speaks volumes in light of what Mr. Kaziu has said

8    here this morning, in that what's remarkable about it is that

9    there really is a lack of specifics about how Mr. Kaziu

10   actually feels bad about what he did, about whether he

11   accepted responsibility.

12        There is just nothing in that submission that tells

13   you that he's accepted responsibility for his crimes and,

14   based on the record as it stands, there's no indication that

15   he's anything but a committed jihadist.  So, any sentence that

16   the court considers here I think has to take that into

17   account.

18        We start with a guidelines sentence of life

19   imprisonment.  As I told your Honor, we did not say that the

20   court has to sentence the defendant to life in prison, but it

21   needs to be at or near life imprisonment because the

22   defendant, I submit, based on the record, based on the facts,

23   is still a committed jihadist and we have to protect the

24   public from what he is capable of doing in the future.

25        His demeanor, his lack of responsibility, or his

1   unwillingness to accept responsibility -- here he claimed he

2   was innocent today in spite of all the overwhelming evidence

3   against him, all of that together suggests that the defendant

4   should be incapacitated for an extraordinary period of time so

5   that men and women who are serving in the armed services and

6   our allies don't have to worry about Betim Kaziu going out and

7   trying to kill them again.

8          The defense counsel talks a lot about the parsimony

9   clause, about whether or not the sentence that the court

10  should impose, what kind of a sentence is sufficient but not

11  greater than necessary.

12         I think in this case any sentence that allows for

13  Mr. Kaziu's release while he's still physically capable of

14  attacking U.S. servicemen and women is not sufficient to

15  achieve the requirements under 3553(a).

16         Mr. Kaziu is a danger to the public and unless he is

17  put away for a long period of time I think there's a very high

18  likelihood that we're going to see him again and we're going

19  to see him again when he tries to attack someone, when he

20  tries to kill someone again, when he goes out and fights on

21  behalf of Islam against the United States.

22         THE COURT:  Thank you, Mr. Airial.

23         Anything further from you, Mr. Dratel, or from you,

24  Mr. Kaziu?

25         MR. DRATEL:  Your Honor, what came across my mind

1  hearing the government speak is whenever a judge or attorney

2  is nominated for the Supreme Court or federal judgeship and

3  they go before Congress, and Congress -- and the opposing side

4  presents them, confronts them with something they wrote in

5  college or in law school, invariably the answer is something

6  to the effect of, "Well, I was young then.  I was not as well

7  informed.  I had different a perspective then, but age and

8  experience, both in life and my profession, has given me a

9  different perspective now and that is not what I feel now."

10         And to freeze it in time right now I think is a huge

11  mistake in human terms, in terms of what it means to sentence

12  someone to the kind of term that the government and even the

13  presentence report is asking for.

14         I don't think anybody is going to be in danger from

15  Mr. Kaziu in 30 years, in 25 years, in 20 years, and less, but

16  that is fine tuning it in terms of a specific number below

17  that, but that's -- and the speculation as to sentencing him

18  on the basis of something that is in the government's mind

19  about what he would have done when there is nothing concrete

20  in the evidence about something with a base in Kosovo or

21  something like that, and to sentence him to additional time,

22  significant additional time for that, I think it is

23  inappropriate to make that argument in the sense that that is

24  not a sentencing argument.

25         We sentence people for what they've done and to

1   project into the future in the context of deterrence, both

2   general and specific, and in that context, again, I think that

3   looking at it that way, the term horizon is significantly

4   shorter and I think the court can do that with a level of

5   confidence.

6           THE COURT:   All right.

7           MR. ARIAIL:  Your Honor, if I may just add one more

8   thing?

9           THE COURT:   Yes.

10          MR. ARIAIL:  In terms of my point earlier about

11  sentencing the defendant to a period of incarceration long

12  enough to prevent him from being a threat, I just wanted to

13  note, in the Ressan case in California, the Ninth Circuit made

14  a point when it sent the district court's decision back for

15  remand and resentencing that it thought that allowing a

16  committed jihadist out of jail at 53 was a serious problem in

17  the district court's decision.  I just wanted to point that

18  out as something to think about.

19          MR. DRATEL:  All I can say to that, which I said in

20  my letter yesterday, my reply letter, there is zero evidence

21  empirically, anecdotally or otherwise for that proposition

22  which appears again and again, but it has no basis.  Each case

23  is individual.

24          THE COURT:   Thank you.

25          Anything further from you?

1      THE DEFENDANT:  No.

2      THE COURT:   All right.

3      I want to say a little bit about the process that

4 has brought Mr. Kaziu before me here today.  From the moment

5 you were arrested there was good reason to believe you were

6 ready and willing and able to kill in the name of jihad and,

7 indeed, that you had decided to do just that.

8      There has never been any specter in my view, having

9 presided over the trial so I know a lot more about your case

10 than a judge typically knows in imposing sentence, never been

11 any specter that you're being prosecuted for harboring

12 extremist political beliefs that happen to include an

13 expressed hatred of your own country.

14      You got arrested, in my view, because you decided to

15 kill in furtherance of those beliefs and the evidence, that

16 included your martyrdom video and farewell messages, shows

17 that you came pretty close to doing that.

18      From the moment you were arrested, our criminal

19 justice system, in my view, was put to the test.  By all

20 appearances, including a lot of compelling evidence, you've

21 devoted your young life to the cause of destroying this

22 country and all it stands for.

23      I think how a government -- I don't mean just the

24 executive branch when I say "the government," I mean our

25 entire government, including its courts -- how it handles

1   criminal charges against someone bent on destroying it I think

2   says a lot about the government itself.

3          You were appointed not one but two lawyers right off

4   the bat. Seeing the nature of the charges against you and

5   what was at stake for you -- and I'll confess, your youth had

6   something to do with it -- it occurred to me it was very

7   important to make sure you got the best defense our system

8   could provide. So I added David Stern to the defense team

9   right at the beginning.

10         Some of the best trial lawyers around,

11   Mr. Steinglass and Mr. Stern, asked for and received all the

12   support, financial and otherwise, that a vigorous, excellent,

13   independent defense of the charges required and should get in

14   every case.

15         They were authorized to retain investigators,

16   paralegals, interpreters, a consultant in foreign law, a jury

17   consultant; they asked for permission and funding to travel to

18   Europe and Canada, take sworn testimony from people you were

19   considering calling as defense witnesses, and they got what

20   they asked for.

21         When you complained to me about them on multiple

22   occasions -- I'm sure you remember our meetings in the

23   juryroom -- it was clear to me, and I shared this with you,

24   that at the core of the problem was they were telling you

25   things you didn't want to hear, and I told you patiently,

1  because in my view you had no reason to understand, that good

2  lawyers frequently tell their clients things that the clients

3  would prefer not to hear.  You received disclosure from the

4  prosecutors of an extensive amount of factual material that

5  might assist in your defense.

6          I learned during this case -- this is the first case

7  I have been involved with that involved the Classified

8  Information Procedures Act -- and I learned that the

9  disclosure under that protocol is considerably more generous

10 as a practical matter than disclosure in other non-CIPA

11 criminal cases.

12         As the trial got closer, you wanted to retain

13 another lawyer, Mr. Dratel.  He is in fact another very good

14 lawyer with considerable experience in this type of case.  You

15 couldn't hire Mr. Dratel yourself and as soon as I found that

16 out I appointed him at government expense.  That made three

17 lawyers for your trial, a truly excellent defense team with

18 deep experience in trying cases and in terrorism cases

19 specifically.

20         The jury in your case was admonished over and over

21 again that you were not on trial for your undisputed extremist

22 political and religious views.  I repeatedly told them that

23 they could vote to find you guilty only if the government

24 proved beyond a reasonable doubt the elements of the crimes

25 charged; they couldn't allow your what I'm sure they thought

1   were repugnant political views to be a substitute for proof

2   beyond a reasonable doubt.

3           The punch line is that at considerable public

4   expense, and appropriate public expense, your rights have been

5   scrupulously respected by the same government that you seemed

6   determined to help destroy.

7           Our criminal justice system has plenty of

8   imperfections -- I don't mean to suggests otherwise -- but if

9   this case proves anything, it proves that those imperfections

10  do not include a dilution of the rights of defendants charged

11  with antiAmerican terrorism.

12          The process certainly doesn't end today.  You have

13  an absolute right to appeal both the jury's verdicts of guilty

14  and the sentence I'll impose in a minute.  You'll have first

15  rate representation on appeal; if there were errors in your

16  trial, and those errors were not harmless, you'll get a new

17  trial.  If the Court of Appeals agrees with your lawyers that

18  there was insufficient evidence with respect to any of the

19  charges, those charges will be dismissed.

20          I mention all this because I think it's critically

21  important.  A very important measure of a government is the

22  extent to which it respects the rights of everyone even

23  those -- especially those -- who despise it.

24          I found myself wondering from time to time during

25  this case how you might have been treated if things were

1    reversed, instead of being an American who turned violently

2    against this country, you had turned against the governments

3    and other institutions that you close to align yourself

4    with -- and there is really no dispute about the fact that you

5    did that.

6         You grew up in Brooklyn and decided to murder your

7    own country's soldiers.  You and your coconspirator admired

8    Osama bin Laden, and I wondered when I was sitting up here

9    watching your trial, what if you had grown up over there in

10   the Middle East and you were caught by al Qaeda plotting to

11   kill members of that organization.

12        There was evidence that you admired this leader of

13   the Chechnyan rebels, Emir Katab.  What if you had grown up in

14   Chechnya and Katab's people had caught you plotting to kill

15   some of his rebels?

16        I don't purport to know the answers to these

17   questions, but my instincts tell me that those organizations

18   wouldn't have accorded you any protection at all, let alone

19   the protections the American Government has accorded you

20   before you came to stand there today.

21        I'm a judge more than seventeen years and I can't

22   recall a case in which a defendant's acceptance of

23   responsibility has the potential to affect the sentence as

24   much as it has here in this case.  There's an obvious reason

25   that transcends this case, which is, we place a lot of stock

1    in acceptance of responsibility and genuine remorse -- so it

2    matters in every case -- but here it could also shed useful

3    light on who exactly stands before me.

4            I find, to tell you the truth, I find what unfolded

5    here this afternoon fascinating.  One wonders whether.

6    Mr. Dratel's pitch might have been different had he gone after

7    you.  I'm not going to intrude on what might be

8    attorney-client communications, but it may well be he heard

9    for the first time this, "I wish I hadn't gone down this path.

10   I regret what I did," because, until you spoke, what was

11   painfully clear to everyone who does this on a regular basis,

12   from the submissions was something glaringly missing, and it

13   came up in Mr. Dratel's oral remarks as well.

14           He was talking about your age and your conduct, and

15   he even paused for a minute, and the thing he left out was

16   your expressed remorse, your acceptance of responsibility.

17   There was no hint of it until you spoke.

18           We know for a fact that as a 19-year-old kid who

19   failed miserably in high school you got swept up by jihad --

20   and I don't mean that to be disrespectful, when you get to be

21   your lawyer's age you'll understand what I mean when I say you

22   were a kid -- old enough to know better, old enough to be held

23   accountable, but young enough for me to hope and even expect

24   that long before today you'd be saying something along the

25   lines of, "What have I done?  What was I thinking?  I'm so

1  sorry."

2         In the papers, the government argues that the big

3  difference between you and your coconspirator Hadzovic --

4  Sulo -- the thing that justifies a much longer sentence for

5  you than the sentence that will be eventually imposed upon him

6  is that you were the ringleader of the plan when you left for

7  Cairo.

8         I disagree with that completely -- not with their

9  assessment that you were a ringleader, whatever that means in

10 this setting -- but so what, you both went off to fight jihad.

11 The big difference between you and him is he figured out it

12 was all wrong.  He showed genuine remorse.  He confessed; he

13 apologized; he pulled out, came home; told the truth.  He got

14 on the witness stand.

15        Mr. Dratel is right.  A big part of the sentence is

16 by looking into the future.  I have to consider everything

17 about you, including the need to incapacitate you.  I don't

18 have a crystal ball, it's a very difficult thing to do, and I

19 can't see into the future, but I think it's fairly clear that

20 Sulo no longer poses a threat of terrorist activity.

21        The hardest thing about this case is, what about

22 you?  You know, in the end -- I listened to you -- it's coming

23 so late and you're protesting your innocence, there is still

24 an element of defiance in you.  I don't completely accept as

25 genuine what you said.  I don't think you shared it with

1  anybody until right now.  I'm afraid it's opportunistic.

2          If you walked out the door right now, I have no

3  reason to doubt at all, notwithstanding what you just said,

4  that you'd try to pick up where you left off, maybe succeed

5  this time.  I really don't think that your resolve to commit

6  terrorist acts has been diminished by 29 months in the MCC.

7  It still leaves the question of when will it, will it ever?

8          You present yourself to me today as a young man who

9  committed a deadly serious crime, who remains largely

10  unrepentant.  You still protest your innocence, you have a

11  right to do that, but I have an obligation based on the facts

12  before me to make my own fact finding, my own conclusions on

13  which I'm basing your sentence, and I don't believe you.

14          I think your guilt was proved overwhelmingly,

15  notwithstanding the excellent defense you got.  My unhappy

16  task today is to hold you accountable for the crimes you

17  committed, which in and of itself requires punishment

18  commensurate with the seriousness of those crimes, and crimes

19  don't get a whole lot more serious than the ones you

20  committed.

21          You made matters a little worse because the

22  decisions you've made have placed before me the need to

23  consider protecting the public from further crimes by you, and

24  I intend to do just that.

25          We now have a one-shot sentencing system, sentences

1    get imposed and that's it, no second looks.  It makes it so

2    difficult to sentence.  The system we jettisoned a quarter

3    century ago allowed for parole commissioners to take a look

4    after some time had passed to consider the need for continued

5    incarceration, maybe the worthiness of parole.

6            We don't have that anymore.  The Sentencing Reform

7    Act, which gave us the Sentencing Commission and these

8    guidelines, eliminated that.  The sentence imposed is the

9    sentence served, less only good time.

10           So my great fear in imposing the sentence you

11   deserve is that some day, maybe even some day soon, you'll

12   wake up and you'll genuinely feel the things that you

13   suggested here today; you'll understand how misguided these

14   crimes were.  That's my great fear, because then it's going to

15   be too late, there will be nothing that could be done about

16   your sentence.

17           At bottom, I believe that you're still way too proud

18   of having become a jihadist.  When the day comes that you wake

19   up, then the prison term that you're going to serve will

20   become very, very difficult for you, much more difficult than

21   it will be until that day.

22           Who did I get that letter from, his cousin?

23           MR. DRATEL:  Yes.

24           THE COURT:   A heart breaking letter.

25           I am mindful of the supportive family, they were

1   here during the trial.  It says something good about you.  It

2   breaks my heart that your relatives, some of the younger

3   relatives are beginning to forget who you are.

4          I have considered all of the factors in 3553(a),

5   which pull in different directions, and reconciled them by

6   alighting upon a sentence of 27 years in the custody of the

7   Attorney General.  The 27 years is imposed on counts one and

8   four.

9          Two and three have 15-year maximum; is that right?

10          PROBATION OFFICER:  That's correct, your Honor.

11          THE COURT:  On counts two and three, the term of

12   imprisonment is 15 years.  All of the terms of imprisonment

13   are to run concurrent with one another.  So it's a total of

14   27 years.

15          The term of imprisonment is to be followed by a

16   supervised release term.  Each count gets a supervised release

17   term.

18          The presentence report says the maximum is five

19   years; is that right?

20          PROBATION OFFICER:  We corrected it in the second

21   addendum, your Honor.

22          THE COURT:  All counts?

23          PROBATION OFFICER:  Counts one through three.

24          THE COURT:  The supervised release term is imposed

25   for the rest of your life on counts one through three and for

1    three years on count four.  They run obviously concurrent with

2    one another.

3              Are there special conditions that the Probation

4    Department recommends?

5              PROBATION OFFICER:  Your Honor, we had recommended a

6    search condition based on the nature of the offense and --

7              THE COURT:  That is too far down the road.  I won't

8    do that.  Any others?

9              PROBATION OFFICER:  Not to possess a firearm,

10   ammunition or destructive device.

11             THE COURT:  There is the prohibition on the

12   possession of a firearm, ammunition or a destructive device.

13   A hundred dollars special assessment on each count.  They are

14   aggregated so it's $400 in assessments.  There is no fine.

15             Is there a place you want me to recommend as close

16   as possible to New York?

17             MR. DRATEL:  Yes, your Honor.

18             THE COURT:   Granted.

19             MR. DRATEL:  Thank you.

20             THE COURT:  You have a right to appeal the jury

21   verdicts in your case and you have a right to appeal the

22   sentence I've just imposed.  If you want to do that, you have

23   to file a notice of appeal within ten days in this courthouse

24   or you lose your right to appeal.

25             Mr. Dratel, you'll make sure a notice of appeal is

1  promptly filed?

2          MR. DRATEL:  Yes.

3          THE COURT:  If you can't afford a lawyer to

4  represent you on appeal, one will be appointed for you just as

5  these lawyers were appointed for you.

6          You should file the notice, and I take it you'll

7  represent him on appeal unless something comes up in which

8  case you'll bring it to the attention of the Court of Appeals.

9          MR. DRATEL:  Your Honor, I think that the trial team

10 should be relieved to give him a fresh start with a lawyer.

11 You heard today, we have all ratified decisions that we have

12 made in one form or another regardless of --

13         THE COURT:  Understood.  I don't mean to suggest an

14 antipathy towards your motion to be relieved, but just as a

15 matter of procedure, you file the notice, make the motion to

16 the Court of Appeals and if in your judgment it's appropriate

17 to have separate appellate representation, feel free to convey

18 my view to the Court of Appeals that your judgment ought to be

19 trusted.

20         MR. DRATEL:  Thank you, your Honor.

21         THE COURT:   Anything further?

22         MR. STEINGLASS: If there's nothing further from

23 anybody else, if I might?

24         Mr. Stern and I -- I didn't ask him this question,

25 but I do believe from my discussions with him, he and I would

34

1   ask your Honor to relieve the two of us at this point.

2           What's happened over the last umpteen months is that

3   since the trial --

4           THE COURT:  Denied without prejudice to renewal

5   before the Court of Appeals.

6           MR. DRATEL:  I will make the motion on behalf of

7   everyone.

8           THE COURT:  There is a presumption of continuity.  I

9   think there might be good reasons for that presumption to be

10  rebutted, but address that to the Court of Appeals.

11          Anything further?

12          MR. ARIAIL:  Nothing from the government, your

13  Honor.

14          MR. DRATEL:  No, thank you.

15          THE COURT:  Have a good day.

16              * * * * * * * *

17

18

19

20

21

22

23

24

25