

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:RMP  
F. #2019V01114

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 12, 2024

<u>By ECF</u>

The Honorable Frederic Block  
United States District Court  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

   Re: United States v. Betim Kaziu  
     <u>Criminal Docket No. 09-660 (FB)</u>

Dear Judge Block:

  The government respectfully submits this letter in advance of defendant Betim Kaziu's re-sentencing in the above-captioned case. For the reasons set forth below, the government respectfully requests that the Court impose a sentence of 25 years' imprisonment.

  The procedural history of this case is long and winding, but the essential facts are simple: In July 2011, the defendant was convicted at trial of four counts, the gravamen of which—as described by the trial judge, former U.S. District Judge John Gleeson—was that "the defendant . . . agreed . . . to kill American soldiers and others, including foreign government officials, overseas in pursuit of [his] goal of violent jihad," and that he "took substantial steps toward providing . . . material support" to terrorists. Order of February 29, 2012 (ECF No. 260). For that conduct, Judge Gleeson imposed a sentence of 27 years of imprisonment, comprising concurrent sentences of 27 years on two counts and statutory maximum sentences of 15 years on two others, and reflecting a downward variance from the advisory U.S. Sentencing Guidelines ("U.S.S.G.," or "Guidelines") range of life imprisonment. Sentencing Tr. (ECF No. 266). The Second Circuit affirmed the defendant's conviction and sentence in all respects. <u>United States v. Kaziu</u>, 559 F. App'x 32 (2d Cir. 2014).

  In 2019, the defendant moved pursuant to 28 U.S.C. § 2255 to vacate his conviction on the counts bearing a 27-year sentence pursuant to <u>United States v. Davis</u>, 139 S. Ct. 2319 (2019), and the government agreed that one of those counts should be vacated, but argued that the aggregate sentence should remain unaltered. After long delays caused principally by the COVID-19 pandemic, Your Honor entered an order vacating the one infirm count of

conviction, rebalancing the 3553(a) sentencing factors, and re-sentencing the defendant to 25 years of imprisonment. (ECF No. 310). The defendant appealed from that re-sentencing on procedural and substantive grounds. Addressing only the procedural grounds, the Second Circuit ruled that re-sentencing on written submissions without an in-person proceeding was improper, vacated the sentence and remanded for in-person, de novo re-sentencing. Kaziu v. United States, 108 F.4th 86 (2d Cir. 2024).

As described more fully below, the defendant was convicted of deadly serious crimes for his extraordinarily egregious criminal conduct—which he persists in minimizing—and that conduct warrants commensurately serious punishment. The government respectfully submits that the 25-year sentence that Your Honor previously imposed on re-sentencing reflects a reasonable balancing of the sentencing factors following the vacatur of one infirm count, notwithstanding the procedural error of doing so on written submissions, and the Court should again impose an aggregate sentence of 25 years upon de novo re-sentencing.

I.     Background and Offense Conduct[1]

The defendant was born in Brooklyn in 1988. He lived there all his life until February 2009, when he and his friend and co-conspirator flew from John F. Kennedy International Airport ("JFK Airport") to Cairo, Egypt, determined to join a foreign terrorist organization, wage violent jihad, and kill Americans and American allies abroad. The evidence at trial showed the following:

A.     Kaziu's Radicalization and Travel to Egypt

The defendant's co-conspirator, Cooperating Witness 1 ("CW1"), pleaded guilty to conspiracy to provide material support to terrorists, in violation of 18 U.S.C. § 2339A, and testified at the defendant's trial pursuant to a cooperation agreement. Trial Tr. 341. CW1 testified that he and the defendant were neighbors and childhood friends, Trial Tr. 354–56, and that starting in or about 2007, they both started to become more serious about their religious observance. Trial Tr. 358–59. Specifically, CW1 testified that both he and the defendant began to observe the "five pillars of Islam" and began to attend a specific mosque in Bensonhurst, Queens. Trial Tr. 353, 359–60. CW1 and the defendant began "growing [their] beards and shortening [their] pants and [they] abstain[ed] from sexual activity with women prior to marriage," and stopped "eating pork, [] drinking alcohol and [] clubbing." Trial Tr. 361. They met new people at the mosque and began to discuss religion more often. Trial Tr. 362. Over time, CW1 and the defendant became radicalized. Specifically, CW1 testified that in or about 2008, "after watching videos of the situation of what was happening in Afghanistan and Iraq, with the Muslims being humiliated in places like Abu Ghraib Prison [and] Guantanamo Bay,

---

[1]     The factual background and trial evidence was thoroughly described in the government's prior re-sentencing submission (ECF No. 306) and is reproduced here in substantially similar form for the convenience of the Court.

2

[his] view of America and what it was doing completely changed," as well as his "view of jihad being obligatory upon every Muslim." Trial Tr. 368–69. CW1 testified that the defendant's views changed in concert with his own. Id.

Around that time, CW1 and the defendant had begun watching videos published online by al-Qaeda's media wing As-Sahab, and by the terrorist group al-Shabaab. Trial Tr. 369. CW1 testified that he and the defendant would "watch videos of Osama Bin Laden . . . about how America was lying and killing the Muslims in places like Iraq and Afghanistan," and that they would discuss the idea "that the people should stand up and fight" and that "[al-]Qaeda and [the] Taliban [were] right fighting against the oppressors." Trial Tr. 370–71.

CW1 and the defendant also watched videos of Chechen mujahedeen[2] conducting military training, and one video of the death of a Chechen mujaheed whose "last words [were] 'I bear witness that there is no God but God.'" Trial Tr. 372–73. CW1 testified that the defendant reacted to this video by indicating that he "liked the way in which the mujaheed [had] died," and that they both saw this as "a beautiful death." Trial Tr. 373. They also watched a video lionizing "the leader of the [Chechen] rebels," Amir Khattab, as the "sword of Islam." Trial Tr. 374–75; GX 403B (attached as Exhibit A).[3] CW1 testified that he and the defendant "looked up to [Khattab] because [they] believed that he was fighting the oppressors who were the Russians." Trial Tr. 372. The video displayed various shots of Khattab preparing for or participating in battle, overlaying a photograph of Khattab holding a shoulder-mounted rocket, accompanied by a militant jihadist hymn interspersed with the sounds of gunfire and explosions. See Exhibit A. The video repeatedly encouraged the viewer to "confront the infidels, the inhabitants of the hell fire." Id.

CW1 and the defendant watched a video of a speech given by Abu Abdullah in reaction to the alleged desecration of a Koran by an American soldier. Trial Tr. 383. The speech included references to the implementation of Islamic rule, and CW1 testified that, in 2008, he and the defendant supported such Islamic rule. Trial Tr. 385. During the speech, members of the crowd chanted "bomb, bomb USA" and Abu Abdullah described a future world under Shariah law. Trial Tr. 387; GX 933 (attached as Exhibit B). CW1 explained that, under such implementation of Shariah law, "[men or women] who break[] the sanctity of marriage are to be stoned [and those] who drink[ are] to be flogged. [And, a]s far as the Christians and the Jews, [] they have three choices . . . they have the choice to convert to Islam, [they have the choice to] pay jizyah, which is [a] tax or [they have the choice to] be killed." CW1 explained that if Christians or Jews were willing to pay the jizyah, then they would receive "protection, food and shelter." Trial Tr. 384–85. In the video of the speech, Abu Abdullah advocated implementing

---

[2] "Mujaheed" (plural "mujahedeen") is Arabic for one who engages in jihad.

[3] Videos attached as exhibits will be submitted to the Court and defense counsel under separate cover.

3

Shariah law, but removing the option for the Christians and Jews to pay the jizyah.  See Exhibit B.  CW1 testified that the implementation of Shariah law that Abu Abdullah described and that CW1 and the defendant desired was depicted on a world map that the defendant kept on his computer, which showed that "within the next hundred years the whole world will be under the Islamic Caliphate."  Trial Tr. 390–92; GX 701-O (attached as Exhibit C).

    CW1 and the defendant had conversations in or about 2008 concerning their belief that "the Zionist Jews were basically killing the Palestinian innocents for their own benefits and that these Zionist Jews were dirty people, that they were pigs."  Trial Tr. 400.  They watched videos about Somalia disseminated by the terrorist group al-Shabaab and its leader Abu Mansour.  CW1 testified that al-Shabaab was fighting with "guns and grenades" and that its goal was to overthrow the government and implement Islamic rule in Somalia.  Trial Tr. 401–02.  CW1 and the defendant discussed "how the government of Somalia was oppressing the people of Somalia and that [he and the defendant] thought that going there and fighting jihad was the right thing to do."  Trial Tr. 401.  CW1 and the defendant began to neglect the teachings of senior scholars in Islam and "started accepting people like Osama bin Laden and [the radical clerics] Anwar al-Awlaki and Abu Mansour and Abu Abdullah."  Trial Tr. 405.  They both adopted the teaching that jihad was obligatory for "every single Muslim that was physically able."  Trial Tr. 406.

    In and around October and November 2008, the defendant began discussing the prospect of overseas travel for the purpose of joining a terrorist organization and waging jihad.  Trial Tr. 412.  CW1 testified that the defendant said he wanted to "go fight jihad with al-Qaeda and the Taliban," Trial Tr. 416, and that the defendant spoke with someone about finding an apartment in Pakistan.  Trial Tr. 414.  Specifically, the defendant told CW1 that after going to Pakistan, he would travel to Waziristan—a known Taliban stronghold in the Federally Administered Tribal Areas on the border of Pakistan and Afghanistan—to join the Taliban, and ultimately would travel to Afghanistan to fight American forces there.  Trial Tr. 417.  The defendant asked CW1 to travel with him to Pakistan, but at first CW1 said he did not have money for the trip and could not go with the defendant.  Id.  They continued to talk about it, however.

    In 2008 and 2009, CW1 and the defendant listened to recorded lectures about jihad by Anwar al-Awlaki.[4]  Trial Tr. 392–98.  CW1 testified that these lectures provided advice for waging jihad overseas, and "basically made it simpler for [them] to leave, making it easier for [them] to leave because [they] knew that by leaving [they were] doing a greater cause for the religion and for [them]selves."  Trial Tr. 393–94.  CW1 testified that the lectures pushed him and

---

   [4] Anwar al-Awlaki was a U.S.-born radical Islamic cleric and prominent leader of al-Qaeda in the Arabian Peninsula (AQAP), who, even today, more than a decade after his death in 2011, is still commonly regarded as the leading figure inciting English-speaking Muslims to participate in violent jihad.

4

the defendant to go to Cairo first, but that they wanted to go from there to Afghanistan, Pakistan, Somalia or Iraq "to fight and die in jihad." Trial Tr. 394.

In December 2008 and January 2009, the defendant and CW1 took additional steps to act on their radicalized beliefs. They spoke with a friend who had ties with Egypt and asked him for help finding an apartment in Cairo. Trial Tr. 418–19. They sent money to a contact of their friend to find an apartment for them. Trial Tr. 419. CW1 obtained a new birth certificate and passport. Trial Tr. 419–20. The defendant purchased plane tickets for himself and CW1, as well as a laptop computer. Trial Tr. 420. Then, in February 2009, the two men went to JFK Airport, boarded an international flight, and flew to Cairo, with intent to "make hijrah"[5] and never come back to the United States. Their plans were to study Arabic and wage jihad. Trial Tr. 406, 420–21.

### B. Kaziu's Efforts in Cairo to Prepare for Jihad

The defendant and CW1 chose Cairo as their first stop because it was close to some of the areas where they wanted to fight. Trial Tr. 424. When they arrived in Cairo, they found an apartment in Nasir City and enrolled in the El Fajr Institute to study Arabic. Trial Tr. 424–25. They continued to discuss plans for waging jihad, and when they talked about going to fight in Chechnya, Somalia, Iraq, Afghanistan, Pakistan, and Israel, they attempted to conceal their discussions by removing the batteries and SIM cards from their phones to avoid the possibility of interception. Trial Tr. 427.

The defendant by this time identified as a mujaheed. He used as a social media "avatar" an illustration of a mujaheed in a black turban, combat boots and vest, and camouflage pants, carrying a scimitar and a black flag with the words "To the brothers & sisters who live, love and fight In the Name of Allah." Trial Tr. 478, 636; GX 701-L (attached as Exhibit D). His YouTube account was registered under the username "soldierofjihad." Trial Tr. 644–45. He kept on his computer a flag-like image with a black background and white print depicting the Arabic text of the Shahada,[6] a silhouette of an AK-47, and the English words "Support Our Troops." Trial Tr. 478–80; GX 701-K (attached as Exhibit E). CW1 testified that he understood the "Troops" in this image to be a reference to mujahedeen. Trial Tr. 480. The defendant and CW1 discussed the doctrinal permissibility of suicide attacks generally, and of the September 11 terrorist attacks in particular, and the defendant told CW1 that "because of what America was doing to the Muslims, that under these circumstances, that what happened on September 11th by those people killing themselves was permissible." Trial Tr. 484–85.

---

[5] "Hijrah" is Arabic for "departure" or "migration."

[6] The "Shahada" is an Islamic creed that means "There is no god but God. Muhammad is the messenger of God." It is often displayed on Islamic flags.

The defendant and CW1 met with people in Egypt to facilitate their desire to wage jihad. One such individual was "Ahmed," a Somali who had previously lived in the United Kingdom, and who agreed to help connect them with al-Shabaab and to wage jihad in Somalia. Trial Tr. 431–32. The defendant and CW1 made plans to contact Ahmed's cousin, fly to Kenya, and travel to the border between Kenya and Somalia, where Ahmed's cousin would pick them up and drive them to Mogadishu. Trial Tr. 445. CW1 testified that he and the defendant also discussed the prospect of traveling on a route through Djibouti, Trial Tr. 446, or shaving their beards to look less suspicious and traveling to Kenya as tourists in an effort to reach Somalia. Trial Tr. 448. CW1 testified that it was his clear understanding, at the time he and the defendant were attempting to travel to Somalia to join al-Shabaab, that al-Shabaab sought to overthrow the Somali government and implement Shariah law, using weapons such as AK-47s and RPGs (rocket propelled grenades) to kill Somali troops, and to sabotage government buildings with bombs. Trial Tr. 449. CW1 testified that the defendant told him that he wanted "to fight and die in jihad" in Somalia, and that CW1 himself expected to die in Somalia while fighting there. Trial Tr. 462–63.

The defendant and CW1 also met Armend Kalanderi, who referred them to an associate who would help them get to Pakistan to join al-Qaeda and the Taliban. Trial Tr. 429–30. Their plan in Pakistan was to "go to Waziristan and join up with Taliban and Al Qaeda and when there [to] receive both physical and combat training . . . with guns . . . [and] ultimately from there going to Afghanistan and fighting jihad against . . . U.S. troops and its allies." Trial Tr. 430–31. CW1 testified about a series of meetings that he and the defendant had with Kalanderi during which they discussed ways Kalanderi could help them travel to Pakistan to fight jihad. Trial Tr. 464–72. The defendant told CW1 that he wanted to go to Pakistan, join al-Qaeda and the Taliban, receive training, and fight jihad in Afghanistan against the United States and its allies. Trial Tr. 473. CW1 testified that he and the defendant intended to kill American soldiers and to fight using weapons including AK-47s, M-4s, M-16s, RPGs and grenades, and that they expected that they might be killed by American soldiers. Id. The defendant and CW1 also attempted to find firearms on the black market in Cairo. They sought "assault rifles primarily, like AK-47s," to use in the event that "some type of war, some type of revolution" broke out in Egypt. Trial Tr. 488.

In May 2009, the defendant sent an email to an associate and told him that the Egyptian army was arresting people in the defendant's neighborhood, and he asked the associate to communicate with the defendant's family if he should disappear. In the email, the defendant asked "[Allah] to not test us with more than we can bear," to "keep[] us firm," "forgive our sins," and "to grant us the best of deaths." The defendant asked his associate to "[t]ell [his] parents that when this occurred [he] wasn't afraid, and that Allah, he tests his servants, and tells them to fear

6

Allah because they are not safe from any calamity except by his will," that they would meet again in jannah.[7]  Trial Tr. 841–43; GX 307 (attached as Exhibit F).

Shortly thereafter, President Barack Obama visited Cairo and gave a speech, which the defendant discussed with CW1.  Trial Tr. 490–91, 494.  CW1 testified that it was around the time of the speech that CW1 began to change his mind about going to fight jihad, and after watching the speech he "was hopeful for the relationship between the Islamic world and the U[nited] S[tates]."  Trial Tr. 494.  CW1 told the defendant that he felt this way, and the defendant chastised him and told him not to be fooled by President Obama's speech, which in the defendant's view was "like throwing sand in your eyes, just to blind you from the truth."  Trial Tr. 494.  CW1 decided to return to the United States, but he attempted to hide this intention from the defendant, because he believed the defendant "would get angry."  Trial Tr. 502–03.  Indeed, the defendant eventually found out and confronted CW1, and the defendant said, "why are you going back to the disbelieving lands?  What about our plans to fight [jihad]?"  Trial Tr. 504.  The defendant tried to convince CW1 to go with him to fight in the Balkans against troops stationed there as part of a North Atlantic Treaty Alliance ("NATO") mission. Trial Tr. 504–05.  CW1 left Cairo to visit family in Montenegro, and to continue on to the United States later, but he stayed in contact with the defendant by email.  Trial Tr. 505–06.  The defendant continued to send emails asking CW1 why he was going back to the United States, asking him not to go back, and asking him about their plans to fight jihad.  Trial Tr. 506.

C.  Kaziu's Move to Kosovo

In July 2009, after CW1 had left Egypt and rejected the defendant's requests that he accompany the defendant to the Balkans to wage jihad against NATO forces, the defendant traveled to the Balkans himself and took up residence in a small apartment in Prizren, Kosovo.  That apartment was about an hour by car from a United States military installation known as Camp Bondsteel.  Trial Tr. 288–89.

On August 5, 2009, the defendant wrote in an email to CW1: "It has been authentically narrated from our messenger . . . [t]he best martyrs are those who fight in the first line.  Not turning around until they are killed."  Trial Tr. 837; GX 301 (attached as Exhibit G).  On August 24, 2009, the defendant sent an email with the following poem, signed with the defendant's own name:

> They say he who believes in Allah is a terrorist,
> He who when the call to Jihad is made doesn't snore.
> Sharp is his spear.
> He's ready to strike.

---

[7] "Jannah" is the Islamic paradise in the afterlife.

> For the hur al-ayn he will delight.[8]
> In the green birds his soul will fly.
> In jannah with wine and thrones raised high.
> In front of Allah leaking in blood he will be asked why.
> For you my rubb I wanted to die.[9]
>     Betim Kaziu

Trial Tr. 838; GX 304 (attached as Exhibit H).

      On or about August 25, 2009, the FBI alerted authorities in Kosovo of the possibility that the defendant was engaged in a terrorist plot.  Shortly thereafter, Kosovar law enforcement executed search warrants at the defendant's Prizren apartment and at the home of an associate of the defendant whom the defendant had recently visited.  Among other things, the Kosovar authorities recovered the defendant's computer and digital camera, identification and travel documents, and a firearms catalog.  Trial Tr. 273–80, 285–86, 818–20.  The defendant had recorded several videos, which were recovered from his digital camera.  In one of the videos, an image of the Statue of Liberty is superimposed over the faces of the defendant and a young friend in Kosovo while the two of them use their hands jokingly as airplanes flying into the Statue, and the defendant's friend says "Oh God, oh God, Statue of Liberty down!" as the defendant smiles and laughs.[10]  (Attached as Exhibit I).  In another of the videos—a martyrdom video—the defendant was apparently on the Albanian coast near Kosovo, speaking into the camera, and he referred to departing soon to jannah: "And, [God willing] these my last few moments before I go, [God willing] to jannah [God willing if Allah, for Allah's sake] if Allah wants.  So I didn't choose to come here.  To me, if I just come here for no reason it's a waste of time, but I came with the brothers to chill before I [God willing] before I depart."  GX 701-C (attached as Exhibit J).

      After the defendant was arrested and transferred to FBI custody, he waived his Miranda rights and consented to an interview.  He said that he had moved to Kosovo in July and planned to travel to Macedonia and then to Pakistan on September 15, 2009, and that he had already purchased tickets to Pakistan from a travel agency in Kosovo.  He also admitted to handling a gun while in Kosovo, and he drew a sketch of the gun for his interviewer.  Trial Tr. 315–21.

---

  [8] "Hur al-ayn" in Islamic eschatology are women who will accompany faithful believers in paradise.

  [9] "Rubb" (or "rabb") is Arabic for "lord" or "sustainer."

  [10] The defendant and this friend also recorded other videos, generally of a playful character and not relating to jihad.  In part for that reason, Judge Gleeson found this "Statue of Liberty Down" video to be more prejudicial than probative and it was not admitted as evidence at trial.

### D. Conviction and Original Sentencing

On July 7, 2011, the defendant was convicted at trial on all four counts with which he had been charged: Conspiracy to Commit Murder in a Foreign Country, in violation of 18 U.S.C. § 956 (Count One), Conspiracy to Provide Material Support to Terrorists, in violation of 18 U.S.C. § 2339A (Count Two), Attempt to Provide Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B (Count Three), and Conspiracy to Use a Firearm, in violation of 18 U.S.C. § 924(o) (Count Four). The applicability of the terrorism enhancement under § 3A1.4 of the Sentencing Guidelines was uncontested, see Defendant's Sentencing Mem. at 7–14 (ECF No. 256),[11] and the resulting Guidelines range was life in prison.

At sentencing, the defendant took the opportunity to address Judge Gleeson, and he principally denied culpability on the basis that "although [he] had certain beliefs or thoughts [he] never reached the point of committing any violent act of terrorism." Sentencing Tr. 12. He also blamed his lawyers who, in his view, "weren't able to defend [him] appropriately." Id. Finally, he expressed a wish that he "never went down this path" and said that he "regret[ted] what [he] did in that phase of [his] life." Sentencing Tr. 14.

Judge Gleeson observed that "[f]rom the moment [the defendant was] arrested there was good reason to believe [he was] ready and willing and able to kill in the name of jihad and, indeed, that [he] had decided to do just that." Sentencing Tr. 22. Judge Gleeson noted that the defendant had not been arrested because of his extremist political views or his hatred of his own country, but "because [he] decided to kill in furtherance of those beliefs and the evidence, that included [his] martyrdom video and farewell messages, shows that [he] came pretty close to doing that." Id. With reference to the defendant's statements that day, the judge said that it "was painfully clear to everyone" that "[t]here was no hint of [remorse] until [he] spoke." Sentencing Tr. 27. Judge Gleeson said that he "d[id]n't completely accept as genuine what [the defendant] said," and he was "afraid it's opportunistic." Sentencing Tr. 28–29. Judge Gleeson said:

> If you walked out the door right now, I have no reason to doubt at all, notwithstanding what you just said, that you'd try to pick up where you left off, maybe succeed this time. I really don't think that your resolve to commit terrorist acts has been diminished by 29 months in the MCC. It still leaves the question of when will it, will it ever?
>
> You present yourself to me today as a young man who committed a deadly serious crime, who remains largely unrepentant. You still protest your innocence, you have a right to do that, but I have an obligation based on the facts before me to make my own fact

---

[11] The defendant also conceded the applicability of the terrorism enhancement on appeal. See United States v. Kaziu, 559 F. App'x 32, 39 (2d Cir. 2014).

9

> finding, my own conclusions on which I'm basing your sentence, and I don't believe you.
>
> I think your guilt was proved overwhelmingly, notwithstanding the excellent defense you got. My unhappy task today is to hold you accountable for the crimes you committed, which in and of itself requires punishment commensurate with the seriousness of those crimes, and crimes don't get a whole lot more serious than the ones you committed.
>
> * * *
>
> At bottom, I believe that you're still way too proud of having become a jihadist.

Sentencing Tr. 29–30.

Judge Gleeson considered the 3553(a) factors and, departing downward from the Guidelines, imposed a sentence of 27 years of imprisonment on each of Counts One and Four, and the statutory maximum sentence of 15 years of imprisonment on each of Counts Two and Three, all to run concurrently, to be followed by a life term of supervised release.

### E. First Re-Sentencing and Appeal

In April 2019, the defendant filed a motion (ECF No. 283) pursuant to 28 U.S.C. § 2255 arguing that both of the convictions for which he received concurrent 27-year sentences—that is, his convictions for Conspiracy to Commit Murder in a Foreign Country, in violation of 18 U.S.C. § 956 (Count One), and Conspiracy to Use a Firearm, in violation of 18 U.S.C. § 924(o) (Count Four)—should be vacated. Specifically, he argued that the firearm count should be vacated pursuant to the Supreme Court's decision in United States v. Davis, 139 S. Ct. 2319 (2019), because none of his crimes of conviction qualified as categorical "crimes of violence," and that the logic of Davis and its predecessor cases should be extended to invalidate the conspiracy to commit murder conviction as well. In response (ECF No. 306), the government agreed that the defendant's firearm conviction was no longer valid after Davis, but argued that the defendant's argument as to his § 956 conviction was meritless, because Davis and its predecessor cases (that is, Johnson v. United States, 135 S. Ct. 2551 (2015), and Sessions v. Dimaya, 138 S. Ct. 1204 (2018)) were about statutes with residual clauses that required categorical determinations of whether other offenses constituted "violent felonies" or "crimes of violence." By contrast, § 956 had neither a "crime of violence" element nor a residual clause of any sort, and the Johnson line of cases thus had nothing whatsoever to say about convictions under that statute. The government further argued that because Judge Gleeson imposed concurrent 27-year sentences on the (valid) murder conspiracy count and the (invalid) firearm count, the infirm count did not affect the aggregate sentence and it could simply be stricken without altering the sentence at all.

10

On May 4, 2021, following long delays occasioned by the COVID-19 pandemic, Your Honor issued a 10-page memorandum and order (ECF No. 310) vacating the defendant's conviction on the firearm count, rejecting his erroneous argument concerning the murder conspiracy count, considering his proffered evidence of rehabilitation and rebalancing the 3553(a) sentencing factors accordingly, and re-sentencing the defendant to 25 years of imprisonment followed by lifetime supervision. The defendant appealed.

On July 16, 2024, the Second Circuit issued an opinion declining to address the defendant's substantive arguments on appeal but vacating and remanding on procedural grounds: that is, ruling that following vacatur of a count of conviction on a § 2255 petition, de novo, in-person re-sentencing is required if the re-sentencing judge is not the original sentencing judge and the defendant plausibly alleges changed circumstances (which Your Honor found by modestly reducing the defendant's sentence based on his claims of rehabilitation). See 108 F.4th 86; Order (ECF No. 317).

F. Kaziu's Conduct During Incarceration

In 2013, the defendant earned a GED while in the custody of the Bureau of Prisons. Since then, he has also participated in courses on health and fitness, culinary arts, and Arabic.

The defendant's disciplinary history records three infractions—two of which were previously considered by Your Honor, and one that occurred more recently, while the defendant's re-sentencing was on appeal.

In 2011, the defendant was sanctioned for interfering with a count of inmates, and he lost telephone privileges for three months. In 2012, the defendant was involved in a dispute with another inmate over the alleged theft of the defendant's watch, several other inmates were drawn into the dispute, and it resulted in a multi-person fight. During this fight, the defendant punched the inmate whom he accused of theft, and when that inmate was on the ground, the defendant kicked him in the head. The penalty for this assault was disallowance of 27 days of "good conduct time," forfeiture of 60 days of non-vested good conduct time, 60 days of disciplinary segregation, and eight months of lost telephone and visitation privileges.

In November 2021—just six months after Your Honor credited the long period of time since the defendant's last disciplinary infractions as "significant evidence of rehabilitation" (ECF No. 310 at 9)—the defendant picked up new infractions for refusing to obey an order and assaulting a member of the prison staff. Specifically, the defendant became argumentative over a purchase from the prison commissary, and he was thus ordered to leave the commissary area. He initially complied with that order, but when a staff member attempted to return the defendant's ID card to him outside the commissary area, the defendant became aggressive and verbally confrontational. The staff member then ordered the defendant to turn around against the wall for a pat search, which the defendant refused, and the defendant then assaulted the staff member by grabbing his arms before another staff member came to assist. The staff member whom the

11

defendant assaulted reported not feeling safe around the defendant. The penalty for the defendant's infractions was 22 days in disciplinary segregation and loss of 27 days of good conduct time.

    II.    <u>Applicable Law</u>

The Supreme Court has explained that a "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007) (citation omitted). Although the Guidelines are advisory, they play a critical role in trying to achieve the "basic aim" that Congress sought to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." <u>United States v. Booker</u>, 543 U.S. 220, 252 (2005). The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion. <u>Molina-Martinez v. United States</u>, 136 S. Ct. 1338, 1345–46 (2016) (internal quotation marks omitted); <u>see also</u> <u>United States v. Crosby</u>, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that [<u>Booker</u>] and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").

After calculating the applicable Guidelines range, a sentencing court must consider the statutory sentencing factors provided by 18 U.S.C. § 3553(a). <u>Gall</u>, 552 U.S. at 50. Specifically, 18 U.S.C. § 3553(a) requires that, in imposing a sentence, a court shall consider, <u>inter alia</u>:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct; [and]
> >
> > (C) to protect the public from further crimes of the defendant[.]

18 U.S.C. § 3553(a). The statute also requires the sentencing court to consider the need to provide the defendant educational training, medical care, or other treatment in the most effective manner, the kinds of sentences available, the applicable Guidelines range and policy statements of the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to any victims. <u>Id.</u> The sentencing court, in its consideration of the Section 3553(a) factors, "may not presume that the Guidelines range is reasonable." <u>Gall</u>, 552 U.S. at 50. Rather, the court "must make an individualized assessment based on the facts presented." <u>Id.</u> When weighing those facts, "the court is virtually unfettered with respect to the information it may consider." <u>United States v. Alexander</u>, 860 F.2d 508, 513 (2d Cir. 1988).

Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Accordingly, in sum, the Court should first calculate the applicable Guidelines range, and then consider that range and all relevant facts while applying the Section 3553(a) factors to arrive at an appropriate sentence.

III.  Analysis

Although re-sentencing in this case is de novo, the Guidelines calculation is exactly the same now as it was at the defendant's original sentencing, and the "factual mosaic" related to the remaining counts of conviction has not been altered. United States v. Rigas, 583 F.3d 108, 118 (2d Cir. 2009). As an initial matter, "the starting point and the initial benchmark" of sentencing is necessarily the Guidelines, Gall, 552 U.S. at 49, and the Guidelines call for life in prison. Indeed, as calculated and described below, the defendant's adjusted offense level of 45 is literally off the chart, and would correspond to a Guidelines sentence of life imprisonment regardless of the defendant's criminal history category and the application of Section 3A1.4(b), which places the defendant into the most serious criminal history category. Thus, the 27-year sentence that Judge Gleeson originally imposed and the reduced 25-year sentence that Your Honor imposed before vacatur and remand both already reflect a substantial reduction from the Guidelines. Given the abhorrent nature of the defendant's criminal conduct, his seeming lack of appreciation for the serious nature of that conduct, and the need for commensurate punishment, as well as the need for both specific and general deterrence, the government respectfully submits that a further reduction to a sentence less than 25 years would not be appropriate.

A.  Guidelines Calculation

The correct Guidelines calculation for the defendant's re-sentencing today is the same as the Guidelines calculation that applied at his original sentencing. The defendant's adjusted offense level is predicated on the greater of the adjusted offense levels for each of the charged counts, pursuant to Section 3D1.4 of the Guidelines, and the greater of the adjusted offense levels is the adjusted offense level for Count One, now as before.

Accordingly, as set forth in the PSR, the defendant's total adjusted offense level for Counts One through Three is 45. PSR ¶¶ 25–51. The Guidelines for Count One are calculated as follows:

| | |
|---|---|
| Base Offense Level: (2A1.5) | 33 |
| Plus: Terrorism Enhancement (3A1.4(a)) | +12 |
| Adjusted Offense Level: | 45 |

13

The defendant is not entitled to an adjustment for acceptance of responsibility pursuant to § 3E1.1. Additionally, pursuant to Guidelines § 3A1.4(b), the defendant's criminal history category is VI. Category VI provides for an applicable advisory Guidelines sentence of life imprisonment. Notably, even if the Court were to accept the defendant's argument that the effect of § 3A1.4(b) unfairly overstates the defendant's actual criminal history and declined to apply it, the applicable Guideline sentence for an adjusted offense level of 45 would still be a sentence of life imprisonment, even at criminal history category I.

### B. The Guidelines Appropriately Account for the Defendant's Conduct

The Sentencing Guidelines treat terrorism offenses severely and thus provide an appropriate touchstone from which to begin the 3553(a) analysis. As the Second Circuit has observed, "the Guidelines signal that any crime promoting terrorism is to be viewed as extremely serious." United States v. Stewart, 597 F.3d 514, 521 (2d Cir. 2010). Likewise, "the strong need to deter terrorism is evident from the Guidelines recommendation that a terrorism defendant be accorded a criminal history of VI, the highest level possible, without regard to [a defendant's] actual criminal record." Id.

"Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under §3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." United States v. Meskini, 319 F.3d 88, 92 (2d. Cir. 2003). Indeed, "[c]onsidering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level." Id.

The present case illustrates the need for such serious treatment. The defendant plotted to join terrorists and to kill United States soldiers in Afghanistan or acting as NATO peacekeepers in Kosovo. He plotted to join terrorists to kill Somali government officials in Somalia. The defendant sought to join three of the world's most dangerous organizations, each of which professes to be at war with the United States: al-Qaeda, al-Shabaab and the Taliban. He took substantial steps to carry out those goals. As Judge Gleeson indicated at the defendant's original sentencing, he nearly completed his plans and was stopped only by the substantial efforts of the United States and Kosovo governments. A sentencing Guideline that presumes a sentence of life in prison for this defendant is well within the bounds of reason, and a 25-year sentence (two years less than imposed by Judge Gleeson, which already reflected a substantial downward variance from the Guidelines) appropriately reflects the tremendous seriousness of the offense and the need to impose commensurately serious punishment for such conduct.

### C. The Defendant's Purported Expert Affidavit Is Only Minimally Probative

The defendant previously submitted, in connection with his earlier re-sentencing, a purported expert affidavit by Dr. Yasir Qadhi, an Islamic cleric who had a conversation with the defendant in prison and concluded that the defendant had reformed. The defendant now

14

attaches a somewhat revised and expanded affidavit by Dr. Qadhi, reaching again the same conclusion. Neither the defendant in his submission nor Dr. Qadhi in his new affidavit even attempt to address the issues that that government raised in its prior objections to Dr. Qadhi's opinion, including that several of his opinions and assertions of fact about radicalization are contradicted by qualified expert opinion, as described in the Declaration of Dr. Lorenzo Vidino, which the government attaches again (as to its prior submission) as Exhibit K ("Vidino Aff."). Most critically, Dr. Qadhi's expertise is in matters of Islamic theology, about which he is no doubt qualified to opine, but he is not a forensic psychologist, and he has no special ability to evaluate the sincerity of the defendant's assertions of reform. The government acknowledges that courts have flexibility to consider at sentencing evidence that would not be admissible at trial, and that Your Honor appeared to place some weight in Dr. Qadhi's opinion in the first re-sentencing. Nevertheless, the government respectfully submits that Dr. Qadhi's opinion warrants no more than minimal consideration.

The third paragraph of Dr. Qadhi's affidavit cites a 2011 article about him in The New York Times Magazine,[12] which provides one very powerful reason to doubt the reliability of Dr. Qadhi's ability to identify individuals who pose a risk of extremist violence: Umar Farouk Abdulmutallab, who on Christmas Day 2009 tried to blow up a commercial airliner headed for Detroit using explosives hidden in his underwear, and who "had been a student of Qadhi's at the AlMaghrib Institute." Dr. Vidino points out that "[i]n the aftermath of Abdulmutallab's attack, Dr. Qadhi gave several interviews to the media and in one to CNN he said: 'At some level, we did not convince [Abdulmutallab] of the validity of our views, and that is cause for regret.'" Vidino Aff. ¶ 9. Indeed, CNN reported that "Qadhi says there was no indication Abdul[m]utallab in 2008 was extreme in his views."[13]

The article that Dr. Qadhi cites also notes that, in addition to Abdulmutallab, other "former students of Qadhi's institute include Daniel Maldonado, a New Hampshire convert who was convicted in 2007 of training with an Al Qaeda-linked militia in Somalia; Tarek Mehanna, a 28-year-old pharmacist arrested for conspiring to attack Americans; and two young Virginia men held in Pakistan in 2009 for seeking to train with militants." The article adds that "Qadhi's onetime mentor, Ali al-Timimi," who was an Islamic cleric in Virginia, was convicted and sentenced to life imprisonment for, inter alia, soliciting others to levy war against the United

---

[12] Andrea Elliot, "Why Yasir Qadhi Wants to Talk About Jihad," The New York Times Magazine (March 17, 2011), https://www.nytimes.com/2011/03/20/magazine/mag-20Salafist.html.

[13] CNN, "Terror suspect attended 2008 Islamic 'knowledge fest' in Houston," http://www.cnn.com/2009/US/12/30/terror.suspect.seminar/index.html.

States.[14]  It is thus fairly clear that Dr. Qadhi has had broad exposure to radical ideologies; but the sheer number of his associates and students who went on to be convicted of crimes of terrorism casts grave doubt on his ability to reliably determine whether a person poses a threat of extremist violence.  Even setting aside this dubious track record, Dr. Qadhi offers no reliable methodology for making such an assessment.  His purported expert affidavit is, for all practical purposes, a lay opinion about the defendant's character, similar to letters of support from friends and family, but less informed by time spent with the defendant.

Additionally, as Dr. Vidino lays out in greater detail, several of the premises underlying Dr. Qadhi's reasoning are dubious or incorrect.  First, Dr. Qadhi bases his conclusions on his view that the defendant represents a standard or "stereotypical" example of a young Muslim who was vulnerable to radicalization because of theological ignorance.  As Dr. Vidino notes, however, "one of the very few virtually unanimous findings of an otherwise very divided academic literature on the subject" is that "there is no common profile of radicalized jihadists."  Vidino Aff. ¶ 6.  And indeed, theological education, which the defendant professes now to have, does not provide a sure remedy, since "many jihadists have advocated, perpetrated, or attempted to perpetrate violence despite a high degree of religious and theological education," including "prominent jihadist leaders like Usama Bin Laden" as well as "the tens of thousands of recruits of various terrorist groups who have graduated from radical madrassas (Islamic schools) in places like Pakistan or Somalia."  Id. at ¶ 7.  Such highly educated jihadists also include "Umar Farouk Abdulmutallab, the so-called 'Underwear Bomber,'" who was Dr. Qadhi's own pupil.  Id. at ¶ 9.

In sum, Dr. Qadhi's opinion is of limited usefulness and is not significantly probative of the sincerity of the defendant's purported rehabilitation nor of whether the defendant continues to pose a threat of extremist violence.  It should be given no more than minimal weight.

### D.  Protecting the Public Requires a Significant Sentence

The evidence adduced at trial reflected the defendant's commitment to the global jihadist cause, and Judge Gleeson observed that the defendant's demeanor at trial and at sentencing reflected this commitment.  From the start of his radicalization, the defendant was determined to become a mujaheed, and he overcame obstacles to persist toward this goal.  When his friend and co-conspirator tried to abandon the criminal plot, the defendant did all he could to stop him.  The defendant devised a new plan to kill U.S. peacekeepers in Kosovo.  Just days before his arrest, as he planned a trip to Pakistan to join the Taliban, the defendant composed a poem about his desire to die for the jihadi cause and to stand "[i]n front of Allah leaking in

---

[14] See also James Dao, "Muslim Cleric Found Guilty in the 'Virginia Jihad' Case" (April 27, 2005), The New York Times, https://www.nytimes.com/2005/04/27/us/muslim-cleric-found-guilty-in-the-virginia-jihad-case.html.

16

blood." See Exhibit H. The defendant recorded a martyrdom video of himself declaring that he would soon be in jannah, i.e., paradise. See Exhibit J. Regardless of difficulties, the defendant continued toward his goal to fight and die a martyr. The evidence showed that the defendant was a committed terrorist who believed his actions were justified.

Importantly, even now, although he professes to have reformed his religious beliefs, the defendant still minimizes his conduct and does not accept full responsibility for its seriousness. In his letter to the Court ("Def. Letter"), echoing the letter he submitted prior to his previous re-sentencing and his statements to Judge Gleeson at his original sentencing, the defendant makes vague expressions of regret for "the path that [his] wrong decisions and actions led [him] to," Def. Letter 1, and especially for the harm his incarceration has caused his family—but he fails to grapple with the actual conduct for which he was convicted and its seriousness. Indeed, he says in his letter that "[l]eaving the house and going abroad alone has caused tragedy even to my family." Id. Needless to say, the defendant was not convicted for going abroad; he was convicted for conspiring to murder Americans and their allies. The defendant claims to have been "blinded by a misguided belief and idea," id., but he does not say anything in particular about what that misguided belief was, nor what he set about to do in furtherance of it. As Judge Gleeson said at the original sentencing, the defendant was not arrested or prosecuted because of his beliefs or views; rather, he was arrested and prosecuted "because [he] decided to kill in furtherance of those beliefs[,] and the evidence, that included [his] martyrdom video and farewell messages, shows that [he] came pretty close to doing that." Sentencing Tr. 22. The defendant professes to be a new man today, and while he may have grown in many ways during his incarceration, he still attempts to minimize his culpability and fails to acknowledge with specificity the grave seriousness of his crimes and the danger he posed when he was last at liberty: that is, he fails to grapple with the likelihood that if not for the intervention of the government, he would have consummated his efforts to kill people and get himself killed in his determination to wage jihad and die a martyr.

In sum, although the defendant professes to have moderated his views, his views were not the basis for the criminal charges against him—his conduct was. And even today, the defendant persists in minimizing the seriousness of his conduct, indicating that even if he is truly on the road to rehabilitation, that rehabilitation is far from complete, nor yet reliable. The sentence imposed in this case must protect against the possibility that the defendant will again attempt to inflict or otherwise support the infliction of violence against Americans and their allies. Only a significant sentence would be "sufficient but not greater than necessary" to achieve that goal and to protect the public from the risk that the defendant could return to jihad. 18 U.S.C. § 3553(a).

### E. Deterrence Weighs Heavily in Favor of a Significant Sentence

Deterrence is a key factor in the Court's assessment of the appropriateness of the defendant's sentence. A significant sentence appropriately sends a message to the community at large that the United States does not tolerate such abhorrent criminal conduct. Given the

17

compelling need to deter the continued threat that home-grown terrorists like the defendant pose to the United States and our allies, a significant sentence is needed to send a clear message to any would-be jihadists that such conduct is not tolerated.

### F. The Second Circuit Rejected the Defendant's Arguments Concerning Sentencing Disparity

The defendant raises again the same arguments made at his original sentencing, on re-sentencing, and on both appeals concerning unwarranted sentencing disparity—only now adding (at significant length) comparisons to and discussions of the sentences imposed on participants in the January 6 riots at the Capitol. Those cases are obviously inapposite, and now as before, the defendant "fails meaningfully to compare the facts of those cases to his own." 559 F. App'x at 40 (2d Cir. 2014) (citing United States v. Fernandez, 443 F.3d 19, 32 (2d Cir. 2006), which rejected disparity challenge where there was no showing that defendants were "similarly situated"); see also id. ("Many of the defendants Kaziu asserts received more lenient sentences either pleaded guilty or did receive comparable punishments of more than 20 years in prison for material support of a terrorist organization."); cf. United States v. Coppola, 671 F.3d 220, 254 (2d Cir. 2012) (stating that § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and that assigned weight is "firmly committed to the discretion of the sentencing judge" (internal quotation marks omitted)).

Additionally, the Second Circuit has held that "concern about unwarranted disparities is at a minimum when a sentence is within the Guidelines range," in part because one of the purposes and effects of the Guidelines is to avoid such unwarranted disparities. United States v. Irving, 554 F.3d 64, 76 (2d Cir. 2009). "Thus, where . . . the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." Id. (internal quotation marks removed).

### G. A 25-Year Sentence Reflects the Seriousness of the Offenses, Promotes Respect for the Law, and Provides Just Punishment

There are few more serious offenses in the federal criminal code than conspiring to kill overseas, conspiring to provide material support to terrorists, and attempting to provide material support to a designated foreign terrorist organization. Indeed, in a case with similar counts of conviction, in which a young American who had become radicalized then conspired to provide material support to a foreign terrorist organization (and like the present case, without final consummation of his efforts), the Second Circuit vacated as substantively unreasonable a sentence of 17 years, which was a downward departure from a Guidelines sentence of 85 years. See United States v. Mumuni, 946 F.3d 97 (2d Cir. 2019). The Second Circuit described the sentence of 17 years as "a shockingly low sentence that, if upheld, would damage the administration of justice in our country." Id. at 206.

18

In Mumuni, the district court departed downward from the Guidelines range of 85 years by relying, in part, on the defendant's youth at the time of the offense, his lack of a criminal record, and his lack of disciplinary infractions during his period of incarceration before sentencing. Id. at 111–12. The Second Circuit noted "the uncontroversial proposition that a District Court's major departure from the Guidelines should be supported by a more significant justification than a minor one," id. at 112 (internal quotation marks and brackets omitted), and held that these three factors could not bear the weight assigned to them. Id. In fact, the Second Circuit held that "no substantially mitigating weight can be borne here by the fact that [the defendant] did what was plainly required of him—that is, behaving himself in prison," id. (emphasis added), because such compliance is merely the minimum expectation, rewarded through good time credit, and moreover "has no bearing on the sentencing factors a district court must consider under 18 U.S.C. § 3553(a)." Id. Similarly, the court held that the defendant's "age and lack of prior criminal record cannot bear the mitigating weight [that the district court] assigned to them," id., and that the sentence of 17 years imposed in reliance on these factors "shock[ed] the conscience and cannot be located within a permissible range of decisions." Id. On remand, the district court imposed a sentence of 25 years' imprisonment, the same sentence that the government requests in this case.

A sentence of 25 years' imprisonment for Kaziu—two years less than Judge Gleeson imposed—reflects a substantial downward variance from the Guidelines sentence of life imprisonment. The government respectfully submits that a further downward variance would not reflect the seriousness of the offenses, promote respect for the laws or provide just punishment for the defendant's criminal conduct, and the 25-year sentence that Your Honor previously imposed is reasonable when weighing all of the 3553(a) factors in light of all of the facts of this case.

IV. Conclusion

For the reasons set forth above, the government respectfully submits that a sentence of 25 years' imprisonment is sufficient but not greater than necessary to achieve the statutory goals of sentencing.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/ Robert M. Pollack
Robert M. Pollack
Assistant U.S. Attorney
(718) 254-6232

cc: Clerk of the Court (FB) (by ECF)
All counsel of record (by ECF)