UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

               Plaintiff,

   -against-

BETIM KAZIU,

               Defendant.

**MEMORANDUM AND ORDER**
Case No. 09-CR-660

*Appearances:*
*For the Plaintiff:*
ROBERT MARSHAL POLLACK
United States Attorneys Office
Eastern District of New York
271 Cadman Plaza East,
Brooklyn, NY 11201

*For the Defendant:*
STANLEY LEWIS COHEN
Stanley L. Cohen & Assoc.
79 Blackberry Lake Rd.
Jeffersonville, NY 12748

**BLOCK, Senior District Judge:**

Having conducted the requisite de novo resentencing of defendant Betim

Kaziu ("Kaziu") on remand from the Second Circuit, *Kaziu v. United States*, 108

F.4th 86 (2d Cir. 2024), the Court reduced Kaziu's sentence on Count One to 20

years' imprisonment followed by 20 years of supervised release. This decision

serves as the Court's Statement of Reasons, tracking the sentence reduction granted

and rationale delivered in open court on February 21, 2025.

## I.    Background

Judge John Gleeson in 2012 sentenced Kaziu to 27 years' imprisonment,

followed by lifetime supervision, for Conspiracy to Commit Murder in a Foreign

Country (Count One), Conspiracy to Provide Material Support to Terrorists (Count Two), Attempt to Provide Material Support to a Foreign Terrorist Organization (Count Three), and Conspiracy to Use a Firearm (Count Four). Of primary concern to Judge Gleeson "was that 'the defendant . . . agreed . . . to kill American soldiers and others, including foreign government officials, overseas in pursuit of [his] goal of violent jihad,' and that he 'took substantial steps toward providing . . . material support' to terrorists." U.S. Sentencing Mem. at 1, ECF No. 323 (quoting Order of Feb. 29, 2012, ECF No. 260). The Court recited the background of this case in its May 4, 2021, Memorandum and Order. *See United States v. Kaziu*, No. 1:09-CV-00660, 2021 WL 1751156, at *1 (E.D.N.Y. May 4, 2021), *vacated and remanded*, 108 F.4th 86 (2d Cir. 2024) (the "2021 Decision").

To summarize, Kaziu, then about 21 years old, traveled with his friend and co-defendant, Sulejmah Hadzovic ("Hadzovic"), from their homes in Brooklyn, New York, to Egypt in February 2009, intending to wage jihad in Pakistan, Afghanistan, and Somalia. *See* U.S. Sentencing Mem. at 6, ECF No. 323; *United States v. Kaziu*, 559 F. App'x 32, 36–37 (2d Cir. 2014) (summary order). Hadzovic pled guilty to conspiracy to provide material support to terrorists "and testified at the defendant's trial pursuant to a cooperation agreement." U.S. Sentencing Mem. at 2. He was sentenced to 5 years of probation and 300 hours of community service. *See United States v. Hadzovic*, 1:09-CR-00648 (E.D.N.Y. Apr. 16, 2015),

ECF No. 51. Hadzovic stated in his plea allocution that the two saw waging jihad as only a "possibility." *Kaziu*, 559 F. App'x at 36–37.  In Egypt, around May 2009, Hadzovic "began to change his mind about going to fight jihad" and returned to the United States. U.S. Sentencing Mem. at 6–7. Kaziu then traveled from Egypt to Kosovo in July 2009, planning "to travel to Macedonia and then to Pakistan on September 15, 2009," with tickets he had purchased. *Id*. at 8. Shortly after he arrived in Kosovo, Kosovar law enforcement—acting on a tip from the FBI—searched Kaziu's apartment and arrested him.[1] *Id*. The authorities recovered Kaziu's computer and digital camera with videos he recorded, including a "martyrdom video" where Kaziu "referred to departing soon to Jannah [the Islamic afterlife]." *Id*. Throughout, Kaziu did not cause anyone physical harm. His conduct consisted of radicalizing himself, producing private writings and videos that advocated jihad, traveling to Egypt and Kosovo, and obtaining his ticket to travel to Pakistan.

About five years after the Second Circuit affirmed his sentence, Kaziu brought a habeas corpus petition pursuant to 28 U.S.C. § 2255. *Kaziu*, 2021 WL 1751156 at *1. On May 4, 2021, the Court granted habeas relief based on *United*

---

[1] Kosovar law enforcement found an "AK-47, ammunition, and hand grenades" in the apartment but "[t]he government has conceded [at the original 2021 resentencing] that it cannot prove possession of [these weapons] by a preponderance of evidence." *Kaziu*, 2021 WL 1751156 at *1 n.1. The Government does not mention these weapons in its current submissions. Notably, Kaziu was only convicted of conspiracy to use a firearm, not actual possession or use.

3

*States v. Davis*, decided after Kaziu's original sentencing. *See* 588 U.S. 445 (2019).

*Davis* invalidated 18 U.S.C. § 924(c) as unconstitutionally vague, requiring the

vacatur of Kaziu's conviction as to Count Four, Conspiracy to Use a Firearm.

*Kaziu*, 2021 WL 1751156 at *2. Conducting a de novo resentencing solely "based

on the parties' detailed written submissions," the Court reduced Kaziu's sentence

on Count One from 27 years' imprisonment to 25 years, followed by lifetime

supervision. *Id*. The Court found this reduction warranted by the 18 U.S.C. §

3553(a) sentencing factors, including "significant evidence of [Kaziu's]

rehabilitation" over his then eleven-plus years of imprisonment and the absence of

physical harm. *Id.* at *3.

    The Second Circuit vacated and remanded, holding that the Court should

have conducted an in-person de novo resentencing "because the resentencing judge

[was] not the original sentencing judge and Kaziu present[ed] plausible arguments

of changed circumstances." *See Kaziu*, 108 F.4th at 94. The Court conducted that

de novo resentencing on February 13, 2025, February 19, 2025, and February 21,

2025. It noted that the law required that Kaziu be resentenced not as he stood

before the court at the time of his original sentence in 2012 and his aborted

resentence three years ago, but "in light of the circumstances as they stood at the

time of [his current] resentencing." *Villanueva v. United States*, 893 F.3d 123, 132

(2d Cir. 2018) (cleaned up). This also required the Court to rebalance the § 3553(a)

factors.[2] *See* Kaziu, 108 F.4th at 88 ("*De novo* resentencing requires the district court to reconsider the sentences imposed on each count, as well as the aggregate sentence, formulating anew the appropriate sentence for each unreversed conviction under the individualized assessment required by § 3553(a).")

## II.    Prior infractions

### a.  Adjudicated infractions

Kaziu had received three infractions over his 16 years in prison. In 2011, he was "sanctioned for interfering with a count of inmates, and he lost telephone privileges for three months." U.S. Sentencing Mem. at 11. In 2012, he "was involved in a dispute with another inmate over the alleged theft of [Kaziu's] watch

---

[2] "**(a) Factors to be considered in imposing a sentence.**-- The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

   **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

   **(2)** the need for the sentence imposed--

      **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      **(B)** to afford adequate deterrence to criminal conduct;

      **(C)** to protect the public from further crimes of the defendant; and

      **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

   **(3)** the kinds of sentences available;

   **(4)** the kinds of sentence and the sentencing range established for [applicable offense categories and for violations of probation or supervised release] . . .

   **(5)** any pertinent policy statement . . .

   **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

   **(7)** the need to provide restitution to any victims of the offense."

18 U.S.C. § 3553(a).

. . . [which] resulted in a multi-person fight," for which he spent 60 days in "disciplinary segregation." *Id.* And in November 2021, Kaziu incurred his third infraction when he allegedly "refus[ed] to obey an order and assault[ed] a member of the prison staff . . . by grabbing his arms before another staff member came to assist." *Id.* at 11–12. As punishment, Kaziu spent "22 days in disciplinary segregation" and lost "27 days of good conduct time." *Id.* at 12.

The government argued that this last infraction, six months after the 2021 Decision, marginalized his rehabilitation. But it did not necessarily render nugatory his subsequent rehabilitation. *See* Def.'s Suppl. Mem. at 1 n.1, ECF No. 325. Kaziu disputed the allegations and emphasized that he remained in a low security facility. However, the Court considered all his infractions as part of the § 3553(a) mix. Given that the three infractions, such as they were, occurred over Kaziu's lengthy sixteen years of imprisonment, the Court did not believe that they should necessarily preclude the sentence reduction.

b**.** Alleged infraction

About two months before resentencing, the Government submitted two letters from an unnamed prisoner ("Person-1") who alleged, *inter alia,* that in early 2024, Kaziu attacked another inmate who "remove[d] himself from the Muslim [community at FCI Danbury] to pursue his gay curious side." ECF No. 332 at 2. A prison staff member documented that the alleged assaultee confirmed and

6

corroborated Person-1's account. ECF No. 333 at 1. The contents of these letters led the Court to conduct an evidentiary hearing before resentencing, where Person-1, Kaziu, and Kaziu's sister testified.

The truncated record of this alleged infraction before the Court was plagued by multiple levels of hearsay. None of the letters were written by the alleged assaultee, who did not testify. And Person-1 admitted he did not witness the alleged assault. The only non-hearsay evidence came from Kaziu, who denied the account. He testified that, although he did not attack the alleged assaultee, that person voluntarily left the Muslim community to explore his sexuality. Nonetheless, the Court gave some limited weight to this marginalized evidence in balancing the requisite § 3553(a) factors.

    c.  <u>Person-1's letters and testimony</u>

In his letters, Person-1 also alleged that Kaziu still espoused and adhered to jihadism. In support, Person-1 pointed to Kaziu "reading books that are pro-Islam [and] anti-American." *See* ECF No. 326-1 at 4–6. Person-1 also alleged that Kaziu, "literally foam[ing] at the mouth like a rabid dog," preached at Jum'ah[3] that Muslims cannot love non-Muslims and that "it is every Muslim's duty to join in Jihad (holy war) against Islam's enemies." *See id.*

_____

[3] Jum'ah is the Arabic word for the Friday noon prayer service in Islam.

Person-1's letters and testimony were based on conclusory inferences. His characterization of Kaziu's books misunderstood jihadism and exhibited bias against Muslims. Person-1 testified that Kaziu had books in Arabic and books by Howard Zinn, Oliver Stone, and Noam Chomsky. *See* Feb. 13 Tr. at 47:22–55:8. On cross-examination, he could not identify any instance where these authors espoused jihadism. *See id.* To the contrary, he admitted that they did not preach terrorism, *id.* at 50:6–10, and that "the [Bureau of Prisons ("BOP")] would never let anything explicitly pro-Jihadi in [the prison]," *id.* at 54:15–18.

Person-1 admitted that the portions of Zinn's book he read did not advocate jihadism. The same for the books authored by Stone and Chomsky. The Court concluded, therefore, that Person-1 based his characterizations on Kaziu's possession of Arabic books without knowledge of their contents. Person-1 assumed that these books espoused terrorism because they were in Kaziu's possession. Kaziu's possession of these books similarly caused Person-1 to conflate jihadism with authors who present an "[a]typical avenue that most Americans [do not] follow when it comes to their . . . history lessons in this country," like Zinn, Stone, and Chomsky. *Id.* at 52:6–10.

Significantly, in one of his letters, Person-1 stated that he "need[ed] to get away from these Muslims." Nonetheless, he had, for over a year, attended numerous Muslim prayer services conducted by Kaziu, who had "become the

8

unofficial 'Imam' or prayer-leader for the Muslims in his facility . . . and ha[d] also become an unofficial spokesperson for [them]." ECF No. 321-1 at 4. In the Court's opinion, Person-1's letters and testimony evinced anti-Muslim bias. Moreover, Kaziu's preaching occurred in a public prayer space near prison offices, including that of the prison's non-Muslim chaplain. And prison administrators and guards would periodically, without warning, attend Muslim services and events. Aside from Person-1's uncorroborated letter, there is no evidence that Kaziu's preaching advocated anti-American sentiments.[4]

At the hearing, the Court carefully listened to and assessed the testimony of the three witnesses— Person-1, Kaziu, and his sister. The Court found Person-1's testimony largely not credible. By contrast, the Court found the testimony of Kaziu and his sister to be credible.

### III.    Discussion

There are four basic purposes identified by the Sentencing Commission's Guidelines that the courts are obliged to consider in rendering sentences: "deterring crime, incapacitating the offender, providing just punishment, and *rehabilitating* the offender." *Rita v. United States*, 551 U.S. 338, 348–49 (2007) (emphasis

---

[4] Notably, Person-1 admitted that he knew his attorney "reached out to the government" about "compensation" for his cooperation. Feb. 13 Tr. at 35:19–40:3. This arguably could have provided a motive for his involvement since, under Fed. R. Crim. P. 35(b)(2), the government can move to modify a prisoner's sentence if the prisoner provides "substantial assistance in investigating or prosecuting another person." *See* Fed. R. Crim. P. 35(b)(1).

added). Since rehabilitation is one of the Guideline's prime sentencing factors, the Court first focused on Kaziu's rehabilitation,[5] which obviously also impacted the issues of deterrence and incapacitation. It then added to the mix, in balancing the requisite 18 U.S.C. § 3553(a) factors, Kaziu's age at the time of his misguided and wanton criminal conduct, *see* U.S.S.G. § 5H1.1, and the conditions he was subjected to when housed at the MDC.

a. Rehabilitation

Circuit Court Judge Gerard E. Lynch, concurring, wrote that "if allowed the right of allocution, [Kaziu] might have been able to persuade Judge Block that his rehabilitation was more profound, and entitled to greater weight, than might appear on a paper record." *Kaziu*, 108 F.4th at 111 (Lynch, J., concurring). He was right.

Kaziu had demonstrated continued and successful rehabilitation since the Court's 2021 decision. In his most recent letter to the Court, he wrote that "understanding and an open mind . . . made me see how self-righteous I was and the bigotry that I consumed." ECF No. 321-1 at 32. He expressed remorse for his "misguided belief and idea" and strove to "be better, as a person, a man, and a role-model." *Id.* at 31–32. Evincing critical reflection, Kaziu wrote: "The regions and

---

[5] Notably, the Supreme Court has remarked that, upon a remand for resentencing, the sentencing court "may consider evidence of the defendant's postsentencing rehabilitation and . . . such evidence may, in appropriate cases, support a downward variance[.]" *Pepper v. United States*, 562 U.S. 476, 481 (2011).

places that I had set out to go to have become far worse than they were because of this ideology, and now I see the full consequences that my actions helped perpetuate." *Id.* at 32–33.

Kaziu's words were not idle self-serving articulations. He was awarded a "Certificate of Appreciation" by the MDC for "Exemplary Pro-Social Behavior on September 30, 2024" after he stopped an inmate from self-harm. *Id.* at 36–38. MDC Warden Maldonado also gave Kaziu a "Special Act Acknowledgement" that day, noting that "Kaziu and other [Adults in Custody] immediately intervened by physically restraining the individual attempting to harm himself until staff arrived, potentially saving his life." *Id.* at 38. Commendably, Kaziu also completed electrician apprentice training with the International Brotherhood of Electrical Workers in July 2024 and has secured work with his cousin's electrical contracting company. Def.'s Sentencing Mem. at 9–10; *see* ECF No. 321-1 at 13. Throughout his incarceration, Kaziu earned over a dozen course certificates. Feb. 19 Tr. at 146:9–21.

Most impressive was Dr. Yasir Qadhi's December 2024 report that Kaziu "has clearly found a healthy and now long-term relationship with mainstream interpretations of the faith . . . [and] that he poses no threat to society." Def.'s Sentencing Mem. at 7–8. Dr. Qadhi, "a qualified authority on American *jihadi* conversion," *Kaziu*, 108 F.4th at 93, first assessed Kaziu about five years ago,

Def.'s Sentencing Mem. at 7 n.7. Then, Dr. Qadhi "opined that [Kaziu] clearly seemed to understand that he went through a misdirected phase during his younger years that was not in line with mainstream interpretations of the faith, and now appeared to be a mature person who posed no threat to society." ECF No. 321-1 at 4. Now, Dr. Qadhi described his "current interactions with" Kaziu as "hav[ing] only reinforced this conclusion[.]" *Id.*

The Government acknowledged Kaziu's rehabilitation but argued that it did not warrant a significant sentence reduction. However, Kaziu's rehabilitation, especially post-2021, undercut the original rationale underlying his 2012 sentence. Kaziu's reformed beliefs demonstrated that he no longer presents the same danger to the public as in 2012. *See United States v. Fell*, 531 F.3d 197, 228 (2d Cir. 2008) (stating that "evidence of beliefs or associational activities" may be relevant "to illustrate future dangerousness"); 18 U.S.C. § 3553(a)(2)(C) (requiring district court to consider need "to protect the public from further crimes of the defendant"). The BOP also determined that Kaziu now presented little risk of danger by virtue of his placement at a low security facility, FCI Danbury, during the past four or five years.[6] And upon release, Kaziu will be supported by his

---

[6] Following "pre- and post-trial detentions at MDC and MCC," Kaziu "was imprisoned for almost five years at FCI Allenwood, a medium security prison." U.S. Sentencing Mem. 2020 at 43 n.63, ECF No. 300. He was then transferred "to FCI Estill," another medium security prison, "for more than two years." *Id.* Next, he spent more than two years at "FCI Schuylkill, another medium security facility." *Id.* After that, Kaziu arrived at FCI Danbury, a low security facility.

caring family in Brooklyn, as evidenced by their numerous letters and robust attendance at his resentencing.[7] *See* ECF No. 321-1 at 13–27.

As for incapacitation and deterrence, data showed an extremely low recidivism rate for offenders like Kaziu. He directed the Court's attention to a study conducted in 2019 that "examined recidivism rates of offenders convicted of terrorism-related offenses post-9/11 in the United States." Omi Hodwitz, *The Terrorism Recidivism Study (TRS): Examining Recidivism Rates for Post-9/11 Offenders*, 13 Perspectives on Terrorism, No. 2, Apr. 2019, at 54. The study found that of the 247 individuals convicted of terrorism-related offenses from 2001 to 2018 who were subsequently released, only four had recidivated, yielding a recidivism rate of 1.6%. *See id.* at 59. An updated version of that study found that, of terrorism-related recidivists, only one "return[ed] to extremist activities." Omi Hodwitz, *The Terrorism Recidivism Study (TRS): An Update on Data Collection and Results*, 15 Perspectives on Terrorism, No. 4, Aug. 2021, at 34. The remaining recidivists had "engaged in apolitical activities, including parole violations, minor theft and fraud for personal gain, drugs, and domestic violence." *Id.*

---

[7] Kaziu testified that upon release he plans to live in his sister's apartment with her, his mother, and his niece. Feb. 19 Tr. at 172:22–25. Kaziu also plans to work for his cousin's contracting company, which had offered him a job.

b. <u>Age</u>

Judge Gleeson did not view Kaziu's youth as a mitigating factor even though he was about 21 years old when he decided to commit jihad, and his radicalization began around age 19.[8] As Kaziu testified at the hearing, he was radicalized by the constant drum of Internet mental manipulation that, unfortunately, many young Muslims are still subjected to. But a defendant's youth has become a sentencing focal point.

For example, in *Miller v. Alabama*, the Supreme Court wrote "that a sentencer should have the ability to consider the mitigating qualities of youth . . . because it is a time of immaturity, irresponsibility, impetuousness, and recklessness" at "a moment and condition of life when a person may be most susceptible to influence and to psychological damage." 567 U.S. 460, 476 (2012) (cleaned up). Notably, in writing for the majority in *Roper v. Simmons,* Justice Kennedy poignantly stated, "any parent knows . . . [that a] lack of maturity and an

---

[8] Specifically, Judge Gleeson said: "We know for a fact that as a 19-year-old kid who failed miserably in high school you [Kaziu] got swept up by jihad—and I don't mean that to be disrespectful, when you get to be your lawyer's age you'll understand what I mean when I say you were a kid—old enough to know better, old enough to be held accountable, but young enough for me to hope and even expect that long before today you'd be saying something along the lines of, 'What have I done? What was I thinking? I'm so sorry.'" Original Sentencing Tr. at 27:18–28:1, ECF No. 266

underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the youth." 543 U.S. 551, 569 (2005).[9]

Of even greater significance is a 2024 amendment to the Sentencing Guideline's age policy statement in § 5H1.1. Before 2024, the statement counseled sentencing courts to consider age when "presented to an unusual degree" that distinguished "the case from the typical cases covered by the guidelines." *Amendments to the Sentencing* Guidelines, U.S. Sentencing Commission (Apr. 30, 2024), at 25. Now, after the 2024 amendment, the Guidelines explicitly state that a "downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offense." *See* U.S.S.G. § 5H1.1. The policy statement also acknowledges that "a youthful individual[]" develops "into the[ir] mid-20's." *Id.* This amended statement did not exist at the time of Kaziu's original sentencing.

c. Confinement at MDC

"The harshness of incarceration at MDC is a relevant factor" in resentencing "even though it is 'insufficient on its own' to justify a reduction of the defendant's sentence." *United States v. Martinez-Rojas*, 1:15-CR-00348, 2023 WL 4867433, at *6 (E.D.N.Y. July 31, 2023) (quoting *United States v. Rodriguez*, 492 F. Supp. 3d

---

[9] *See also* Frederic Block, *A Second Chance: A Federal Judge Decides Who Deserves It* 126-27 (2024).

306, 311 (S.D.N.Y. 2020)). The horrible conditions at MDC, which still regrettably exist,[10] amplify the retributive power of a sentence. Kaziu was transferred to MDC in mid-September 2024 to prepare for resentencing. The Court considered that period in balancing the § 3553(a) factors.

d.  Disproportionate sentence compared to similarly situated defendants

Kaziu argued that his original sentence "is disproportionately higher than those imposed on other similarly situated defendants." *See Kaziu*, 559 F. App'x at 40 (rejecting argument on appeal of original sentence because "Kaziu fail[ed] meaningfully to compare the facts of those cases to his own"). Section "3553(a)(6) statutorily obligates a federal sentencing court to consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *United States v. Toohey*, 132 F. App'x 883, 886 (2d Cir. 2005) (summary order) (quoting 18 U.S.C. § 3553(a)(6)). This required the Court to consider sentences "of all similarly situated defendants throughout the country," *United States v. Joyner*, 924 F.2d 454, 460–61 (2d Cir.

_____

[10] *See, e.g.*, Robert Abruzzese, *Judge Sentences Convicted NYer to House Arrest Rather Than 'Barbaric' Brooklyn Prison*, Queens Daily Eagle, Aug. 9, 2024, at 2, https://static1.squarespace.com/static/5b9ffe0f1137a680c2c08250/t/66b611cd4c19a853c5e0ca41/1723208142124/QDE+08092024+digital.pdf (describing MDC as still "plagued by reports of severe understaffing and violence"); Artemis Moshtaghian, *Mansion to Misery: A Glimpse Inside the Prison Sean 'Diddy' Combs Now Calls Home*, CNN (Sept. 19, 2024), https://www.cnn.com/2024/09/19/us/mansion-to-misery-a-glimpse-inside-the-prison-sean-diddy-combs-is-calling-home/index.html (stating that MDC, "[n]otorious for poor living conditions, staffing shortages, inmate violence and power outages," formed "an Urgent Action Team earlier [in 2024] 'to take a holistic look at the challenges at MDC Brooklyn'").

1991), "across judges (or districts)," *United States v. Fernandez*, 443 F.3d 19, 31
n.9 (2d Cir. 2006).

Kaziu cited many cases involving defendants with similar records who
engaged in similar conduct. *See, e.g.*, *United States v. Saidakhmentov*, No. 1:15-
CR-00095-2, 2018 WL 461516 (E.D.N.Y. Jan. 18, 2018) (15-year statutory
maximum for defendant who contacted ISIL operatives and planned to travel to
Syria); *United States v. Juraboev*, No. 1:15-CR-00095-1, 2017 WL 5125523
(E.D.N.Y. Nov. 1, 2017) (same). But these defendants all pled guilty and were thus
improper comparators. *See Kaziu*, 559 F. App'x at 40; *also United States v.
Williams*, 524 F.3d 209, 215 (2d Cir. 2008) (finding improper a district judge's
consideration of plea bargaining policies as a means to avoid sentencing disparities
with respect to defendant convicted at trial). Kaziu also provided a chart detailing
the varying average sentences rendered in international and domestic terrorism
prosecutions but did not cite the underlying cases or mention whether they
involved a guilty plea. *See* ECF No. 321-1 at 29. Nonetheless, the sentences in this
chart for conduct comparable to Kaziu's were drastically lower: around 10 years
for non-violent material support and 11 years for a foiled violent plot. *Id.*

Conversely, the Government pointed to a case where the Second Circuit
reversed a 17-year sentence for a defendant who pled guilty to planning to "travel
to Syria to join ISIS" and "to conduct a domestic terrorist attack against law

enforcement officers." *United States v. Mumuni*, 946 F.3d 97, 101–02 (2d Cir. 2019). But that case was distinguishable from Kaziu's for multiple reasons. *See id.* at 107–08. Primarily, the defendant, acting "in the name of ISIS," stabbed an FBI officer who was executing a search warrant. *Id.* at 103–04, 113.

Kaziu also cited two cases involving defendants convicted for attacking the U.S. Capitol building and disrupting the joint session of Congress on January 6, 2021. He argued that they committed terrorist acts much more egregious than Kaziu's but received lower sentences. The Government responded that these two defendants were not similarly situated. In particular, the Government emphasized that they were not convicted for an intent to kill, that the sentencing court determined that their conduct was not akin to waging war against the United States, and that their underlying offenses were different.

Kaziu first pointed to Stewart Rhodes III, leader and founder of the Oath Keepers,[11] who was found guilty and sentenced to 18 years' imprisonment, followed by 36 months' supervised release, for leading "a conspiracy to use any means necessary, up to and including the use of force, to oppose the lawful transfer

---

[11] "The Oath Keepers group is an anti-government, anti-authority, right-wing extremist organization . . . preoccup[ied] with preparation for a seemingly inevitable direct conflict against the government." Matthew Kriner and Jon Lewis, *The Oath Keepers and Their Role in the January 6 Insurrection*, 14 Combating Terrorism Center at West Point Sentinel 1, 2–3 (2021). "FBI Director Christopher Wray has characterized the January 6 insurrection as domestic terrorism." *Id.* at 1 n.b.

of power from President Trump to President-Elect Biden."[12] *United States v. Rhodes III et al.*, 1:22-CR-00015 (D.D.C. May 5, 2023), ECF No. 565 at 83. Rhodes, having "procured numerous firearms and firearm accessories" to support his goal, "ordered his co-conspirators to join in the attack on the Capitol, both directly and indirectly," resulting in actual harm to people and property. *Id.* at 84– 86. Kaziu, by comparison, did not successfully join a terrorist group, did not cause any physical harm, and did not possess a weapon. Yet he received a longer sentence than Rhodes, who led his terrorist group to conduct a terrorist attack on U.S. soil.[13] It is also of note that the § 3A1.4 terrorism enhancement applied to both Rhodes and Kaziu, although Rhodes' was a § 3A1.4 cmt. n.4(A) ("Note 4") adjustment.[14] *See id.* at 2.

---

[12] A jury found Rhodes guilty of: seditious conspiracy (Count One); obstruction of an official proceeding (Count Three); and tampering with documents or other objects (Counts Seven). *United States v. Rhodes III et al.*, 1:22-CR-00015 (D.D.C. Nov. 29, 2022).

[13] Rhodes' case "is the first time a court has found that a defendant's conduct related to the January 6 attack was tantamount to terrorism warranting an upward departure under the sentencing guidelines." U.S. Dep't of Justice, "Court Sentences Two Oath Keeper Leaders on Seditious Conspiracy and Other Charges Related to U.S. Capitol Breach" (May 25, 2023), https://www.justice.gov/usao-dc/pr/court-sentences-two-oath-keepers-leaders-18-years-prison-seditious-conspiracy-and-other. But "[i]n the absence of a specific federal statute with attached criminal penalties for purely domestic, ideologically motivated acts of violence undertaken with no relationship to foreign terrorist organizations, no individuals charged in relation to their alleged activity at the U.S. Capitol are facing standalone terrorism charges [as of December 2021]." Kriner and Lewis, *Oath Keepers*, *supra* at 1 n.b.

[14] Section 3A1.4 applies an upward departure for terrorism where the offense "involved, or was intended to promote, a federal crime of terrorism," defined by a list enumerated in 18 U.S.C. § 2332b(g)(5). *See* U.S.S.G. § 3A1.4, cmt. n.1. But in cases not involving a § 2332b(g)(5) offense, Note 4 of § 3A1.4 might still enable an upward departure. *See id.* at cmt. n.4. Such departure might be warranted if a defendant's "offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id.* An upward departure under Note 4 cannot exceed "the top of the guideline range that would have

Kaziu then cited the sentence of Enrique Tarrio, chairman of the national Proud Boys organization[15] and "primary organizer" of the January 6 invasion of the Capitol. *United States v. Nordean et al.*, 1:21-CR-00175 (D.D.C. Aug. 17, 2023), ECF No. 855 at 84. Tarrio was found guilty at trial and received 22 years' imprisonment with 3 years of supervised release. *Nordean et al.*, 1:21-CR-00175 (D.D.C. Sept. 5, 2023). Although he monitored the attack from afar, Tarrio had recruited, organized, and led people that "viewed themselves as revolutionaries" overthrowing an oppressive government, necessitating the January 6 attack, which resulted in physical harm and property damage. *Nordean et al.*, 1:21-CR-00175 (D.D.C. Aug. 17, 2023), ECF No. 855 at 6, 84–85.[16] By comparison, Kaziu failed in his plan to join a terrorist group and did not cause any physical harm. Tarrio also

---

resulted" under the base § 3A1.4 adjustment. *Id.* The district court had to apply a Note 4 terrorism enhancement to Rhodes because he held the requisite intent but did not commit an offense enumerated in § 2332b(g)(5)(B). *See Rhodes III*, 1:22-CR-00015 (D.D.C. May 5, 2023), ECF No. 565 at 66–68.

[15] "The Proud Boys is an ultra-nationalist organization . . . Branding itself as 'proud western chauvinists,' the group positions itself in opposition to what it describes as 'white guilt' and 'political correctness,' as well as perceived constraints on Masculinity. According to its own members the Proud Boys' purpose is to defend 'the West' from forces that purportedly seek to erode it." "Actor Profile: The Proud Boys," Armed Conflict Location & Event Data (Jan. 22, 2025), https://acleddata.com/the-proud-boys/.

[16] A jury found Tarrio guilty of: seditious conspiracy (Count One); conspiracy to obstruct an official proceeding (Count Two); obstruction of an official proceeding (Count Three); conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties (Count Four); interference with law enforcement officers during a civil disorder (Count Five); and destruction of federal property (Count Six). *Nordean et al.*, 1:21-CR-00175 (D.D.C. Aug. 17, 2023), ECF No. 855 at 45–46.

received a § 3A1.4 terrorism adjustment on Count Six. *Nordean et al.*, 1:21-CR-00175 (D.D.C. Sept. 6, 2023), ECF No. 891 at 37:5.

To be sure, these two defendants were not interested in waging global jihad. But they did engage in overt terrorist acts—albeit domestic—motivated to disrupt or harm the United States and national security. In contrast to Kaziu, whose efforts fortunately proved ineffective, their conduct resulted in actual physical assaults on law enforcement officers.

While consideration of these two defendants' sentences was not necessary to support the Court's conclusion that the balancing of the § 3553(a) factors warranted the 20-year sentence because of Kaziu's rehabilitation, his age during his radicalization, and his confinement at the MDC, they nonetheless add cogency to the Court's decision.[17] To be clear, however, the Court would, in any event, have imposed the same sentence.

## IV.    Conclusion

The Court acknowledged that "the Guidelines signal that any crime promoting terrorism is to be viewed as extremely serious." *United States v. Stewart*, 597 F.3d 514, 521 (2d Cir. 2020). However, changing circumstances had

---

[17] The Court did not consider the political pardons issued to these defendants because pardons are dehors the strictures of the law.

affected Kaziu's original sentence.[18] Rebalancing the § 3553(a) factors, as the

Court was required to do, the Court reduced Kaziu's sentence on Count One to 20

years, followed by 20 years of supervised release.[19]

**SO ORDERED.**

         _/S/ Frederic Block_____

         FREDERIC BLOCK
         Senior United States District Judge

Brooklyn, New York
February 27, 2025

---

[18] There was enormous anti-Muslim sentiment that followed 9/11. The 9/11 terrorist attacks led some people to appraise "Muslims as enemies [and] terrorists" who "pose a threat to the individual, and to Western society," exacerbated by a "widespread lack of knowledge about Islamic faith." Emily Dubosh et al., *Islamophobia and Law Enforcement in a Post 9/11* World, 3 Islamophobia Stud. J. 138, 139 (2015). Our criminal justice system is not immune from such biases. In the decade following 9/11, the NYPD showed officers a training video titled "The Third Jihad," which "posited that few Muslim leaders can be trusted." *Id.* at 141. A 2011 study of "mid-level police managers in the Midwestern United States" revealed that "only 51.9% rejected the blanket notion that most Muslims are fanatics." *Id.*

[19] Counts Two and Three, each carrying a 15-year sentence, remained untouched and continue to run concurrently with the revised Count 1.